**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| K. MIZRA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO. 6:20-CV-01031-ADA |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>DEFENDANT CISCO SYSTEMS, INC.'S OPENING BRIEF IN SUPPORT OF ITS
MOTION TO EXCLUDE K.MIZRA'S DAMAGES EXPERT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................... 1

III.   LEGAL STANDARDS ................................................................................... 8

IV.    ARGUMENT .................................................................................................. 9

       A.   Mr. Pellegrino used incorrect facts and data to overstate the
            royalty base by hundreds of millions of dollars ....................................... 10

            1.   Mr. Pellegrino used overstated sales data rather than actual U.S. sales to
                 customers who purchased both products at the accused Premier-level
                 licenses ............................................................................................ 11

            2.   Mr. Pellegrino incorrectly included sales of
                 non-accused hardware appliances .................................................. 12

       B.   Mr. Pellegrino's methodology is unreliable............................................. 13

            1.   Mr. Pellegrino failed to apportion .................................................. 14

            2.   Mr. Pellegrino conflated lump sum with running royalty analysis
                 to shoe-horn projected profits beyond trial ..................................... 18

V.     CONCLUSION ............................................................................................. 21

i

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Seating Co. v. USSC Group, Inc.*,
  514 F.3d 1262 (Fed. Cir. 2008)........................................................................................13

*Apple Inc. v. Wi-LAN Inc.*,
  25 F.4th 960 (Fed. Cir. 2022) ....................................................................................10, 14

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)..........................................................................................................10

*Daedalus Blue LLC v. SZ DJI Technology Company, Ltd.*,
  No. W-20-CV-00073, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022)..........................9, 18, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)..................................................................................................8, 9, 10

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
  No.6:11-CV-00201-JRG, 2017 WL 1322555 (E.D. Tex. Apr. 6, 2017) ................................14

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
  909 F.3d 398 (Fed. Cir. 2018)...........................................................................................11

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012)...........................................................................................20

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014).........................................................................................15

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018).........................................................................................14

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970)...................................................................................19

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)..................................................................................... *passim*

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..........................................................................9, 19, 20, 21

*MLC Intellectual Property, LLC v. Micron Technology, Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021) ..................................................................................1, 14, 20

ii

*Omega Patents, LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ...................................................................................14

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013)...................................................................................11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018)...............................................................................12, 14

*Rembrandt Social Media, LP v. Facebook, Inc.*,
    561 F. App'x 909 (Fed. Cir. 2014) .............................................................................15

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)...............................................................................10, 15

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015).....................................................................................9

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)...............................................................................10, 13

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013)...................................................................................16

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)...................................................................................16

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
    778 F.3d 1365 (Fed. Cir. 2015), *vacated on other grounds*, 824 F.3d 1344 .........................13

*Weisgram v. Marly Co.*,
    528 U.S. 440 (2000)....................................................................................................8

*Westinghouse Co. v. Wagner Mfg. Co*,
    225 U.S. 604 (1912)...................................................................................................13

Statutes

35 U.S.C. § 271(f).............................................................................................................11

35 U.S.C. § 284..........................................................................................................9, 11, 21

## I.     INTRODUCTION

Cisco moves to exclude the opinions and proposed testimony of K.Mizra's damages expert, Michael J. Pellegrino. Mr. Pellegrino's opinions are inadmissible because they are based on incorrect information and unreliable methodology. His two main factual errors allowed him to overstate the accused royalty base by hundreds of millions of dollars. He (1) used inflated, incorrect sales data (even though the correct data was available) and (2) improperly included sales of hardware (even though there is no evidence that the accused software feature drives demand for hardware). Mr. Pellegrino also made two fatal methodological errors. He (1) failed to apportion correctly for the value of the patented invention and required presence of Microsoft devices, and (2) presented what is actually a running royalty based on projected accused sales through the patent's expiration in 2029, disguised as a lump sum that he says the parties would have negotiated in 2012 (but not paid until 2020 or 2021). There is no sound basis to pump up a 2012 lump sum based on six years of speculation about post-trial infringing sales that have not happened and may never occur.

Alone, any one of these significant errors warrants exclusion. Together, they leave no room for doubt that Mr. Pellegrino's "ultimate opinion regarding a reasonable royalty" is (at best) "speculative," and thus cannot pass through the gate. *MLC Intellectual Property, LLC v. Micron Technology, Inc.*, 10 F.4th 1358, 1368 (Fed. Cir. 2021) (cleaned up).

## II.     FACTUAL BACKGROUND

1. *The accused combination of Cisco products and computers running Microsoft Windows 10 or 11.* There is no single accused product in this case. K.Mizra's infringement claim requires a specific combination of multiple products configured in specific ways. First, it requires licenses to the highest level ("Premier," formerly called "Apex," level licenses) to two Cisco software products: Identity Services Engine (ISE) and AnyConnect Secure Mobility Client (AnyConnect).

1

Ex. 1 (Cole Dep. Excerpts) at 25:16-20, 26:19-25, 221:17-22; Ex. 2 (Pellegrino Dep. Excerpts) at 43:3-14, 44:7-14, 56:12-18; Ex. 3 (Pellegrino Damages Report Excerpts) at 17, 82. ISE is network-side software; that is, ISE runs on a server or virtual machine and can be used to control access to a network. Ex. 1 at 25:6-15. AnyConnect, in contrast, is virtual private network (VPN) software that runs on users' laptops, computers, or other devices. ISE and AnyConnect need not be purchased or used together. The accused feature, called ISE posture check ("posture check"), requires Premier-level licenses to both products; it is unavailable at licensing levels lower than Premier. Ex. 1 at 221:17-22; Ex. 2 43:3-14, 44:7-14.

Premier licenses to ISE and AnyConnect are not, however, coextensive with the accused "posture check" feature. Rather, for both ISE and AnyConnect, the Premier license level also provides other functionality that is not accused. Ex. 1 at 221:11-16; Ex. 2 at 67:12-68:14; Ex. 4 (Cole Infringement Report Excerpts) ¶ 99; Ex. 5 (AnyConnect Guide) at 8 (listed in Dr. Cole's Report, Ex. C, as materials considered No. 463); Ex. 6 (ISE Guide) at 20, 26, 33-35 (listed in Dr. Cole's Report, Ex. C, as materials considered No. 464). There is no evidence that the accused posture check feature drives purchases of Premier-level licenses to ISE or AnyConnect. Ex. 2 at 106:13-107:23, 109:6-114:7.

Moreover, the infringement claim requires more than just Premier licenses to ISE and AnyConnect. To perform the accused method or possess the allegedly infringing system, someone (presumably a network administrator or other Cisco customer operating a computer network) must also set up ISE and set up or require individual users to set up AnyConnect in specific ways. Ex. 1 at 96:2-20, 97:22-98:9, 204:12-205:9, 171:21-172:5, 172:13-173:15, 187:25-188:24. For example, the products must be configured to use the posture check feature (which relatively few customers use), and the posture check settings must be configured to verify the presence or absence of a

specific software patch or patch level on a computer attempting to access the network. Ex. 1 at 97:4-98:9, 204:12-205:9, 95:16-96:7, 102:16-104:3, 109:12-110:25, 125:3-126:9; Ex. 7 (Excerpts of Appendix C to Cole Infringement Report) at 45 ("Posture defines the state of compliance with the company's security policy") and 24 ("Posture conditions customizable"). In addition, to even arguably possess one of the limitations of every asserted claim (the "trusted platform module" or TPM"), AnyConnect must be installed on laptops or other computing devices running Microsoft Windows 10 or 11 operating systems, which Cisco doesn't sell. Ex. 7 at 31, 32-42; *see* Ex. 1 at 43:17-44:7, 37:5-20.

The accused combination of Cisco products does not include hardware. Ex. 2 at 241:2-4. Cisco sells hardware devices that can (but need not) be used to run ISE at both the accused, Premier license level, and at lower, unaccused license levels. Ex. 3. at 66, 17; Ex. 2 at 235:22-236:3. Nothing about the hardware is accused of satisfying any claim limitation. The footprint of the invention concededly resides in software. Ex. 3 at 23 ███████████████████████ ████████████████████████████████████████████████ There is no evidence that the accused posture check feature drives purchases of this hardware. Nor does Cisco's hardware sales data include any bundled software revenue; Cisco records software revenue separately even when customers purchase hardware with ISE software preinstalled. Ex. 8 (Salters Damages Report Excerpts) ¶¶ 84-85 & n. 161; Ex. 2 at 234:21-239:20 (acknowledging that Mr. Pellegrino he assumed the products were bundled rather than charged separately and that ████ ████████████████████████████████████████████████ ██████████████████.

2. *The accused sales revenue*. Cisco produced U.S. sales data for the accused combination, that is, customers who purchased Premier licenses to both ISE and AnyConnect. Even though

K.Mizra's earliest damages theory begins to run from the filing of the complaint in 2020, in discovery, K.Mizra demanded data going back to the launch of Windows 10 in 2015 (Cisco's fiscal 2016). As Cisco informed K.Mizra, to retrieve data back that far required additional time, because Cisco had to access an older data source. Ex. 9 (3/22/23 Sarah Rahimi email) at 1. Cisco produced the complete data on March 23, 2023, and pointed K.Mizra to the data by Bates number in supplemental interrogatory responses served on March 31, 2023. Ex. 10 (3/23/23 Sarah Rahimi email) at 1; Ex. 11 (Cisco's Second Suppl. Obj. and Resp. to K.Mizra's Interrog. Nos. 8 and 9 (citing CISCO-00000928 and -929). The data shows that from 2020 (the earliest K.Mizra's damages claim begins to run) Cisco's total revenue to date for customers who purchased Premier licenses to both ISE and AnyConnect is ███████ Ex. 8 ¶ 102, Workpaper 7. Starting on November 12, 2021, the earliest possible date due to a license K.Mizra's predecessor granted to ███████ *see* ECF No. 113, the accused revenue is ███████ Ex. 8 ¶ 41, Workpaper 1, Workpaper 1.1. K.Mizra continued its deposition of Cisco's corporate witness, Steven Boyles, after Cisco produced the revenue data, and thus had the opportunity to question Cisco about the complete sales data—but chose not to.[1] Mr. Pellegrino's report cites to this correct revenue data in his materials considered, Ex. 3 at 155; however, he did not use it for his damages calculation.

3. *Mr. Pellegrino's analysis.* Mr. Pellegrino offered a reasonable royalty opinion based on a hypothetical negotiation and application of the Georgia Pacific factors. Ex. 3 at 56. He opined that the negotiation would have occurred between Cisco and the then-owner of the patent (inventor Aaron Emigh, and his company, Radix Holdings) in 2012, but (inexplicably) that payment would have been delayed until damages began to accrue eight or nine years later (in 2020 or 2021). Ex. 3

---

[1] Mr. Boyles sat for a second day of deposition on April 7, 2023. Mr. Pellegrino attended both days of Mr. Boyles' deposition and had the chance to ask counsel to confirm information for him. Ex. 2 at 30:1-23.

at 30, 112-120, Exs. F-H. By asserting that Emigh and Radix Holdings would have waited that long to receive payment, Mr. Pellegrino was able to give an opinion that resulted in ████████ more in damages (based on discounting to present value) than if he had assumed Cisco made the payment in 2012. Ex. 8 ¶¶ 115-116, n. 229, Workpaper 11 (based on 2020 system claim calculation).

Mr. Pellegrino also ignored Cisco's actual U.S. sales data for Premier license purchases of ISE and AnyConnect. By using the wrong data—even though the correct data was available—Mr. Pellegrino overstated the damages base by hundreds of millions of dollars. He disregarded Cisco's actual revenue data and instead "estimated" accused revenue using a data file he called the -956 workbook. Ex. 3 at 41; Ex. 2 at 37:13-15. Mr. Pellegrino concedes that document reflects worldwide sales of ISE and AnyConnect at all license levels, not just U.S. customers who acquired the Premier licenses to both products that are required to possess the accused functionality. Ex. 2 at 94:13-18, 97:9-13. Cisco produced that data to show cost data for the accused ISE and AnyConnect products, not to show the accused revenue. Ex. 12 (Boyles Dep. Excerpts) at 220:25-224:9. It contains no transaction-level information and is too high-level to be a reliable source of accused revenue. Ex. 12 at 220:25-224:9.

To be sure, Mr. Pellegrino made certain reductions that he said were intended to eliminate non-U.S. and non-Premier-license-level sales. Ex. 2 at 94:13-18; Ex. 3 at 47, Exs. F-H. But he did not even try to make an adjustment to limit his royalty base to only customers who had purchased the accused combination, meaning Premier licenses to *both* ISE and AnyConnect. Ex. 3 at 82. And the reductions he made did not come close to accomplishing his stated goal. By starting from the incorrect worldwide data, rather than using Cisco's data showing actual accused U.S. sales to customers of the accused Premier licenses, Mr. Pellegrino overstated the accused revenue for the

November 2021 through August 2023 time period 

██████ Ex. 3 at Exs. G and H. The overstatement is even worse for Mr. Pellegrino's longer time

period, which starts with the filing of the complaint in November 2020 ███████████

██████████████████████████████ *Id.* He also made no effort to limit his analysis

to the incremental revenue Cisco charges for Premier-level licenses to ISE and AnyConnect, and

thus necessarily included revenue for the unaccused license levels of ISE and AnyConnect.

Mr. Pellegrino also overstated the accused revenue in a second way: he included in his

royalty base ████████████ in "ISE Hardware" sales. Ex. 3 at Ex. A1. He did this even

though the hardware is not accused and ISE software can be run on a wide variety of hardware,

including hardware that Cisco does not sell. Ex. 3 at 66, 17; Ex. 2 at 235:22-236:3. He included

Cisco's "ISE Hardware" sales on the basis of an alleged but unspecified "functional relationship"

between the hardware and software. Ex. 3 at 15. But the data he used included hardware sales to

customers who may have purchased unaccused versions of ISE software and may not have

purchased AnyConnect licenses at all. Ex. 2 at 285:17-287:15. He included the hardware revenue

even though there is no evidence to suggest that the claimed invention or accused posture check

functionality form the basis for any demand for this hardware.

Next, Mr. Pellegrino purported to apportion, but in actuality failed to apportion, for the

value of the invention. This is true in two respects. First, for his technical apportionment, Mr.

Pellegrino relied on K.Mizra's infringement expert, Dr. Cole. This led him to apply a technical

apportionment factor of ██████████████████. Ex. 3 at 82-83, Exs. F-H. Mr.

Pellegrino applied these percentages to his entire revenue estimate for ISE and AnyConnect, not

to the additional incremental portion attributable to the purchase of the accused Premier licenses.

*Id.* But there is no sound basis to conclude that the accused posture check feature accounts for ██

of all ISE and over half of all AnyConnect sales revenue Ex. 13 (Clark Noninfringement Report Excerpts) ¶¶ 140-141. ████████████████████████████████████████

████████████ Ex. 14 (CISCO-00000948). And Mr. Cole acknowledged that the main reason customers buy AnyConnect at the lower licensing levels is for its VPN capability, which has nothing to do with the asserted patent. Ex. 1 at 127:16-128:12. Even the Premier license levels for both products include additional features besides posture checking that are not accused. Ex. 3 at 18; Ex. 2 at 119:13-120:3; Ex. 4 ¶ 99; Ex. 5 at 8; Ex. 6 at 20, 26, 33-35. Yet the only evidence Mr. Pellegrino could point to for the invention supposedly driving demand is based on the demand for Premier licenses, which could have been based upon non-accused features. Ex. 2 at 106:13-107:23, 109:6-114:7.

Second, with respect to apportionment, Mr. Pellegrino applied a Microsoft apportionment factor to his analysis of damages based on infringement of method claims. Ex. 3 at 122-125. He did not apply this reduction for the system claims even though all claims require a TPM to infringe, and the only proof K.Mizra has tried to muster for the presence of a TPM relies on the presence of endpoint devices (such as laptops or tablets trying to access a protected network) running Windows 10 or 11. Ex. 3 at 122-123; Ex. 2 at 134:9-13. As Cisco has addressed separately, K.Mizra has a fundamental failure of proof with respect to whether anyone has ever installed Premier-level AnyConnect on Windows 10 or 11 devices in a system where the network is protected by Premier-level ISE and configured the software to possess all of the settings required for infringement. ECF No. 119 at 4, 8-11. But at minimum, because all claims require a TPM, Mr. Pellegrino should have applied his Microsoft apportionment factor to all claims.

Finally, Mr. Pellegrino's supposed "lump sum" is really a running royalty that impermissibly extends long past trial. Tellingly, and despite acknowledging that Cisco's preferred

licensing structure would be a lump sum, Ex. 3 at 60, he dismissed the relevance of the existing licenses involving the asserted patent ███████████████████ including the only two resulting from other litigation in which it was asserted, Ex. 3 at 58-59. Those assertions resulted in modest settlements ███████████████ Ex. 3 at 58. In his report, Mr. Pellegrino also completely ignored that Radix Holdings sold all rights to the application that issued as the asserted patent ████████████████████████████ *See* Ex. 2 at 154:10-18. Instead of this evidence, which is highly relevant to lump sum damages under *Georgia Pacific*, he projected Cisco's accused revenues beyond trial, through the date of the expiration of the accused patent on November 25, 2029. Ex. 3 at 112-120, Exs. F-H; Ex. 2 at 124:6-125:18. His calculations relied primarily on documents and information that concededly would have been unavailable to the parties at the hypothetical negotiation. Ex. 2. at 156:9-157:22.

Had he limited the damages period to the date of trial rather than projecting for six additional years, his damages calculations would be reduced ████████████████████ ████████████████████████ Ex. 8 ¶ 114. Instead, without interest, his opinions range from ████████████████████████████████ ████████████████████████████████ ███████████████████ Ex. 3 at 2. These numbers don't pass the red face test given that the actual accused revenue before apportionment is ████████████████████ ████████████ Ex. 8 at ¶ 102, Workpaper 7.

## III.   LEGAL STANDARDS

"Since *Daubert* . . . parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet." *Weisgram v. Marly Co.*, 528 U.S. 440, 455-56

(2000). The proponent must establish[2] that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) (explaining that Rule 702 requires district courts to ensure that all expert evidence is "based on reliable principles and . . . sufficiently tied to the facts of the case."). As gatekeeper, this Court "ensure[s] that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993).

## IV.    ARGUMENT

Under Section 284, damages in a patent case may take the form of "a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. One way to assess such damages is the "hypothetical negotiation" approach, which seeks to determine "the value of the patented technology to the parties in the marketplace when infringement began." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

K.Mizra's attempt to proffer a reasonable royalty damages theory through Mr. Pellegrino fails the *Daubert* threshold. Mr. Pellegrino divorced his analysis from the invention at every turn. His factual and methodological errors "inflate[d] the reasonable royalty analysis." *LaserDynamics, Inc.*, 694 F.3d at 76, 79. His opinions are inadmissible because "[a]ny evidence unrelated to the

---

[2] *Daedalus Blue LLC v. SZ DJI Technology Company, Ltd.*, No. W-20-CV-00073, 2022 WL 831619, at 3 (W.D. Tex. Feb. 24, 2022) ("The burden of establishing the admissibility and relevance of the expert testimony is on the party offering the testimony." (citing *Pax v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

> **A.** **Mr. Pellegrino used incorrect facts and data to overstate the royalty base by hundreds of millions of dollars.**

Expert opinions must be grounded in fact or they "fail[] to pass muster under *Daubert*." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Even reasonable, valid methodology "is nonetheless unreliable where the data used is not sufficiently tied to the facts of the case." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (quoting *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)).

Mr. Pellegrino's analysis is unmoored to the facts of this case in two critical respects. First, he dramatically overestimated Cisco's accused sales revenue by relying on the wrong data, and then making speculations based on such data—even though the actual (and far more modest) data was available. Second, he further inflated the revenue base by hundreds of millions of dollars more by including sales of hardware—even though hardware is not accused, the footprint of the invention resides in software, there is no evidence that the patented feature drove hardware sales, and the hardware data he included was not limited to customers who also purchased ISE and AnyConnect software at the Premier license levels required for alleged infringement. The mismatch between reality and the facts and data Mr. Pellegrino used warrants exclusion. *See, e.g.*, *LaserDynamics*, 694 F.3d at 79-81 (Fed. Cir. 2012) (ordering retrial and, on remand, precluding a damages expert from presenting a theory that "finds no support in the facts in the record"); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[W]hen indisputable record facts contradict or otherwise render the [expert's] opinion unreasonable, it cannot support a jury's verdict.").

      **1.**      **Mr. Pellegrino used overstated sales data rather than actual U.S. sales to customers who purchased both products at the accused Premier-level licenses.**

Section 284 authorizes reasonable royalty damages only for activities that constitute infringement. 35 U.S.C. § 284. The royalty base thus cannot include foreign sales or domestic sales of non-accused products.[3] "It is improper to award a reasonable royalty damages for the defendant's sale of the prohibited non-infringing products, because acts that do not constitute patent infringement cannot provide a proper basis for recovery of damages under Section 284." *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 411-12 (Fed. Cir. 2018) (cleaned up) (quoting *Gjerlov v. Schuyler Labs.*, Inc. 131, F.3d 1016, 1024 (Fed. Cir. 1997)).

In *Enplas*, the Federal Circuit vacated a damages award where the jury had adopted an expert's legally erroneous damages theory that was based, in part, on non-infringing sales of non-accused products. *Id.* at 409-12. That is precisely what Mr. Pellegrino has done by using the wrong data to calculate his royalty base instead of the U.S. sales data for customers who actually purchased the accused combination of products—ISE and AnyConnect software at the accused Premier license level. The *only* accused sales are to customers who purchased both ISE and AnyConnect at the Premier license level in the U.S. Cisco produced exactly that data: the real revenue for the relevant accused sales. And Cisco offered its corporate witness for a second day of deposition so that Mr. Pellegrino and K.Mizra could ask any questions they had about that data.

Instead of using the correct revenue, Mr. Pellegrino started with incorrect worldwide data for all ISE and AnyConnect sales, inclusive of all license levels—including the lower license levels

---

[3] K.Mizra is an NPE, and Mr. Pellegrino has not asserted lost profits. Ex. 2 at 74:1-76:15, 167:10-169:25. There is also no assertion of infringement under 35 U.S.C. § 271(f). Accordingly, and as all experts agree in principle, K.Mizra is not entitled to compensation for foreign sales, "which is not infringement at all." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013).

which are not accused. Although he purported to make adjustments to limit to U.S. sales at the Premier license level, his adjustments did not come close to being accurate. Instead, Mr. Pellegrino overstated the accused revenue compared to the correct data, to the tune of ██████████ ██████ This fundamental error warrants exclusion. It risks significant prejudice to Cisco, because a damages range ████████████████████████████████ ████████████████████████████████████ ████████████████████████████ *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (quoting *Laser Dynamics, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012).

**2.    Mr. Pellegrino incorrectly included sales of non-accused hardware appliances.**

K.Mizra accuses only the posture check feature of Premier-level ISE and AnyConnect software (when configured a certain way and deployed with Windows 10/11 devices). *See, e.g.*, Ex. 1 at 25:16-20, 26:19-25, 27:14-28:19. Cisco hardware is not accused of satisfying any claim limitation. Although Cisco sells hardware appliances that customers can purchase to run ISE software, they may use it to run ISE at non-accused license levels. They may also run ISE on this hardware without any version, let alone the accused version, of AnyConnect. Nevertheless and without explanation, Mr. Pellegrino included sales of Cisco's ISE hardware appliances in his royalty base. He did so while recognizing that the footprint of the invention is concededly software, not hardware. Ex. 3 at 23. It was thus wrong to include *any* hardware sales in the royalty base unless Mr. Pellegrino had a basis to treat them as convoyed sales. As explained next, he did not.

There is no evidence whatsoever that the accused posture check feature drives any sales, let alone sales of ISE hardware appliances. Nor did Mr. Pellegrino identify any functional relationship with the patented component; rather, it is undisputed that Cisco offers the hardware

12

appliance to customers of ISE at license levels lower than Premier, and to ISE Premier-level customers who do not purchase or use AnyConnect, neither of which possess the accused functionality. As a result, hardware sales cannot properly be included in the royalty base on a convoyed sales basis. *Westinghouse Co. v. Wagner Mfg. Co*, 225 U.S. 604, 615 (1912) (recovery for convoyed sales requires patentee to prove that patented feature is the basis for customer demand for the unpatented parts to which it seeks to extend its damages). In fact, given the lack of any functional relationship between the hardware and the invention, there is no basis to include even those hardware sales to customers who also purchased ISE and AnyConnect Premier-level software licenses. *American Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) ("Our precedent has not extended liability to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage.") (quoting *Rite-Hite Corp. v. Kelley Co. Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1998)); *see also Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, (Fed. Cir. 2015), *vacated on other grounds*, 824 F.3d 1344, 1377 ("If the convoyed sale has a use independent of the patented device, that suggests a non-functional relationship.") (citing, *e.g.*, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1333 (Fed. Cir. 2009)). Even if Mr. Pellegrino had limited the revenue to customers who also purchased ISE and AnyConnect software at the accused Premier license level, including hardware sales would be indefensible.

### B.      Mr. Pellegrino's methodology is unreliable.

In addition to reliable data, an expert's opinion about patent damages must be based on sound economic principles. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). Even "ideal input data cannot save a methodology that is plagued by logical deficiencies or is otherwise unreasonable." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (quoting

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)). Here, Mr. Pellegrino took the demonstrably unreliable data discussed above and compounded his errors by calculating damages using unreliable principles and methods.

### 1.    Mr. Pellegrino failed to apportion.

"Even when a damages theory relies on the smallest salable unit as the basis for calculating the royalty," which Mr. Pellegrino's theory did not, "the patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." *Power Integrations, Inc.*, 904 F.3d at 997 (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). "We have repeatedly held that when the accused technology does not make up the whole of the accused product, apportionment is required." *MLC Intellectual Property, LLC*, 10 F.4th at 1373 (citing, e.g., *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018)); *see also, e.g., Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021) (remanding for new trial where damages expert failed to apportion). "This is so even where the proposed royalty base is the smallest saleable patent practicing unit or SSPPU." *Id.* (citing *VirnetX, Inc.*, 767 F.3d at 1329); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309-1311 (Fed. Cir. 2018) ("[I]f the smallest salable unit—or smallest identifiable technical component—contains non-infringing features, additional apportionment is still required.").

Courts routinely strike damages experts who fail to apportion. *See, e.g., MLC Intellectual Property, LLC*, 10 F.4th at 1373 (affirming district court's exclusion of reasonable royalty damages opinion for failure to apportion the royalty base or rate to account for the patented technology); *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No.6:11-CV-00201-JRG, 2017 WL 1322555, at *4-5 (E.D. Tex. Apr. 6, 2017) (excluding expert opinion because there was "no evidence" that the patentee's expert "separate[d] the value of the patented features from the

unpatented features of" the agreed-upon SSPPU). That is so with good reason: to be admissible, the opinion of a damages expert must "carefully tie proof of damages to the claimed invention's footprint in the market place." *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). Where, as here, "a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226-1227 (Fed. Cir. 2014); *see also Rembrandt Social Media, LP v. Facebook, Inc.*, 561 F. App'x 909, 912 (Fed. Cir. 2014) (nonprecedential) (noting that too high a royalty base, even if mathematically offset by a low enough rate, "carries a considerable risk of misleading a jury into overcompensating by skewing the damages horizon for the jury" (cleaned up)).

Mr. Pellegrino should have apportioned his base down, both to isolate the value of the accused "posture check" feature within the Premier-level ISE and AnyConnect licenses, and to fully account for the requirement to deploy these Cisco software products on endpoints running Microsoft Windows 10 or 11. He was required to apportion damages to "the value attributable to the infringing features of the product, and no more." *Ericsson*, 773 F.3d at 1226. Instead, Mr. Pellegrino failed to apportion for the value of the "posture check" feature within Cisco's Premier licenses. And he only partially applied Microsoft apportionment (for the method claims) even though a TPM associated with a trusted computing base, and thus the Microsoft Windows 10 or 11 devices, are required by all asserted claims.

To purport to account for the value of the patented invention, Mr. Pellegrino applied a ███ ████████████████████████████████████████████████████████████████ ███████████████████████████ The revenue amounts he used were overstated for the reasons

described above. *Supra* at 5-6, 10-13. But even had he used the correct revenue base, these percentages are untethered to the value of the accused posture check feature. Posture check is just one of multiple functionalities to which customers gain access by purchasing Premier-level licenses (and one among a vast set of functionalities within ISE and AnyConnect as a whole). Ex. 3 at 18; Ex. 2 at 119:13-120:3; Ex. 4 ¶ 99; Ex. 5 at 8; Ex. 6 at 20, 26, 33-35.

Moreover, Mr. Pellegrino cited no evidence that the posture check itself drove any demand for, or contributed to the value of, ISE or AnyConnect as a whole, or their Premier-level licenses. (He purported to show demand for Premier licenses, which is circular and unhelpful given that those licenses indisputably include additional unaccused features. Again, as explained above, when the accused feature is only a subset of the smallest saleable patent-practicing unit, further apportionment is required. *VirnetX, Inc.*, 767 F.3d at 1329.) These errors are fatal because Mr. Pellegrino did not adequately tie the royalty base to the patented feature that "creates the basis for customer demand or substantially creates the value of the component parts." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013). Rather, to arrive at his overstated percentages, he relied solely upon K.Mizra's technical infringement expert, Dr. Cole. Dr. Cole's apportionment opinions are, in turn, demonstrably unreliable.

For his part, Dr. Cole, like Mr. Pellegrino, failed to apportion in a defensible manner. Dr. Cole apportioned over the entire product value (for both products) and failed to come close to identifying the value of the accused feature. *LaserDynamics*, 694 F.3d at 67. He acknowledged that customers purchase lower-level AnyConnect licenses primarily for VPN capability, yet failed to deduct the price of those licenses from the revenue base. Ex. 1 at 128:8-12. Dr. Cole also ignored

████████████████████████████████████████████████

████████████████████████████████████████████████

Ex. 14; Ex. 1 at 166:10-168:10. And Dr. Cole did not attempt to apportion among features within each Premier license, even though there are many besides the posture check, Ex. 3 at 18; Ex. 2 at 119:13-120:3; Ex. 4 ¶ 99; Ex. 5 at 8; Ex. 6 at 20, 26, 33-35, or between accused and unaccused configurations of the posture check capability. ECF No. 119 at 4, 8-11; Ex. 1 at 114:17-115:20, 189:12-190:3.

Nor is there any admissible expert analysis to support the overstated apportionment percentages Mr. Pellegrino, based on Dr. Cole, applied. To the contrary, he replicated precisely the errors the Federal Circuit warned against in *Laser Dynamics*. To wit: he never conducted any market studies, consumer surveys, or economic analysis to ascertain whether demand for ISE or AnyConnect is driven by the ISE posture feature. 694 F.3d at 69; Ex. 1 at 164:16-165:15; Ex. 2 at 111:13-114:7. Instead, Dr. Cole based his apportionment on Cisco product guides that describe the different ISE and AnyConnect features and license levels, and on his ███████████████████ ██████████████████████████████████████ Ex. 4 at ¶ 82; Ex. 1 at 161:23-162:24. But the product guides Dr. Cole cites say nothing about the relative value of different features, and he does not identify what is relevant about them or discuss their contents at all—he simply cites two entire documents that are 68 pages long. *See* Ex. 4 ¶ 82 (citing Exs. 5 and 6). His reliance on nothing more than a pointless citation that lacks support for the asserted proposition and his "experience … in the security industry"—also without elaboration—is exactly the sort of "vague qualitative notion[] of . . . relative importance" that the Federal Circuit held inadmissible as "plucked out of thin air." *LaserDynamics*, 694 F.3d at 69.

Mr. Pellegrino also applied an incomplete apportionment based on the requirement that, to even allegedly infringe, the accused Cisco software products must be used or at least set up in systems containing endpoint computers running Microsoft Windows 10 or 11. This is a

requirement of every asserted claim. Without it, K.Mizra cannot satisfy a key claim limitation (a trusted computing base associated with a TPM). Mr. Pellegrino is not aware of any Cisco customers who actually use the accused products in the accused way. Ex. 2 at 64:23-67:3 ███ ██████████████████████████████████████████████████████████████ There is no evidence of specific customers who have ever used the accused Cisco software with Microsoft Windows devices. Ex. 1 at 43:17-44:7. For the method claims, Mr. Pellegrino used an assumed percentage based on industry data. But that data is, on its face, general Windows desktop market share data. Ex. 3 at 124. The figure is necessarily inflated because it does not exclude non-accused versions of Windows (versions other than Windows 10 or 11), does not take account of laptops or other devices that can use AnyConnect, and does not address the factors AnyConnect customers might consider when choosing an operating system. Dr. Pellegrino plucks his market share figure out of thin air, offering no discussion of the sources or data on which the graph is based, the methodology used to calculate it, or the reliability of "StatCounter" as a source of market-share data for operating systems. Moreover, Mr. Pellegrino should at least have applied the same reduction to all asserted claims, including the system claims, as they, too, require a TPM.

### 2. Mr. Pellegrino conflated lump sum with running royalty analysis to shoe-horn projected profits beyond trial.

Mr. Pellegrino's final methodological error mirrors and yet surpasses even the approach he took in *Daedalus Blue LLC v. SZ DJI Technology Company, Ltd.*, in which this Court excluded his testimony. No. W-20-CV-00073, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022). In *Daedalus Blue*, the defendant moved to exclude Mr. Pellegrino's opinions on multiple grounds, including that he had conflated a lump sum with a running royalty license. The Court did not reach that issue and instead excluded him for using an incorrect hypothetical negotiation date. *Id.* at *7-8. But in that case, unlike the present case, his sleight of hand was less severe: there, Mr. Pellegrino had not

based his supposed lump sum on running royalty damages past the trial. The magnitude of his error here is much larger. Mr. Pellegrino ignores the modest comparable licenses to the asserted patent that should inform a genuine lump sum analysis. And worse, he further inflates his numbers by projecting damages after trial in 2023 through the patent's expiration in 2029.

In conducting a reasonable royalty analysis, the factors, including those identified in *Georgia-Pacific*, are supposed to be objective. *See, e.g.*, *Lucent*, 580 F.3d at 1324-35 (endorsing and applying factors from *Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Objective factors are important to ensure that a hypothetical negotiation does "not occur in a vacuum of pure logic." *Georgia-Pacific*, 318 F.Supp. at 1121.

Normally, the analysis would begin with "[a]ctual licenses to the patented technology," which are generally the most "highly probative as to what constitutes a reasonable royalty for those patent rights." *LaserDynamics, Inc.*, 694 F.3d at 79. Mr. Pellegrino effectively ignored those modest data points, though, which would have resulted in a five or six-figure damages number. In *Lucent,* the Federal Circuit vacated a damages verdict awarding "roughly three to four times the amount in the lump-sum agreements in evidence." *Lucent*, 580 F.3d at 1332. Here, Mr. Pellegrino's ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ This alone warrants exclusion. *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 522-23 (Fed. Cir.

2012) (affirming decision precluding plaintiff from presenting evidence of damages at trial where expert selectively ignored settlement agreements).

But it is worse, because Mr. Pellegrino not only ignored the inconvenient comparable licenses; his "hypothetical negotiation" opinions are based on theoretical accused sales for six years post-trial—spanning eleven to seventeen years after his 2012 hypothetical negotiation date. Instead of presenting an opinion based on two or three years of damages for which there is actual accused sales data, he is offering pure speculation about what Cisco's accused sales may be for six future years and tying those made up numbers to a royalty hypothetically negotiated 19 years earlier. There is no evidence or basis to believe the parties would have had any reason to know those speculative amounts or give them any credence at a hypothetical negotiation in 2012. The gamesmanship is palpable.

Mr. Pellegrino's analysis also suffers from the flaw the Federal Circuit identified in *Lucent,* namely that his methodology fails to account for the differences between a lump-sum and running royalty and offers zero support for the expectations relied upon. ECF No. 101 at 8-9 (citing *Lucent*, 580 F.3d at 1326-27). In *MLC Intellectual Property*, the Federal Circuit noted: "We addressed the fundamental differences between lump-sum agreements and running-royalty agreements in *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009). *MLC Intellectual Property*, 10 F.4th at 1368; *see also Lucent*, 580 F.3d at 1326. ("Significant differences exist between a running royalty license and a lump-sum license."). And as in *Lucent*, while "[p]arties agreeing to a lump-sum royalty agreement may, during the license negotiation, consider the expected or estimated … production … of a given invention," that is "assuming proof is presented to support the expectation." *Lucent*, 580 F.3d at 1327. But Mr. Pellegrino, like *Lucent*, cited no evidence about the parties' expectations in 2012 (or 2015). Ex. 2 at 311:16-314:10. And there is none.

Mr. Pellegrino instead simply asserted that he may consider his inflated projections based on the "book of wisdom." That assertion contravenes *Lucent* (which is dispositive against this approach absent proof to support the parties' expectations at the time of the hypothetical negotiation, 580 F.3d at 1327) and is unfaithful to the notion of the book of wisdom. The book must reflect what the negotiators would have known or otherwise believed at the time of the hypothetical negotiation. It must be invoked in a principled way. Projecting accused sales through 2029 is not principled. If Mr. Pellegrino wanted to give a running royalty, disguised as a lump sum or otherwise, he should have stopped at trial. Instead, his opinion exceeds what the statute allows: Section 284 limits damages to "a reasonable royalty *for the use made of the invention by the infringer*." 35 U.S.C. § 284 (emphasis added).

## V.     CONCLUSION

Cisco respectfully asks the Court to exclude Mr. Pellegrino's report and testimony.

//

//

//

//

//

//

//

//

//

//

//

//

21

Dated: June 14, 2023                    Respectfully submitted,


By: */s/ Melissa R. Smith*
    Melissa R. Smith (State Bar No. 24001351)
    melissa@gillamsmithlaw.com
    GILLAM & SMITH LLP
    303 South Washington Avenue
    Marshall, TX 75670
    Telephone: 903.934.8450
    Facsimile: 903.934.9257

    Elizabeth R. Brannen (*Pro Hac Vice*)
    ebrannen@stris.com
    Kenneth J. Halpern (*Pro Hac Vice*)
    khalpern@stris.com
    STRIS & MAHER LLP
    777 S. Figueroa St, Ste 3850
    Los Angeles, CA 90017
    Telephone: (213) 995-6800
    Facsimile: (213) 216-0299

*Attorneys for Defendant*
*Cisco Systems, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I certify that on June 14, 2023, the documents filed with the Clerk of Court via the Court's CM/ECF system under seal in the above-captioned case were subsequently served on all counsel of record by electronic mail.

*/s/ Melissa R. Smith*

Melissa R. Smith