—1—

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                       WACO DIVISION

 3   K.MIZRA LLC             *
                             *    July 13, 2023
 4   VS.                     *
                             * CIVIL ACTION NO. 6:20-CV-1031
 5   CISCO SYSTEMS, INC.     *

 6        BEFORE THE HONORABLE ALAN D ALBRIGHT
                PRETRIAL CONFERENCE
 7
     APPEARANCES:
 8
     For the Plaintiff:  Robert R. Brunelli, Esq.
 9                       Bart A. Starr, Esq.
                         Matthew C. Holohan, Esq.
10                       Patricia Y. Ho, Esq.
                         Angela J. Bubis, Esq.
11                       Sheridan Ross P C.
                         1560 Broadway, Suite 1200
12                       Denver, CO 80202

13                       Anna Rebecca Skupin, Esq.
                         Scheef & Stone, LLP
14                       200 North Travis Street, Ste. 402
                         Sherman, TX 75090
15
                         Michael Charles Smith, Esq.
16                       Scheef & Stone, LLP
                         113 E. Austin Street
17                       Marshall, TX 75670

18   For the Defendant:  Elizabeth Rogers Brannen, Esq.
                         Sarah Rahimi, Esq.
19                       Kenneth J. Halpern, Esq.
                         Stris & Maher LLP
20                       777 South Figueroa Street, Ste 3850
                         Los Angeles, CA 90017
21
                         Jhaniel James, Esq.
22                       Stris & Maher LLP
                         111 N Calhoun St., Suite 10
23                       Tallahassee, FL 21202

24                       James Travis Underwood, Esq.
                         Gillam & Smith
25                       102 N. College, Suite 800
                         Tyler, TX 75702
</pre>

2

1    Court Reporter:        Kristie M. Davis, CRR, RMR
                            PO Box 20994
2                           Waco, Texas 76702-0994
                            (254) 340-6114
3

4      Proceedings recorded by mechanical stenography,

5    transcript produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:03 | 1 | (Hearing begins.) |
| 09:03 | 2 | DEPUTY CLERK:  A civil action in Case |
| 09:03 | 3 | 6:20-CV-1031, K.Mizra LLC versus Cisco Systems, |
| 09:03 | 4 | Incorporated.  Case called for a pretrial conference. |
| 09:03 | 5 | THE COURT:  Announcements from counsel, |
| 09:04 | 6 | please. |
| 09:04 | 7 | MR. SMITH:  Yes, Your Honor.  For the |
| 09:04 | 8 | plaintiff K.Mizra, Michael Smith.  And with me at |
| 09:04 | 9 | counsel table is our lead counsel Mr. Rob Brunelli; our |
| 09:04 | 10 | founder and managing member of K.Mizra, Mr. Chuck |
| 09:04 | 11 | Hausman; Ms. Angela Bubis; in the gallery, Mr. Matt |
| 09:04 | 12 | Holohan; Mr. Bart Starr; Ms. Patricia Ho; and also in |
| 09:04 | 13 | the gallery, Ms. Becca Skupin, from my office; and |
| 09:04 | 14 | Ms. Lori Brown.  And we're ready to proceed. |
| 09:04 | 15 | THE COURT:  Welcome. |
| 09:04 | 16 | MR. UNDERWOOD:  Good morning, Your Honor. |
| 09:04 | 17 | Travis Underwood from Gillam & Smith on behalf of the |
| 09:04 | 18 | defendant Cisco.  I'm joined this morning by our lead |
| 09:04 | 19 | counsel, Ms. Liz Brannen.  Also at counsel table is |
| 09:04 | 20 | Ms. Xiao Chang, our client representative here in |
| 09:04 | 21 | person.  I'm also joined by Ken Halpern, Ms. Sarah |
| 09:04 | 22 | Rahimi, Ms. Jhaniel James.  And over Zoom, we have two |
| 09:04 | 23 | more client representatives observing this morning, |
| 09:04 | 24 | Mr. Buddy Toliver and Ms. Katerina Weitzmann.  And with |
| 09:05 | 25 | that, we're ready to proceed. |

4

09:05  1                    THE COURT:  Very good.

09:05  2                    The first issue I have is defendant's

09:05  3    motion of summary judgment for noninfringement.

09:05  4                    Yes, ma'am.  Good morning.

09:05  5                    MR. BRANNEN:  Good morning, Your Honor.

09:05  6    Thank you for having us here in person.  I'm told this

09:05  7    hookup is easy.  May I proceed, Your Honor?

09:05  8                    THE COURT:  Yes, ma'am.

09:05  9                    MR. BRANNEN:  Thank you.  My name is

09:05  10   Elizabeth Brannen, and it's my privilege to be arguing

09:05  11   today.  I thought I would start out by updating the

09:05  12   Court on where things stand.  A few of the claims have

09:06  13   dropped out even since the parties' briefing.  I'd like

09:06  14   to cover a little bit about what's accused in the case

09:06  15   just to make sure we're all on the same page, and then

09:06  16   touch on three arguments.

09:06  17                   The first argument is about a failure of

09:06  18   proof.  It's not a claim construction argument, Your

09:06  19   Honor.  I want to look at what their expert said was

09:06  20   needed, and the disconnect between what they said was

09:06  21   necessary to infringe and the proof they have.  And

09:06  22   then the remaining two arguments are about two

09:06  23   limitations in every asserted claim, a TPM limitation

09:06  24   and a limitation related to DNS responses that we also

09:06  25   believe independently warrant summary judgment.

5

| 09:06 | 1 | So what's left? |

09:06    1          So what's left?

09:06    2          In K.Mizra's opposition brief, it dropped

09:06    3    indirect infringement.  So we're down to alleged direct

09:06    4    infringement by Cisco under 271(a).  A couple days ago,

09:06    5    maybe it was even just yesterday, and I think it was

09:07    6    two days ago, they also let us know they're not

09:07    7    planning to pursue Method Claims 1 and 9.

09:07    8          So we have three asserted claims left.

09:07    9    Claim 12 is a system claim, and it has a dependent

09:07   10    Claim 16.  The question there is whether Cisco makes,

09:07   11    uses, or sells the complete system required by those

09:07   12    claims.  And then there's also Claim 19, which is a

09:07   13    computer program product.  That claim requires a

09:07   14    nontransitory computer-readable medium with the

09:07   15    complete instructions.  They don't have it.

09:07   16          What are they accusing?  Let's take a

09:07   17    moment to talk about the Cisco and non-Cisco products

09:07   18    that are required.  There are two Cisco products that

09:07   19    are accused of, together, cooperating -- talking to

09:07   20    each other to perform the accused feature which is

09:07   21    called posture check.  The first one is ISE.  ISE is a

09:08   22    software product, and in order to have the accused

09:08   23    posture --

09:08   24          THE COURT:  And that's I-S-E?

09:08   25          MR. BRANNEN:  Yes.  I-S-E or ISE.  That's

6

09:08    1    right.  I forget that it could be confusing.

09:08    2            So ISE software -- if you look at

09:08    3    Exhibit I to our opening brief, which was, I think, ECF

09:08    4    No. 119.  If you read a little bit about ISE, it

09:08    5    protects networks and it has a lot of different use

09:08    6    cases.  One of the things people do with ISE, for

09:08    7    example, is to give guest access to their WiFi

09:08    8    networks.  So you don't need to be using ISE with any

09:08    9    kind of VPN.

09:08    10            But if you look at Exhibit H to our

09:08    11    opening brief, AnyConnect, the primary functionality

09:08    12    there is a VPN, or virtual private network,

09:08    13    functionality.  So AnyConnect goes on the computer as a

09:08    14    laptop or a user computer that might be trying to

09:08    15    connect to a network.

09:08    16            It's undisputed that these products are

09:08    17    software products sold separately.  People buy ISE

09:08    18    alone.  People buy AnyConnect alone.  People buy one at

09:09    19    the highest Premier or Apex level, and they may not buy

09:09    20    the other at the Premier or Apex level.  To have the

09:09    21    accused posture check feature, you have to have both of

09:09    22    these software products and you have to have them at

09:09    23    the Premier level.

09:09    24            What else do you need?  Well, we learned

09:09    25    from the opposition brief that because K.Mizra is going

| | | |
|---|---|---|
| 09:09 | 1 | for Claim 12 requires a processor and a memory, they |
| 09:09 | 2 | are saying that they're only accusing ISE software when |
| 09:09 | 3 | it is actually sold and running on that particular |
| 09:09 | 4 | Cisco SNS hardware product.  That hardware product only |
| 09:09 | 5 | runs ISE, but you can run ISE on other things.  You |
| 09:09 | 6 | could run ISE on a virtual machine.  So that hardware |
| 09:09 | 7 | product is not necessary, but some people do run ISE on |
| 09:09 | 8 | it.  And that SNS hardware product also is used for |
| 09:09 | 9 | nonaccused versions of ISE. |
| 09:09 | 10 | And then, finally, AnyConnect, in order |
| 09:10 | 11 | to be doing anything, talking to the ISE at all, |
| 09:10 | 12 | AnyConnect has to be running on something.  And in |
| 09:10 | 13 | order to have the TPM limitation, K.Mizra's allegations |
| 09:10 | 14 | require the users to have installed AnyConnect on a |
| 09:10 | 15 | laptop that Cisco -- a laptop or other computer that |
| 09:10 | 16 | Cisco doesn't sell that would be running a Microsoft |
| 09:10 | 17 | Windows operating system. |
| 09:10 | 18 | The -- it's really important to |
| 09:10 | 19 | emphasize, because there's a line in their brief that |
| 09:10 | 20 | suggests -- in my view, without support -- that they |
| 09:10 | 21 | can say that ISE alone satisfies the processor |
| 09:10 | 22 | limitations or the instructions.  That is not what they |
| 09:10 | 23 | accused, and it's not what their expert tried to |
| 09:10 | 24 | substantiate.  The alleged infringement here requires |
| 09:10 | 25 | AnyConnect Premier-level software installed on |

8

| | | |
|---|---|---|
| 09:10 | 1 | Windows 10 and 11 devices, not just ISE software. |
| 09:11 | 2 | How do we know?  Here are just a few |
| 09:11 | 3 | examples of how we know that. |
| 09:11 | 4 | Their opposition brief, which is ECF 139, |
| 09:11 | 5 | defines the accused system not as ISE alone but as ISE |
| 09:11 | 6 | when it's sold and employed in conjunction with |
| 09:11 | 7 | AnyConnect.  It's undisputed, though, that these |
| 09:11 | 8 | products are sold separately.  Customers don't need to |
| 09:11 | 9 | use or deploy them together, and they have no evidence |
| 09:11 | 10 | that anyone ever has.  We'll get back to that in a |
| 09:11 | 11 | moment. |
| 09:11 | 12 | Their brief at Page 4, this is really |
| 09:11 | 13 | critical.  The infringement theory requires AnyConnect, |
| 09:11 | 14 | not just ISE, to even be capable of carrying out the |
| 09:11 | 15 | instructions.  The instructions they're talking about |
| 09:11 | 16 | do not even allegedly exist if you only have ISE alone. |
| 09:11 | 17 | Their expert also testified that in his view, and we |
| 09:11 | 18 | see this here in the third bullet on the slide, it's |
| 09:11 | 19 | ISE with AnyConnect together that would perform the |
| 09:12 | 20 | steps of the claims. |
| 09:12 | 21 | They also concede that the infringing |
| 09:12 | 22 | product must interact, at least to some extent, with a |
| 09:12 | 23 | trusted platform module or TPM.  Your Honor may |
| 09:12 | 24 | remember that from the claim construction phase.  You |
| 09:12 | 25 | construed that as a secure cryptoprocessor.  It's a |

| 09:12 | 1 | chip that conforms with certain Trusted Computing Group |
|---|---|---|
| 09:12 | 2 | specifications and can store cryptographic keys. |
| 09:12 | 3 | Finally, Dr. Cole, K.Mizra's infringement |
| 09:12 | 4 | expert, was very clear.  The infringing TPM that he is |
| 09:12 | 5 | talking about is on the client computer.  So they need |
| 09:12 | 6 | that client computer running Windows 10 or 11 to even |
| 09:12 | 7 | arguably have the TPM. |
| 09:12 | 8 | And not to beat a dead horse, but I |
| 09:12 | 9 | really wanted to bring to life what Dr. Cole was saying |
| 09:12 | 10 | about what's necessary to infringe.  So this is one of |
| 09:13 | 11 | his charts in his infringement report.  The very first |
| 09:13 | 12 | step that the processor has to do, Step 1 that the |
| 09:13 | 13 | instructions have to do is detecting an insecure |
| 09:13 | 14 | condition.  And we can see here that what he says does |
| 09:13 | 15 | that step is not ISE alone.  He says it's AnyConnect, |
| 09:13 | 16 | the posture feature in particular. |
| 09:13 | 17 | And we know that that feature requires |
| 09:13 | 18 | ISE running on the SNS hardware and it also requires |
| 09:13 | 19 | AnyConnect.  And AnyConnect cannot detect anything, |
| 09:13 | 20 | much like any software can't do anything, unless it's |
| 09:13 | 21 | running.  So they need the Windows 10 and 11 computers |
| 09:13 | 22 | to have a claim. |
| 09:13 | 23 | Now, to the first point that I wanted to |
| 09:13 | 24 | make in support of summary judgment of noninfringement. |
| 09:13 | 25 | There is just no evidence here, Your Honor, that Cisco |

09:13  1    or any Cisco customer or anyone anywhere has ever

09:14  2    assembled or used this accused combination of Cisco and

09:14  3    non-Cisco products.

09:14  4                    And that's fatal under 271(a).  This

09:14  5    actually could make an interesting hypothetical, I

09:14  6    think, for a law school exam.  Although, if the

09:14  7    students had been paying attention, it wouldn't be a

09:14  8    hard question for them.

09:14  9                    When you sell the complete system, you

09:14  10   might have liability under 271(a), but if you sell the

09:14  11   components and someone else has to put them together,

09:14  12   that might give rise to liability under 271(f) -- it's

09:14  13   being done outside the U.S. -- might give rise to

09:14  14   271(b) liability here, but they've dropped that claim.

09:14  15                   And so this law is well settled.  It's

09:14  16   really beyond dispute.  Your Honor acknowledged it in

09:14  17   the Roku case that we've cited in the opening brief and

09:14  18   shown here.  And we also pointed out an Eastern

09:14  19   District of Texas case explaining very clearly Congress

09:14  20   overruled Deepsouth Packing when it enacted 271(f), but

09:15  21   for 271(a) liability somebody somewhere has to have

09:15  22   made, used, or sold the full thing -- in this case,

09:15  23   Cisco -- and they just don't have any proof of that.

09:15  24                   So before moving on here, I want to just

09:15  25   emphasize, in case they would suggest to you that all

09:15  1   they really need to prove is capability and I'm trying

09:15  2   to do something sneaky on claim construction, I'm not.

09:15  3   The case law's very clear.  You have to sell the

09:15  4   complete system in the configuration that's accused to

09:15  5   infringe the system claims, and the -- for the computer

09:15  6   program product claim, it needs to allegedly infringe

09:15  7   without modification.

09:15  8             There's also an extensive showing in our

09:15  9   briefing that in addition to just combining these two

09:15  10  products and deciding to use the posture check

09:15  11  feature -- by the way, when my associate Ms. Rahimi

09:15  12  argues our motion to exclude K.Mizra's damages expert,

09:15  13  we'll hear a little bit more about how only 7 percent

09:16  14  of ISE users reported using any kind of posture feature

09:16  15  with ISE.  The accused posture feature's an even

09:16  16  smaller subset of that.

09:16  17            But you have to choose to set these

09:16  18  products up together, choose to use posture.  Then you

09:16  19  have to choose to enforce a posture check policy that's

09:16  20  within what the claims require.  The posture checking

09:16  21  could check for other things, as we point out.  It

09:16  22  could check, oh, is somebody trying to put a USB device

09:16  23  in the computer and download the crown jewels?  That's

09:16  24  not -- that's a modification that the person setting up

09:16  25  the system has to do.  They have to set it up to check

—12—

09:16  1    for something the claim requires.  That could be a

09:16  2    virus, except that the accused products can't check for

09:16  3    that.

09:16  4                So the only thing they could be accusing

09:16  5    there is if somebody sets up the posture check to check

09:16  6    for a specific software patch or software level.

09:16  7    That's possible to set up, in theory, but they just had

09:17  8    no proof that anybody ever made that modification in

09:17  9    practice.  And then there are certain containment and

09:17  10   redirection settings that also the user has to decide

09:17  11   to set up and implement before they even have their

09:17  12   infringement read.

09:17  13               Now, before we move on from this point,

09:17  14   let's just spot them for a moment.  Imagine that their

09:17  15   expert had accused ISE alone and had a theory that,

09:17  16   actually, AnyConnect, TPM, all of that is unclaimed,

09:17  17   not required.  They still, according to the Federal

09:17  18   Circuit, have to have some proof of at least one

09:17  19   instance that the accused product, in fact, does

09:17  20   execute all the claim limitations in operation.  And

09:17  21   they don't have that.  Not even one.  There is not

09:17  22   enough here to get to a jury, Your Honor.

09:17  23               Point No. 2, there's also a limitation

09:17  24   required by every claim where when you're doing the

09:18  25   detecting of an insecure condition, you need to be

09:18   1   contacting a trusted computing base on the host

09:18   2   machine, and that trusted computing base has to be

09:18   3   associated with the TPM or a trusted platform module.

09:18   4   They don't have proof of that.  To be sure, they tried

09:18   5   to get it.  K.Mizra subpoenaed Microsoft for proof that

09:18   6   on these Windows 10 and 11 computers the TPM would

09:18   7   actually interact with something that they could tie

09:18   8   back to the Cisco products.  K.Mizra replied by

09:18   9   objecting on the basis of its license.  And as we'll

09:18   10  hear a little bit when my associate Ms. James, if she's

09:18   11  allowed to argue our license defense, that should have

09:18   12  been the end of the case, for two reasons.

09:18   13          The license bars this theory.  They can't

09:18   14  be pursuing infringement when they need Microsoft, but

09:18   15  also Microsoft refused to give them the proof they

09:18   16  need.  That's also independently fatal here.  So all we

09:19   17  have is the expert pointing to routines on Windows 10

09:19   18  or 11.  BCryptGenRandom.  You can see a few of the

09:19   19  routings here.

09:19   20          And what he says is, Well, these

09:19   21  routines -- which are Windows 10 and 11 routines, not

09:19   22  AnyConnect -- these need random numbers, these need

09:19   23  randomness, and I believe they get it from the TPM.

09:19   24  But nothing in the pages here ties that together or

09:19   25  shows that the TPM is actually supplying the

09:19  1   randomness.  And they admittedly don't have any

09:19  2   Microsoft code, which is what they would need to show

09:19  3   that that is actually what's happening here.

09:19  4           Let's assume they did.  They still don't

09:19  5   have any proof that the accused posture check feature

09:19  6   is using any of the random numbers.

09:19  7           And to put another nail in this coffin,

09:19  8   as Your Honor recognized in the Roku case but in the

09:19  9   second decision a little bit later, citing one of my

09:19  10  all-time favorite cases, the Amazon.com versus Barnes &

09:20  11  Noble, the nose of wax can't do it, their infringement

09:20  12  expert at Page 91 of his deposition called the TPM and

09:20  13  the fact that it generates secure keys which are used

09:20  14  to sign the digital attestation of cleanliness that's

09:20  15  supposed to be provided back, he said that's the heart

09:20  16  of this invention.  That's how you distinguish this

09:20  17  invention from the imposters.

09:20  18          And so even if Dr. Cole, the infringement

09:20  19  expert, could be proving that the TPM is giving random

09:20  20  numbers, there's a massive disconnect.  There's a no-no

09:20  21  there because they're reading the claims one way to try

09:20  22  to defend validity and a completely different way to

09:20  23  prove infringement, and it's not allowed.

09:20  24          And finally, just briefly, all of the

09:20  25  asserted claims also require that there be a DNS

09:20  1    response to a query when the host computer is unclean.

09:21  2    When it can't -- when it's trying to get on the network

09:21  3    and it can't give the attestation that it's clean, it

09:21  4    has the right software patch and it says, please let me

09:21  5    into the system, let me into the Western District of

09:21  6    Texas ECF, let me into the Cisco system, the response

09:21  7    has to be back with an IP address, a DNS response has

09:21  8    to come back putting them at a quarantine server.

09:21  9            K.Mizra has no evidence of that because

09:21  10   it doesn't happen.  It doesn't even allegedly happen in

09:21  11   these accused products.  What they point to in their

09:21  12   opposition to try to create a genuine issue of fact is

09:21  13   Cisco testimony about DNS queries.

09:21  14           Yes.  Queries are used widely, lots of

09:21  15   queries.  But what they need is a response to one of

09:21  16   those queries that gives the IP address of a quarantine

09:21  17   server and they don't have it.

09:21  18           What they pointed to is something

09:21  19   different.  It's a URL or HTTP redirection.

09:22  20   That's "they" being Dr. Cole, not they -- not them in

09:22  21   their opposition.

09:22  22           And that's obviously something different.

09:22  23   The prosecution history makes that clear.  This Court

09:22  24   probably knows it's different, even without evidence.

09:22  25           And if we needed to point to more, their

09:22  1    invalidity expert expressly said these claims are about

09:22  2    DNS redirection.  They do not cover URL redirection.

09:22  3                    The counsel in this case has been very

09:22  4    professionally courteous and cooperative to deal with,

09:22  5    but we would think that the next step here really

09:22  6    should not be trial.

09:22  7                    MR. STARR:  Good morning, Your Honor.

09:23  8                    THE COURT:  Good morning.

09:23  9                    MR. STARR:  Bart Starr on behalf of

09:23  10   K.Mizra.

09:23  11                   I'd like to begin, say, I think

09:23  12   Ms. Brannen did a relatively good job of spelling out

09:23  13   the products that are at issue in this case and to

09:23  14   clarify that we are, in fact, accusing the Cisco ISE

09:23  15   product, I-S-E product, of directly infringing system

09:23  16   Claim 12 and product Claim 19.

09:23  17                   Up on this particular slide, we've tried

09:23  18   to capture what goes on in the claimed invention.  And

09:23  19   again, I'll -- I will sound like a broken record today,

09:24  20   Your Honor, and I apologize for that.  But I -- of

09:24  21   course, we need to keep coming back to the claims.

09:24  22                   And many of the claims -- or the claim

09:24  23   limitations in Claims 12 and 19, as Your Honor knows,

09:24  24   recite functions or steps that are performed by

09:24  25   something or someone.

09:24    1              And I think the question that we need to

09:24    2    keep coming back to is:  What or whom performs those

09:24    3    particular functions that are recited in Claims 12 and

09:24    4    19?

09:24    5              I think that's a critical question for us

09:24    6    to decide today.  And I think we have conflicting

09:24    7    evidence from Cisco's expert and K.Mizra's own expert

09:24    8    that we believe -- we believe our expert, Dr. Eric

09:24    9    Cole, has set forth a robust infringement case.

09:25   10              We believe at minimum there are genuine

09:25   11    issues of material fact for trial based, at least in

09:25   12    part, on the respective expert reports of the parties.

09:25   13              This particular slide shows two different

09:25   14    elements shown in black boxes.  The black box on the

09:25   15    left generally is -- as you'll see labeled, is a Cisco

09:25   16    network server or other server.

09:25   17              And on that server -- and this is

09:25   18    important to Claim 12, system Claim 12, on that

09:25   19    particular server is installed a processor and a

09:25   20    memory, as Dr. Cole points out in his report.  Also

09:25   21    residing on that server is the Cisco ISE software.

09:25   22              And it's our contention that the Cisco

09:25   23    ISE software is that thing, that thing that performs

09:26   24    each claimed function or step recited in Claims 12 and

09:26   25    19.

09:26   1                    Now, over on the right side of this
09:26   2   slide, Your Honor, you'll see that there's a host
09:26   3   computer.  A host computer is an end-point computer.
09:26   4   It's essentially -- one example is just simply a
09:26   5   Windows -- a Microsoft Windows laptop running the
09:26   6   Version 10 or 11 operating system.
09:26   7                    And that host computer includes what's
09:26   8   referred to as a trusted computing base, in this case a
09:26   9   TCB.  As -- and the parties have agreed upon the
09:26   10  definition of a TCB.  And that host computer is -- on
09:26   11  that host computer is installed the Cisco AnyConnect
09:26   12  software.
09:26   13                   And the Cisco AnyConnect software serves
09:26   14  essentially as a conduit between the host computer and
09:27   15  the Cisco ISE system or product.
09:27   16                   The trusted computing base gathers
09:27   17  information about the status of the host computer.  Is
09:27   18  the host computer clean?  Should it be allowed to
09:27   19  connect to the network?  Is there a virus?  Is there
09:27   20  malware?  Is there a problem with the host computer?
09:27   21                   And the Cisco AnyConnect software helps
09:27   22  determine -- make that determination, and the Cisco
09:27   23  identity services engine, or ISE, ultimately makes all
09:27   24  the decisions about whether that host computer should
09:27   25  be connected to the network or not.

| | | |
|---|---|---|
| 09:27 | 1 | The claims -- and again, I think my -- |
| 09:27 | 2 | Next slide. |
| 09:27 | 3 | -- Ms. Brannen did a fine job of laying |
| 09:27 | 4 | out what I think are the three primary noninfringement |
| 09:28 | 5 | arguments that Cisco has, and I'd like to address each |
| 09:28 | 6 | of those in turn if I could. |
| 09:28 | 7 | Number one, as Ms. Brannen said, Cisco |
| 09:28 | 8 | simply does not directly infringe any asserted claim of |
| 09:28 | 9 | the '705 patent.  We disagree and we believe we have |
| 09:28 | 10 | record evidence that shows to the contrary and, at |
| 09:28 | 11 | minimum, that there's a genuine issue of material fact |
| 09:28 | 12 | that should go to trial on that issue. |
| 09:28 | 13 | The second argument that Ms. Brannen made |
| 09:28 | 14 | is that Cisco does not meet the trusted platform module |
| 09:28 | 15 | claim limitation, the TPM claim limitation. |
| 09:28 | 16 | And number three, the argument by Cisco |
| 09:28 | 17 | is Cisco does not meet this DNS query limitation. |
| 09:28 | 18 | Again, the Claims 12 and 19 of the '705 |
| 09:29 | 19 | patent are written such that -- and this is an -- this |
| 09:29 | 20 | is verbatim Claim 19 of the '705 patent, which as |
| 09:29 | 21 | Ms. Brannen mentioned, is directed to a computer |
| 09:29 | 22 | program product. |
| 09:29 | 23 | Our contention is and our expert's |
| 09:29 | 24 | contention is is that computer program product is Cisco |
| 09:29 | 25 | ISE -- is Cisco ISE product. |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | Now, the question again, when you get                      |
| 09:29 | 2  | into the body of the claim, Your Honor, you'll see that    |
| 09:29 | 3  | really the body of the claim comprises just a number of    |
| 09:29 | 4  | steps or functions that are performed by the Cisco ISE     |
| 09:29 | 5  | product.                                                   |
| 09:29 | 6  | For example, these are all action verbs,                   |
| 09:29 | 7  | action items, things that take place, which answers our    |
| 09:29 | 8  | question:  What is performing these particular             |
| 09:29 | 9  | functions that are recited in Claims 12 and 19?            |
| 09:29 | 10 | In Claim 19, for example, we have                          |
| 09:29 | 11 | something that has to detect an insecure condition on a    |
| 09:30 | 12 | host computer, for example, a laptop computer that's       |
| 09:30 | 13 | trying to join the network.                                |
| 09:30 | 14 | We have the other verb contacting a                        |
| 09:30 | 15 | trusted computing base.  We have receiving a response.     |
| 09:30 | 16 | We have determining whether the response includes a        |
| 09:30 | 17 | valid digitally signed attestation of cleanliness.         |
| 09:30 | 18 | It goes on and on, all the way down to                     |
| 09:30 | 19 | the last clause, which recites permitting the first        |
| 09:30 | 20 | host to communicate with the remediation host.             |
| 09:30 | 21 | Now, what performs those functions?                        |
| 09:30 | 22 | The evidence of record and our position                    |
| 09:30 | 23 | is, Your Honor, is that the Cisco ISE product performs     |
| 09:30 | 24 | each and every function that is recited in that claim.     |
| 09:30 | 25 | And the Cisco ISE product is certainly --                  |

09:30  1  and this is or should be uncontested -- is a computer

09:30  2  program product for protecting a network.

09:31  3          Again, we're taking the claims in reverse

09:31  4  order today.  I wanted to start with Claim 19, the last

09:31  5  claim of the patent, which has no dependent claims that

09:31  6  we're asserting.

09:31  7          Claim 19 recites again:  A computer

09:31  8  program product for protecting a network that can

09:31  9  perform the following functions.

09:31  10          Again, the question remains:  What

09:31  11  performs the following functions?  What receives a

09:31  12  service request from a first host?  What contacts a

09:31  13  trusted computing base?  What receives the response

09:31  14  from the trusted computing base?  What determines from

09:31  15  that response whether the first host computer is

09:31  16  infested or if it's clean and ready to go?  What serves

09:31  17  a quarantine notification page?  What provides an IP

09:31  18  address?  What permits the host computer to communicate

09:31  19  with the remediation host?

09:31  20          And again and again the answer to those

09:32  21  questions is it's the Cisco ISE product that is

09:32  22  interacting with the host computer.

09:32  23          So again, I think it's important to keep

09:32  24  our eye, as Your Honor knows, on the language and

09:32  25  limitations of the claim to determine what is

09:32   1   performing those functions.

09:32   2                   Is it the host computer?  The answer is

09:32   3   no.  Emphatically no.

09:32   4                   Is it the TCB?  The answer is

09:32   5   emphatically no.

09:32   6                   The answer is:  The product that performs

09:32   7   all those functions is the Cisco ISE product using, of

09:32   8   course, as a conduit to the computer the Cisco

09:32   9   AnyConnect software.

09:32  10                   Cisco made a -- I think Ms. Brennan

09:32  11   mentioned this modification argument.  And their

09:32  12   argument I believe is that AnyConnect is configurable

09:33  13   by a user and that K.Mizra, therefore, cannot prove

09:33  14   direct infringement.  And they rely upon this INVT case

09:33  15   from the Federal Circuit.

09:33  16                   However, whether AnyConnect is

09:33  17   configurable or not is not relevant to direct

09:33  18   infringement because the claim language and the lack of

09:33  19   any code modification of ISE by the user is

09:33  20   dispositive.  And Dr. Cole speaks about that in his

09:33  21   report.

09:33  22                   There is no modification by a user -- no

09:33  23   modification by a user of the Cisco ISE code.

09:33  24                   Now, is ISE customizable?  Is AnyConnect

09:33  25   customizable?

23

| | |
|---|---|
| 09:33 | 1 |

09:33   1          Yes.  But the code itself is fixed.  And

09:33   2   it's provided off-the-shelf, as-is as a fixed set of

09:33   3   code that cannot be modified by the end user.

09:33   4          And there's no evidence that anyone has

09:34   5   or has attempted to modify the actual code that comes

09:34   6   from the ISE software in this case.

09:34   7          I wanted to talk and distinguish a couple

09:34   8   of cases.  The INVT case that K.Mizra cites in their

09:34   9   brief involved an accused product which was a

09:34   10  smartphone or a smartwatch or a smart tablet, some sort

09:34   11  of smart device.  And it involved an interaction with a

09:34   12  base station.

09:34   13         Importantly, the base station -- unlike

09:34   14  in our case, in INVT, the base station actually

09:34   15  modified the code.  It modulated and encoded the

09:34   16  signal.  We don't have that in our case.

09:34   17         In INVT, they discussed the Finjan

09:35   18  decision, which is a Federal Circuit decision from

09:35   19  2010.  And I would like to discuss that, because we

09:35   20  believe that our case is on all fours with the Finjan

09:35   21  decision and not the INVT decision in that in Finjan,

09:35   22  we tried to attempt to represent what the claim

09:35   23  required in the Finjan case.

09:35   24         And if you look up at the top of this

09:35   25  slide, Your Honor, you'll see to the left a security

09:35    1    server, what they call a comparing engine in Finjan,

09:35    2    and also a client.

09:35    3    And interestingly, Finjan is an

09:35    4    interesting case because it involves network security

09:35    5    technology, the same sort of technology that we're

09:35    6    addressing in this case.

09:35    7    Now, in Finjan, as in our case, the

09:36    8    security server in Finjan is tantamount to the ISE

09:36    9    product. I would make the analogy that the security

09:36    10   server is the ISE product and the client is the host

09:36    11   computer.

09:36    12   And in Finjan, the Court found that the

09:36    13   claim was infringed because all of the required actions

09:36    14   could be performed by the source code on the server, on

09:36    15   the security server, such as an ISE server. The claim

09:36    16   was infringed because all the required actions could be

09:36    17   performed by the source code on the server. The claim

09:36    18   was infringed whether the client ever sent a

09:36    19   downloadable to the server or not.

09:36    20   And so again, in our case, as in Finjan,

09:36    21   the server on which ISE resides, the ISE software

09:37    22   resides, performs each of those recited claim

09:37    23   functions.

09:37    24   They also went on to -- the Finjan court

09:37    25   then discussed this -- a decision by the Federal

09:37  1    Circuit in Fantasy Sports.  I won't go into detail on

09:37  2    that.  But the Fantasy Sports court held that the user

09:37  3    is only activating means that are already present in

09:37  4    the underlying software.  As in this case, the user of

09:37  5    Cisco ISE is only activating code, software code, that

09:37  6    is already present in the underlying Cisco ISE

09:37  7    software.  So that case, we believe, is also analogous

09:37  8    and supports our position on infringement.

09:38  9            Let me address, if I could, briefly, the

09:38  10   second argument that Ms. Brannen made, and it's an

09:38  11   interesting argument.

09:38  12           Cisco argues that the trusted platform

09:38  13   module, TPM, limitation is not met.

09:38  14           The asserted claims, both Claims 12 and

09:38  15   19 that we're asserting, the independent claims,

09:38  16   require that the Cisco product or products can contact

09:38  17   a trusted computing base, a TCB, associated with a

09:38  18   trusted platform module within the first host.  So what

09:38  19   does that mean?

09:38  20           Well, it simply means that Cisco ISE has

09:38  21   to contact a TCB -- which the parties have agreed upon

09:38  22   the definition of a TCB in very broad terms and let me

09:38  23   recite that, if I could, for the record.  A trusted

09:39  24   computing base, a TCB, in ECF No. 35 was agreed upon as

09:39  25   meaning hardware or software that has been designed to

09:39  1   be a part of the mechanism that provides security to a

09:39  2   computer system.

09:39  3          So a TCB is extremely broad.  It really

09:39  4   includes any hardware or software that contributes to

09:39  5   the network security or the computer security.  It

09:39  6   includes things such as the AnyConnect software.  It

09:39  7   includes things such as the TCB -- the TPM that resides

09:39  8   on the host computer.  And Dr. Cole, as we cited in our

09:39  9   brief ECF No. 139, Dr. Cole, Eric Cole, his expert

09:39  10  report and claim chart, which ran 140 pages or so,

09:40  11  explained how the accused Cisco product and systems,

09:40  12  specifically Cisco ISE, contact and interact with the

09:40  13  trusted computing base, a TCB, that is associated with

09:40  14  the TPM within the first host.

09:40  15         And though -- and although Cisco itself

09:40  16  does not sell a TPM or a host computer, they're not in

09:40  17  that business.  Infringement is not negated since

09:40  18  direct infringement occurs even if it depends on an

09:40  19  action or a function by a third party, e.g., the user

09:40  20  of the laptop computer or host.  That is not recited in

09:40  21  the claims.  That is not recited in the claims.

09:40  22         And here the -- all the limitations that

09:40  23  are recited in the claims, the steps of the claims are

09:40  24  performed by Cisco ISE.

09:40  25         Dr. Clark's report and testimony indicate

—27—

09:40  1    that ISE, in fact, contacts a TCB associated with a TPM

09:41  2    within a host computer.  We talked with Dr. Clark, who

09:41  3    is Cisco's own expert, and he testified that, in fact,

09:41  4    Cisco's AnyConnect software is installed on a client's

09:41  5    computer.  AnyConnect serves as a conduit, again,

09:41  6    between ISE and the host computer.

09:41  7              Cisco knows, according to Dr. Clark, that

09:41  8    customers do in fact install the AnyConnect software on

09:41  9    their computers.  He admitted to use by customers of

09:41  10   the Cisco ISE and AnyConnect products.  And Dr. Clark

09:41  11   also testified that such computers -- such host

09:41  12   computers like a laptop, for example, would include

09:41  13   things such as new or -- Microsoft Windows machines

09:41  14   which necessarily include a TPM.

09:41  15             I would represent, for example, I -- my

09:41  16   laptop back in my office runs Windows 11, and it has a

09:42  17   TPM in it.  That TPM, however, does not perform the

09:42  18   recited functions of the claim.  The recited functions

09:42  19   of the claim are performed by ISE.  Cisco ISE.  Which

09:42  20   is our infringement position.

09:42  21             Finally, Ms. Brannen brought up a -- an

09:42  22   argument that Cisco -- that -- excuse me.  Yes.  That

09:42  23   Cisco's system or product did not meet the DNS query

09:42  24   claim limitation.  As it noted in the slide, each

09:42  25   asserted claim, including independent Claims 12 and 19,

09:42  1   require that, quote:  In the event the service request

09:42  2   comprises a DNS query, providing in response an IP

09:42  3   address of a quarantine server..., end quote.

09:42  4              And I've emphasized the DNS query.  That

09:43  5   is the claim language.

09:43  6              The next point there on the slide is that

09:43  7   there's been a lot of talk about this DNS redirect.

09:43  8   Nowhere in the claims is there any recitation of what's

09:43  9   called a DNS redirect.  It simply refers to a DNS

09:43  10  query.

09:43  11             Finally, the last portion of that slide,

09:43  12  Cisco had a designated 30(b)(6) witness who was an

09:43  13  expert on the operation of Cisco ISE.  I believe his

09:43  14  name was Mr. Nygaard.  Nilsen-Nygaard.  And he

09:43  15  testified that Cisco ISE, the accused product, quote --

09:43  16  in fact:  Uses DNS, quote, as a core part of how we

09:43  17  facilitate communication between ISE nodes that we have

09:44  18  deployed, end quote, and that, quote, basically pretty

09:44  19  much anything we do today, we need to use a DNS

09:44  20  query -- which is recited in the claim -- we need to

09:44  21  use a DNS query of some kind in order to resolve from a

09:44  22  human-readable name to an IP address -- also recited in

09:44  23  the claim -- that the network understands.

09:44  24             That's Cisco's own expert, their 30(b)(6)

09:44  25  witness on ISE, talking about the use of a DNS query

09:44  1    and an IP address.

09:44  2              Finally, Dr. Cole addresses this

09:44  3    limitation in his report and his claim charts and

09:44  4    demonstrates that in the event the service request

09:44  5    comprises the DNS query, it provides in response an IP

09:44  6    address of a quarantine server.

09:44  7              So we've got here, I think, perhaps a

09:44  8    good old-fashioned battle of the experts between our

09:45  9    expert, Dr. Eric Cole, and their expert, Dr. Clark.

09:45  10   Dr. Clark does, in fact, support his position using

09:45  11   Cisco's own source code.  I think Ms. Brannen said that

09:45  12   nowhere did we -- have we invoked any source code.  We

09:45  13   did invoke -- Dr. Cole did invoke source code in his

09:45  14   expert report.  Kind of as a belt-and-suspenders

09:45  15   exercise.

09:45  16             We don't believe source code is necessary

09:45  17   to prove infringement in this case.  But he did, in

09:45  18   fact -- we did review thoroughly, exhaustively, source

09:45  19   code that was provided to us by Cisco.  And Dr. Cole

09:45  20   cites to that source code in support of the fact that

09:45  21   DNS query argument limitation is, in fact, met.

09:45  22             For the same reasons, Claim 12, little

09:45  23   bit different claim, Your Honor.  The body of the claim

09:45  24   is similar, if not identical, to that of Claim 19.  It

09:46  25   recites a series of steps.  What performs those steps?

| | | |
|---|---|---|
| 09:46 | 1 | Who or what performs those steps?  Again, the answer -- |
| 09:46 | 2 | I keep coming back to this.  The answer is the Cisco |
| 09:46 | 3 | ISE product, and the Cisco ISE software, which is |
| 09:46 | 4 | installed on a server. |
| 09:46 | 5 | That's the mastermind.  That is the |
| 09:46 | 6 | piece -- that is the product that is calling the shots. |
| 09:46 | 7 | That's the product that is performing all these claim |
| 09:46 | 8 | functions. |
| 09:46 | 9 | Claim 12 is a little bit different in |
| 09:46 | 10 | that it's a system claim.  And it does recite some |
| 09:46 | 11 | structure in the body of the claim, including a |
| 09:46 | 12 | processor and a memory coupled to the processor.  And |
| 09:46 | 13 | Cisco does, in fact, make and sell and offer to sell in |
| 09:46 | 14 | the United States the ISE computer program that's |
| 09:46 | 15 | preinstalled on a server that includes a processor and |
| 09:46 | 16 | memory.  And that, I believe, is or should be |
| 09:47 | 17 | undisputed. |
| 09:47 | 18 | Dr. Cole cites to that in Appendix C to |
| 09:47 | 19 | his report at the pages that I've recited -- cited in |
| 09:47 | 20 | this slide. |
| 09:47 | 21 | That server serves to protect a network |
| 09:47 | 22 | and it performs all the functions recited in the |
| 09:47 | 23 | claims.  So, again, we keep coming back to Cisco ISE. |
| 09:47 | 24 | What performs these steps in these functions in the |
| 09:47 | 25 | claim?  The answer I keep coming back to is it's Cisco |

09:47  1    ISE.  It's Cisco ISE.  It's not the host computer.

09:47  2    It's not the TPM.

09:47  3                And, again, Your Honor, we have made a

09:47  4    decision to try to truncate the case and limit the case

09:47  5    further.  And we will not be presenting an allegation

09:47  6    of infringement at trial of system -- or I'm sorry --

09:47  7    method Claim 1 at this time.

09:47  8                That's all I have at this point.  I would

09:48  9    just conclude that summary judgment of noninfringement

09:48  10   should be denied as to all claims.  We believe that

09:48  11   K.Mizra will prove at trial --

09:48  12               THE COURT:  I got it.

09:48  13               MR. STARR:  Okay.  Thank you, Your Honor.

09:48  14               THE COURT:  Yes, ma'am.

09:48  15               MR. BRANNEN:  Your Honor, may I make a

09:48  16   brief rebuttal?  Thank you.  There's just one...

09:48  17               I'd like to make five points, Your Honor.

09:48  18   The -- only the second point requires the slides so I'm

09:48  19   going to try to multitask here.  My first response is

09:48  20   that even if everything that Mr. Starr said is right --

09:48  21   and it's not, we'll get to that in a moment -- but even

09:48  22   if everything he said is right about what their

09:48  23   infringement theory requires and what they're accusing,

09:48  24   they still need evidence under INVT of at least one

09:49  25   instance of Cisco or a Cisco customer, of someone,

09:49  1    putting -- putting the system together in the

09:49  2    claim-required environment.

09:49  3              They don't have it.  We've said multiple

09:49  4    times that they don't have it, and he didn't try to

09:49  5    show you any.  So that is the first point.  It's a

09:49  6    relatively easy way to dispose of the case.

09:49  7              Now I'd like to go to the remaining four

09:49  8    points where I explained to Your Honor why I believe

09:49  9    that some of the things Mr. Starr said are not just

09:49  10   wrong, but remarkably wrong in a really unsubstantiated

09:49  11   way.

09:49  12             So his -- he showed a Slide No. 5 and

09:49  13   tried to tell the Court that it's ISE that performs all

09:49  14   the actual limitations that are required by Claim 19,

09:50  15   and Claim 19 parallels what's required by System

09:50  16   Claim 12.  Well, his slide included receiving,

09:50  17   contacting, receiving, determining, and permitting.

09:50  18   But the step his slide omitted is the slide that we

09:50  19   showed, which we're showing again here, where Dr. Cole

09:50  20   explains that the very first step that the processor

09:50  21   needs to do in Claim 12, or the instructions need to do

09:50  22   in Claim 19, is the step of detecting an insecure

09:50  23   condition.  And what they point to there is AnyConnect,

09:50  24   not ISE.

09:50  25             So there's just no evidence to

09:50  1    substantiate what he told you, that they can make an

09:50  2    infringement claim by pointing to instructions or

09:50  3    things that are carried out on the ISE server alone.

09:50  4    The ISE server alone can't even do the accused posture

09:50  5    check.  They need AnyConnect.  And as we see, they need

09:50  6    AnyConnect to be performing the first step in the

09:51  7    claims.  They say it's AnyConnect that is responsible

09:51  8    for detection of an insecure condition.

09:51  9              And, of course, once they need two

09:51  10   different products sold separately, they have an

09:51  11   insurmountable Deepsouth problem.  They have a further

09:51  12   problem there, because if we look at the claim language

09:51  13   on this slide, that step of detecting the insecure

09:51  14   condition has to include contacting a trusted computing

09:51  15   base associated with a trusted platform module.  And in

09:51  16   order to do that, they need the Microsoft Windows 10

09:51  17   and 11 devices that Cisco doesn't even sell.

09:51  18             We think they need to prove that that's

09:51  19   always present.  They certainly need to prove that that

09:51  20   was present at least once, and that these steps were

09:51  21   actually performed by the combination they're accusing,

09:51  22   which is the combination of ISE and AnyConnect when it

09:51  23   does the accused posture feature.  And so what he said

09:51  24   now, that they're accusing ISE alone, is just

09:51  25   absolutely unsubstantiated by anything in Dr. Cole's

09:52  1    report, and we can see it here.

09:52  2                    And there was no attempt to answer this

09:52  3    part.  They just omitted it from their slides.  The

09:52  4    TCB, trusted computing base, and trusted platform

09:52  5    module, these are not unclaimed.  These are things they

09:52  6    have to prove happen, and they can't.  And they

09:52  7    certainly can't prove that Cisco or any Cisco customer

09:52  8    has ever assembled the complete system they would need

09:52  9    to demonstrate that these instructions have been or

09:52  10   ever could be carried out.

09:52  11                   The third point I'd like to make is a

09:52  12   reputation on whether the products need to be modified.

09:52  13                   So the slide that Mr. Starr showed said

09:52  14   we were contending that AnyConnect needed to be

09:52  15   modified.  Actually, the modifications we're pointing

09:52  16   out, many of them have to be made when you're setting

09:52  17   up ISE, choosing whether to try to do a posture check

09:52  18   at all, choosing whether to do the posture check with

09:53  19   AnyConnect as opposed to ISE's different posture

09:53  20   feature, choosing whether to set the posture check

09:53  21   policy to check for a patch level rather than to check

09:53  22   for something the claims don't require.

09:53  23                   I actually find it intriguing -- and I

09:53  24   don't think the Court needs to reach the question of

09:53  25   whether the code itself needs to be modified.  I know

09:53  1   that's wrong based on the law we cited for the system

09:53  2   claims.  For those, you actually have to be selling the

09:53  3   complete accused system in the required configuration.

09:53  4              I believe that even for Claim 19, the

09:53  5   modifications don't need to be something that you would

09:53  6   make at the level of the code.

09:53  7              But here, the modifications we're talking

09:53  8   about are to the code in the following sense:  The ISE

09:53  9   code alone doesn't cut it.  You need to combine it with

09:53  10  AnyConnect code running on a Windows 10 or 11 machine.

09:53  11             That's a change to the code because you

09:53  12  can't perform any of the steps unless you have both of

09:54  13  those pieces of software running on both of the pieces

09:54  14  of hardware that they say you need.

09:54  15             I do think just Finjan is inapposite

09:54  16  because -- for that same reason.  There, all the

09:54  17  required actions could be performed by the server.

09:54  18  Here, they cannot even allegedly, according to

09:54  19  Dr. Cole, be performed by ISE alone.

09:54  20             The fourth point I'd like to make is on

09:54  21  the TPM, an association with the TPM.

09:54  22             Mr. Starr said that our expert,

09:54  23  Dr. Clark, admitted a bunch of things.  If he had

09:54  24  admitted those things, maybe they would be closer to

09:54  25  creating a question of fact on whether they could prove

—36—

09:54  1    that there was an association with the TPM.  Dr. Clark

09:54  2    did not say those things.

09:54  3              And we pointed out in our reply brief,

09:54  4    which is ECF No. 159, at Page 9 in Footnote 2, the

09:55  5    testimony they cite, which is actually attached to

09:55  6    their opposition, it's their opposition No. 139,

09:55  7    Exhibit 5, you could read that testimony.  It's pretty

09:55  8    quick.  They didn't include much of it.

09:55  9              But they don't ask him the questions that

09:55  10   Mr. Starr said that they asked him, and he doesn't give

09:55  11   the answers that Mr. Starr said he gave.

09:55  12             He instead testified that he might not be

09:55  13   surprised about certain things -- certain instructions,

09:55  14   but he said, I actually haven't seen anything like

09:55  15   that.

09:55  16             So there's not enough on the TPM, and

09:55  17   they never answer the point that their invalidity

09:55  18   expert was very clear, that the heart of the invention

09:55  19   would require the TPM to actually be doing what a TPM

09:55  20   does, generating digital keys to sign the attestation

09:55  21   of cleanliness.

09:55  22             He's requiring one thing that their guy

09:55  23   is saying it does something completely different.  And

09:55  24   there really is no proof.  They would have needed

09:55  25   Microsoft code to actually prove it up, and they

09:56    1    couldn't get that.  Microsoft refused to give it

09:56    2    because of the license.

09:56    3                    So finally, on the last limitation,

09:56    4    Mr. Starr characterized our argument as an argument

09:56    5    about DNS queries.  And then he proceeded to refute

09:56    6    that straw man, but the claim language he showed very

09:56    7    clearly explained that it's in response to a DNS query

09:56    8    that you have to provide the IP address of a quarantine

09:56    9    server.  There's no evidence of anything like that.

09:56   10                    And he said, well, Dr. Cole pointed to

09:56   11    code, but there's another argument he didn't answer.

09:56   12    The code Dr. Cole pointed to is something very

09:56   13    different.  A URL or HTTP redirect, that is admittedly

09:56   14    not what the claims cover.

09:56   15                    So for each of these three reasons, this

09:56   16    case should be dead in the water.  There is not a

09:56   17    chance that a reasonable jury could hear the evidence

09:56   18    that was presented and find that Cisco directly

09:56   19    infringes any of the three remaining asserted claims.

09:57   20                    We very much appreciate the opportunity

09:57   21    to be heard and would ask that the Court grant our

09:57   22    motion.

09:57   23                    THE COURT:  The Court is going to deny

09:57   24    the motion.

09:57   25                    But let me -- and I don't mean this to

| | | |
|--|--|--|
| 09:57 | 1 | sound threatening, although it might a little bit. |
| 09:57 | 2 | I've had now more than one trial where at the directed |
| 09:57 | 3 | verdict stage at the end of the plaintiff's case, the |
| 09:58 | 4 | defendant has gotten up and said, Judge, we have the |
| 09:58 | 5 | transcript.  Their expert had put on no evidence about |
| 09:58 | 6 | certain claim elements or whatever. |
| 09:58 | 7 | And in both cases, the plaintiffs have |
| 09:58 | 8 | scrambled and looked at me like, I don't know what |
| 09:58 | 9 | they're talking about, and were unable to respond to |
| 09:58 | 10 | that. |
| 09:58 | 11 | So I understand the arguments that the |
| 09:58 | 12 | defendants made and their concerns about the evidence |
| 09:58 | 13 | that they believe is lacking. |
| 09:58 | 14 | And so I -- if at the end of the |
| 09:58 | 15 | plaintiff's evidence, the defendant can point out |
| 09:58 | 16 | specific issues where they believe the record is |
| 09:58 | 17 | deficient, I expect for the plaintiff to be able to |
| 09:58 | 18 | respond immediately and say, no, Judge.  Of course, |
| 09:58 | 19 | this is where we put on evidence. |
| 09:58 | 20 | You'd think that wasn't true, but I've |
| 09:58 | 21 | granted two directed verdicts so far where the |
| 09:59 | 22 | plaintiff couldn't do that. |
| 09:59 | 23 | Next up I have the issue of the license |
| 09:59 | 24 | that I'll take up. |
| 09:59 | 25 | I have it as a -- kind of a two-step |

—39—

| | | |
|---|---|---|
| 09:59 | 1 | motion for summary judgment on Cisco's contract-based |
| 09:59 | 2 | affirmative defense and also defendant's motion for |
| 09:59 | 3 | summary judgment regarding the license.  And they look |
| 09:59 | 4 | to me to be related. |
| 09:59 | 5 | Is that correct? |
| 09:59 | 6 | MR. HOLOHAN:  Yes, Your Honor.  It's |
| | 7 | basically cross motions. |
| 09:59 | 8 | This is Matthew Holohan.  Sorry, ma'am. |
| 09:59 | 9 | Your Honor, I think what we effectively |
| 09:59 | 10 | have here is cross motions for summary judgment on this |
| 09:59 | 11 | license defense. |
| 09:59 | 12 | Thank you, Your Honor.  May it please the |
| 09:59 | 13 | Court. |
| 09:59 | 14 | My name is Matt Holohan.  I'm here for |
| 09:59 | 15 | plaintiff K.Mizra to speak about the -- Cisco's license |
| 09:59 | 16 | and contract defenses and counterclaims. |
| 09:59 | 17 | I would say that the sort of central |
| 09:59 | 18 | issue on these motions is whether the '705 patent is a |
| 10:00 | 19 | so-called ███████████ under the Microsoft |
| 10:00 | 20 | agreement.  It's not.  There's no evidence that it is. |
| 10:00 | 21 | Separate from that issue, though, and |
| 10:00 | 22 | I'll probably address these points with more brevity, |
| 10:00 | 23 | there's no evidence in the record that Cisco is even a |
| 10:00 | 24 | third-party beneficiary of the agreements.  There's no |
| 10:00 | 25 | evidence that the infringement claims in this case |

10:00  1  implicate any release, license or covenant in the

10:00  2  agreement.

10:00  3          On the sort of counterclaim side, to the

10:00  4  extent Cisco seeks to prove up a breach of contract

10:00  5  claim, there was no timely presented or developed

10:00  6  theory of damages that would support such a claim.

10:00  7          So we believe that all of the license and

10:00  8  contract issues should be eliminated from the case

10:00  9  prior to trial.

10:00  10          Beginning with this ████████████

10:00  11  issue, this is the definition of the ████████████

10:00  12  in the Microsoft agreement.  As you can see, it's very

10:00  13  long and dense.

10:00  14          Most of this definition is basically

10:01  15  saying ████████████████████████████████████

10:01  16  ████████████████████████████████████

10:01  17  ████████████████████████████████.  And it

10:01  18  wasn't.

10:01  19          And Cisco has not really sought to prove

10:01  20  that it was.  So I think that is at least undisputed,

10:01  21  that this first definition -- this first portion of the

10:01  22  definition, which is almost the entire definition, is

10:01  23  not at issue.

10:01  24          Instead, Cisco points to this second

10:01  25  cite -- sentence of the definition, which says:

—41—

10:01  1

10:01  2

10:01  3

10:01  4

10:01  5

10:01  6          And if you look at what the parties

10:01  7   bargained for with the ████████████ definition, it

10:01  8   was ████████████████████████████████

10:01  9

10:01  10

10:02  11

10:02  12          And that was the substantive bargain the

10:02  13   parties reached. ██████████████████████

10:02  14

10:02  15          Looking further into the Microsoft

10:02  16   agreement, Cisco has to rely on these updated exhibits.

10:02  17   And I'll get to those in a minute, but just to go

10:02  18   through the definitions, ████████████████████

10:02  19

10:02  20

10:02  21

10:02  22

10:02  23

10:02  24

10:02  25          As a formal matter, ████████████████



42



| | |
|---|---|
| 10:02 | 1 |
| 10:02 | 2 |
| 10:02 | 3 |
| 10:02 | 4 |
| 10:02 | 5 |
| 10:02 | 6 |
| 10:03 | 7 |
| 10:03 | 8 |
| 10:03 | 9 |
| 10:03 | 10 |
| 10:03 | 11 |
| 10:03 | 12 |
| 10:03 | 13 |
| 10:03 | 14 |
| 10:03 | 15 |
| 10:03 | 16 |
| 10:03 | 17 |
| 10:03 | 18 |
| 10:03 | 19 |
| 10:03 | 20 |
| 10:03 | 21 |
| 10:03 | 22 |
| 10:03 | 23 |
| 10:03 | 24 |
| 10:03 | 25 |

As for the e-mails themselves, I just wanted to note -- and we've talked about this in our briefs, but there is some clear errors that have not

| 10:04 | 1 | been contested in the way that iPEL actually |
| 10:04 | 2 | supplemented these disclosures. |



44



10:05   1

10:05   2

10:05   3

10:05   4

10:05   5

10:05   6

10:05   7

10:05   8

10:05   9

10:05   10

10:05   11

10:05   12

10:05   13

10:05   14

10:06   15

10:06   16          That's what you have -- that is the

10:06   17  counterfactual you have to accept to conclude that the

10:06   18  '705 patent is a ▮▮▮▮▮▮▮▮▮▮▮▮.

10:06   19          I don't belabor this, but as I said, ▮▮▮

10:06   20

10:06   21

10:06   22          On the record as characterized by Cisco,

10:06   23  there were no ▮▮▮▮▮▮

10:06   24

10:06   25

| | | |
|---|---|---|
| 10:06 | 1 | ███████████████████████████████ |
| 10:06 | 2 | ████████████████████     I don't think a |
| 10:06 | 3 | reasonable jury could find that. |
| 10:06 | 4 | So there's a complete lack of proof on |
| 10:06 | 5 | Cisco's ██████████ theory.  And for that reason, |
| 10:06 | 6 | summary judgment is appropriate on any defense or claim |
| 10:06 | 7 | on the basis of the '705 being a ████████████ |
| 10:06 | 8 | So we don't really need to look at the |
| 10:06 | 9 | declarations, but K.Mizra has submitted declarations |
| 10:07 | 10 | from Mr. McWilliams himself, who is the author of the |
| 10:07 | 11 | e-mails, and Brian Yates, who is a CEO of iPEL, |
| 10:07 | 12 | providing more context and explaining -- resolving |
| | 13 | some -- |
| 10:07 | 14 | Happens every time, ma'am.  I apologize. |
| 10:07 | 15 | -- resolving some of the ambiguities in |
| 10:07 | 16 | these exhibits, Mr. Yates has said that ████████ |
| 10:07 | 17 | ████████████████████████████████████████████ |
| 10:07 | 18 | ██████     This testimony, as a substantive matter, is |
| 10:07 | 19 | uncontested.  There's no evidence in the record that |
| 10:07 | 20 | ████████████████████████████████████ |
| 10:07 | 21 | ███████████████████████████████████ |
| 10:07 | 22 | ██████████████ |
| 10:07 | 23 | As for the -- as for Cisco's objections |
| 10:07 | 24 | to these declarations, we said in our briefs, Rule 56 |
| 10:07 | 25 | explicitly contemplates affidavits or declarations in |

46

| | | |
|---|---|---|
| 10:07 | 1 | advancing or opposing a summary judgment motion. |
| 10:07 | 2 | That's what we've done here.  There's nothing |
| 10:07 | 3 | unremarkable -- or there's nothing remarkable or |
| 10:07 | 4 | special about the approach we've done here. |
| 10:08 | 5 | And I do want to highlight this case from |
| 10:08 | 6 | the Richardson decision.  From this court -- this is |
| 10:08 | 7 | actually a quote from another district court, but it |
| 10:08 | 8 | was adopted in that case. |
| 10:08 | 9 | Nearly every brief in support of or in |
| 10:08 | 10 | opposition to a motion for summary judgment filed in |
| 10:08 | 11 | this district court relies on affidavits or |
| 10:08 | 12 | declarations signed within days of that filing. |
| 10:08 | 13 | That's what happened here. |
| 10:08 | 14 | Mr. McWilliams and Mr. Yates signed their declarations |
| 10:08 | 15 | the first week of June, right before we filed our |
| 10:08 | 16 | motion. |
| 10:08 | 17 | If plaintiff's argument were argument, |
| 10:08 | 18 | then all of these federal litigants flout the federal |
| 10:08 | 19 | rules of civil procedure, and all declarations should |
| 10:08 | 20 | be stricken unless they were executed prior to the |
| 10:08 | 21 | discovery deadline and shared with opposing counsel at |
| 10:08 | 22 | that time.  This is not how Rule 26 works. |
| 10:08 | 23 | So this idea that we have somehow |
| 10:08 | 24 | breached the discovery rules, breached the federal |
| 10:08 | 25 | rules by submitting declarations with our summary |

10:08  1    judgment motion is simply inconsistent with the common

10:08  2    practice in every federal district court when it comes

10:09  3    to summary judgment.

10:09  4                I don't need to belabor their objections.

10:09  5    We responded to them in our briefs.  The declarations

10:09  6    are relevant.  They go to the interpretation of the

10:09  7    ambiguous contract, supplements and whether the patent

10:09  8    was being looked at at the relevant time period.

10:09  9    They're not speculative.

10:09  10               Mr. Yates and Mr. McWilliams support all

10:09  11   of their observations and factual conclusions with

10:09  12   percipient context and testimony.  We're not relying on

10:09  13   them for any legal conclusions, and we don't believe

10:09  14   there are any relevant inconsistencies.  But as was

10:09  15   held in this Wingspan case, inconsistent testimony is a

10:09  16   matter for cross-examination, not striking a

10:09  17   declaration entirely.

10:09  18               So we believe the summary judgment on the

10:09  19   sort of ███████████ theory that would completely

10:09  20   bar the case is warranted based on a complete failure

10:09  21   of proof.  Briefly, Cisco bears the burden on proving

10:10  22   that they were a third-party beneficiary and that the

10:10  23   infringement allegations implicate the agreement.  Who

10:10  24   am I going to cross-examine on these issues?  There is

10:10  25   no evidence in the record, there's only attorney

—48—

10:10  1   argument showing that Cisco can even invoke this

10:10  2   agreement at all.  So that's a separate basis for

10:10  3   granting summary judgment.

10:10  4            There was this issue that came up in the

10:10  5   briefs as to whether if the ████████████████████

10:10  6   ██ from the other patent category applies.  Is

10:10  7   dismissal the appropriate remedy, you know, years

10:10  8   later, because we filed suit early.  Cisco, in their

10:10  9   motion for summary judgment, did not seek dismissal

10:10  10  based on the ████████████  theory so we don't think that

10:10  11  that is even before the Court.  They don't seem to be

10:10  12  asking for that.

10:10  13           But that would not be an appropriate

10:10  14  remedy.  The cases that were cited in the brief show

10:10  15  that a covenant not to sue in perpetuity is a complete

10:10  16  release, which would bar suit.  That's not what we have

10:10  17  here.  ███████████████████████████████████████████████

10:10  18  █████████████████████████████████████████████████

10:11  19  ███████████████████████████

10:11  20           And, finally, Cisco has a counterclaim

10:11  21  for breach of contract on either the █████████████████

10:11  22  ██████  theory.  There was never any disclosure of a

10:11  23  damages theory, expert reports, Rule 26 disclosures,

10:11  24  interrogatory responses.  In their briefs, they say,

10:11  25  well, we can take attorneys' fees.  In theory, they

| | | |
|---|---|---|
| 10:11 | 1 | could, but they still have to -- they have to have had |
| 10:11 | 2 | told us that earlier in the case so we could have |
| 10:11 | 3 | interrogated that and investigated it. |
| 10:11 | 4 | So for that reason, we would ask for |
| 10:11 | 5 | summary judgment on all the contract claims in this |
| 10:11 | 6 | case, Your Honor.  Thank you. |
| 10:11 | 7 | THE COURT:  A response? |
| 10:11 | 8 | MS. JAMES:  Good morning, Your Honor. |
| 10:12 | 9 | THE COURT:  Good morning. |
| 10:12 | 10 | MS. JAMES:  My name is Jhaniel James, and |
| 10:12 | 11 | I'm an associate at Stris & Maher LLP.  I'll be arguing |
| 10:12 | 12 | in response on behalf of Cisco. |
| 10:12 | 13 | Your Honor, the party's cross-motion for |
| 10:12 | 14 | summary judgment on Cisco's license-based affirmative |
| 10:12 | 15 | defenses and counterclaims raises three questions, each |
| 10:12 | 16 | of which is a matter of contract interpretation. |
| 10:12 | 17 | Question 1:  Is Cisco a third-party |
| 10:12 | 18 | beneficiary under an agreement by which K.Mizra's |
| 10:12 | 19 | predecessors and interest ███████████████████████ |
| 10:13 | 20 | ███████████████████████████████████████████ |
| 10:13 | 21 | ██████████████████████████ |
| 10:13 | 22 | Question 2:  Does K.Mizra's infringement |
| 10:13 | 23 | contentions rely on a Microsoft product as defined in |
| 10:13 | 24 | their agreement; and is the asserted patent here, the |
| 10:13 | 25 | '705 patent, a ██████████████ as defined in their |

10:13  1    agreement?

10:13  2              The answer to each of these questions is

10:13  3    yes.

10:13  4              Question 1 requires the Court to look no

10:13  5    further than the agreement.  The agreement has a

10:13  6    section entitled "Third-Party Beneficiaries." ████

10:13  7    ████████████████████████████████████████████████

10:13  8    ████████████████████████████████████████████

10:13  9    ████████████████████████████████████████████████

10:13  10   ██████████

10:13  11   ███████████████████████████████████

10:13  12   ████████████████████████████████████  ██

10:14  13   ████████████████████████████████████████████████

10:14  14   ████████████████████████████████████████████████

10:14  15   K.Mizra has not articulated a coherent argument for why

10:14  16   the agreement itself is not sufficient evidence to

10:14  17   establish that Cisco can enforce the agreement, and

10:14  18   there can be no genuine dispute that Cisco can.

10:14  19              Question 2.  Does K.Mizra's infringement

10:14  20   contentions use a Microsoft product to satisfy a

10:14  21   limitation of the asserted patent is also a matter of

10:14  22   contract interpretation.

10:14  23   ████████████████████████████████████

10:15  24   ██████████████████████         K.Mizra's infringement

10:15  25   contentions explicitly allege, as my colleague

10:15  1    Ms. Brannen discussed, that Cisco infringes when

10:15  2    running on Windows 10 or 11, both of which are

10:15  3    Microsoft software.  K.Mizra argues, as Mr. Starr

10:15  4    argued, that it is not relying on Windows 10 or 11 but

10:15  5    merely using these Microsoft products to confirm

10:15  6    infringing functionality.  This argument, however, is

10:15  7    belied by K.Mizra's and its infringement expert's own

10:15  8    admissions.

10:15  9          The '705 patent -- again, all of the

10:15  10   claims of the '705 patent require contacting a trusted

10:15  11   computing base associated with a trusted platform

10:15  12   module.  K.Mizra has conceded that the trusted

10:15  13   computing base is part of the Windows 11 operating

10:16  14   system, which, again, is a Microsoft product.  And

10:16  15   K.Mizra's infringement expert has also premised his

10:16  16   opinion on the use of Microsoft windows APIs that

10:16  17   utilize and are associated with the claim TPM.  These

10:16  18   APIs, too, are Microsoft software.

10:16  19          K.Mizra has offered no alternative to

10:16  20   these Microsoft software and has conceded that the

10:16  21   accused Cisco products do not have a TPM and that Cisco

10:16  22   does not sell a TPM.  There, thus, can be no genuine

10:16  23   dispute that K.Mizra is relying on Microsoft products

10:16  24   to satisfy at least one limitation of the asserted

10:16  25   patents.

10:16   1               For Question 3, which I think is the meat

10:16   2   of the dispute between the parties, is the '705 patent

10:16   3   a ███████████████? Again, Your Honor, this requires

10:16   4   the Court to look no further than the agreement.

10:16   5

10:17   6

10:17   7

10:17   8

10:17   9

10:17   10

10:17   11

10:17   12

10:17   13

10:17   14

10:17   15

10:18   16

10:18   17

10:18   18

10:18   19

10:18   20

10:18   21       ████████  There are a few issues with this argument,

10:18   22   Your Honor.  I'm going to try to take some of them.

10:18   23               K.Mizra has stated that there's somehow a

10:18   24   difference between the term "Exhibit C" in one portion

10:18   25   of the agreement where it says "Exhibit C hereto" and

10:18  1    another portion of the agreement where it discusses

10:18  2    updates to Exhibit C.  Doing -- or interpreting the

10:19  3    agreement this way, Your Honor, would violate a basic

10:19  4    tenant of contract interpretation under the applicable

10:19  5    Washington state law whereby the same term in the

10:19  6    agreement should be given the same definition

10:19  7    throughout the agreement.

10:19  8              K.Mizra has also said that ███████

10:19  9    ███████████████████████████████████████████████████

10:19  10   ██████████████████████████████████████████████████

10:19  11   ██████████████████████████████████████████████████

10:19  12   █████████████████████████████████████████████

10:19  13      ████████████████████████████████████████████

10:19  14   █████████████████████████████████████████

10:19  15   ████████████████████  ██████████████████████████

10:19  16   ███████████████████████████████████████████████████

10:19  17   ███████████████████████████████████████████

10:20  18   ██████    ████████████████████████████████████████

10:20  19   ██████████████████████████████████████████

10:20  20   ████████████████████████████████████████████

10:20  21   ███████████████████████████████████████████████

10:20  22   ███████████████████████████████████████████████

10:20  23   █████████████████████████████████████████

10:20  24   ████████████████████████████████████████████████████

10:20  25   ██████████

10:20  1          Basically, they'd like Microsoft and

10:20  2    whoever else has to rely on this agreement to look

10:20  3    through and somehow determine what they meant to be

10:20  4    ██████████████████ and what they meant to be ████████

10:20  5    ██████.  But the agreement is what matters and the

10:20  6    agreement states that ███████████████████████████

10:20  7    ████████████████████  ████████████████████████████████

10:20  8    ████████████████████████████████████████████████████████

10:20  9    ████████████████████████████████████████

10:21  10   ██████████████

10:21  11              ██████████████████████████████████

10:21  12   █████████████████████████████████████████████

10:21  13   ████████████████████████████████████████████████████

10:21  14   █████████████████████████

10:21  15          K.Mizra has also discussed certain errors

10:21  16   in e-mails and apparent carelessness in recordkeeping.

10:21  17   What K.Mizra is really asking the Court to do is reform

10:21  18   the agreement based on a mutual mistake.  But these

10:21  19   errors that they point out are not -- or at least the

10:21  20   errors they point out could be mutual mistake.  I think

10:21  21   a scriber's error such as ████████████████████████████

10:21  22   ████████████████████████████ is the epitome of a

10:21  23   mutual mistake that, under Washington law, the parties

10:22  24   could correct.

10:22  25          But in this case where K.Mizra ████████████

—55—

10:22  1  ███████████████████████████████████████████████

10:22  2  Under Washington law, a mutual mistake requires both

10:22  3  parties to independently make a mistake.  And it cannot

10:22  4  be said here that both K.Mizra and Microsoft

10:22  5  independently made the same mistake.

10:22  6           For one, under Washington law, where a

10:22  7  party has to rely on another party's representation

10:22  8  regarding a fact, any mistake regarding that fact is

10:22  9  the party making the representations alone and can only

10:22  10  be a unilateral mistake.

10:22  11           Furthermore, under Washington law, the

10:22  12  party who is allocated a risk of performing a task

10:22  13  under the agreement cannot avoid the agreement under

10:22  14  the mutual mistake doctrine.

10:22  15           And here, K.Mizra's predecessor

10:22  16  ███████████████████████████████████████████████

10:23  17  █████████████████████   ███████████████████████

10:23  18  ████████████████████████████████████████████

10:23  19  ███████████████████████████████████████

10:23  20  ██████████████████████████████████

10:23  21           K.Mizra has also mentioned certain

10:23  22  declarations and has focused on a portion of the

10:23  23  agreement that █████████████████████████████

10:23  24  ██████████████████████████████████████████████████

10:23  25  ███████

—56—

```
10:23   1              These declarations are inadmissible for a
10:23   2    litany of reasons, but -- that we've briefed -- that
10:23   3    Cisco has briefed, but I will focus on the most fatal.
10:23   4              Under Washington state law, a party
10:24   5    cannot submit extrinsic evidence to contradict the --
10:24   6    an agreement or contradict terms defined in an
10:24   7    agreement.
10:24   8              Here, because ████████████████████████
10:24   9    ████████████████████████████████████████████████
10:24   10   ████████████████████████████████████████████████
10:24   11   ████████████████████████████████████████████████
10:24   12   ████████████████████████
10:24   13             Furthermore, the exhibit -- or the
10:24   14   declarations, rather, do not even say what K.Mizra
10:24   15   purports that they say.
10:24   16             K.Mizra is attempting to use the
10:24   17   declarations to prove when due diligence happened.
10:24   18   However, one declaration declarant, Mr. Yates, states
10:24   19   that ████████████████████████████████████
10:24   20   ████████████████████████████████████████
10:24   21   ████████████████████████████████████████████████
10:24   22   ████████████████
10:24   23             And Mr. McWilliams himself also stated
10:24   24   ████████████████████████████████████████
10:25   25   ████████████████████████████████████████████
```

10:25  1  ████████████████████████████████████

10:25  2          K.Mizra's arguments about what a

10:25  3  reasonable jury would or would not understand amounts

10:25  4  to their speculation as to what could have happened.

10:25  5          But again, this issue is a matter of

10:25  6  contract interpretation.  A million and one things

10:25  7  could have happened, but what the agreement said

10:25  8  controls.  ███████████████████████████████

10:25  9  ████████████████████████

10:25  10  ██████████████████████

10:25  11  ███████████████████████████████

10:25  12  █████████████████

10:25  13          Your Honor, for this reason, K.Mizra's

10:25  14  motion should be denied and Cisco's motion for summary

10:25  15  judgment should be granted.

10:25  16          In terms of -- sorry -- in terms of the

10:25  17  breach of contract claim, K.Mizra argues that Cisco

10:26  18  never notified them at an earlier date that Cisco would

10:26  19  seek attorneys' fees for any of its claims.  That's

10:26  20  incorrect, Your Honor.

10:26  21          Cisco's initial disclosures specifically

10:26  22  reserved the right to seek attorneys' fees for all of

10:26  23  its claim and so did the complaint.

10:26  24          On this basis too, Your Honor, K.Mizra's

10:26  25  summary judgment motion should be denied and Cisco's

10:26  1    motion should be granted.

10:26  2                    Thank you.

10:26  3                    THE COURT:  Anything else?

10:26  4                    MS. JAMES:  Not at this time.

10:26  5                    THE COURT:  Yes, sir.

10:26  6                    MR. HOLOHAN:  Your Honor, I think these

10:26  7    issues have been well briefed, so I won't take a lot of

10:27  8    time.

10:27  9                    I'd just like to make the overall point

10:27  10   that Cisco is pursuing an extremely pedantic theory of

10:27  11   contract interpretation in this case, that merely

10:27  12   typing the patent number onto an e-mail attachment

10:27  13   transforms it into a ██████████████████ contrary to all

10:27  14   of the context, all of the actual facts, all of the

10:27  15   ambiguities in the agreement and the full landscape of

10:27  16   reality that impacts that question.

10:27  17                    And if we're going to be that pedantic,

10:27  18   ████████████████████████████████████████████████

10:27  19   ██████████, so it is not within the definition.  ████

10:27  20   ████████████████████████   ████████████████████

10:27  21   ██████████████████████████████████████████████

10:27  22   ████████████████████

10:27  23              ████████████████████████████████████

10:27  24   ██████████████████████████████████████

10:27  25   ████████████████████   ████████████████████

10:28  1  ████████████████████████████████████████

10:28  2  ██████████████

10:28  3          And for that reason, it's unproven and

10:28  4  summary judgment in favor of K.Mizra on that issue is

10:28  5  warranted.

10:28  6          Thank you, Your Honor.

10:28  7          THE COURT:  Thank you.

10:28  8          (Off-the-record bench conference.)

10:29  9          THE COURT:  The Court is going to deny

10:29  10  the motions.

10:29  11          I think there's a possibility on what we

10:29  12  have to submit to the jury that there may be fact

10:29  13  issues we have to take up.  And even after that, I may

10:29  14  have to take up issues of law afterwards, but I'm going

10:29  15  to deny the motions.

10:29  16          On the next motion I have, which is the

10:29  17  motion on IPR estoppel, let me hear from Cisco as to

10:29  18  why I should not grant Cisco from relying on the NAC

10:30  19  system.

10:30  20          MR. HALPERN:  Thank you, Your Honor.

10:30  21          So there are essentially two issues on

10:30  22  K.Mizra's estoppel motion, whether the system material

10:30  23  Cisco is relying on to evidence the NAC prior art are

10:30  24  different from the published manuals and whether the

10:30  25  NAC product is identical to or different from the

| 10:30 | 1 | Gleichauf patent, which was in the IPR. |
| 10:30 | 2 | So first, there was some discussion in |
| 10:30 | 3 | briefs about the applicable standard, but really |
| 10:30 | 4 | there's no dispute about what the standard is. |
| 10:30 | 5 | It's the standard this Court applied in |
| 10:30 | 6 | the CliniComp case in which it distinguished Wasica, |
| 10:30 | 7 | the Delaware case K.Mizra is relying on. |
| 10:30 | 8 | In CliniComp, the Court read Wasica to |
| 10:30 | 9 | support estoppel only if the expert while purporting to |
| 10:30 | 10 | rely on system art relies "solely on publicly available |
| 10:30 | 11 | documents." |
| 10:30 | 12 | What the Court said there is:  The Court |
| 10:30 | 13 | finds Wasica distinguishable because -- from the |
| 10:30 | 14 | situation presented here, in making his expert report, |
| 10:31 | 15 | Greenspun did not rely solely on publicly available |
| 10:31 | 16 | documents. |
| 10:31 | 17 | Similarly, in the Hafeman case, also from |
| 10:31 | 18 | this Court, which K.Mizra relies on, the Court found no |
| 10:31 | 19 | substantive difference and it also appears, it's a very |
| 10:31 | 20 | brief holding there, that it was stipulated that there |
| 10:31 | 21 | was no difference between the products and the |
| 10:31 | 22 | patent -- the publications, which were patents in that |
| 10:31 | 23 | case. |
| 10:31 | 24 | The standard does not require extensive |
| 10:31 | 25 | reliance on the product.  The CliniComp court noted |

10:31  1    that, as a matter of fact in that case, there was

10:31  2    extensive reliance, but it did not say that was the

10:31  3    standard.

10:31  4              In any case, however, the differences

10:31  5    here between the NAC publications, you know, the

10:31  6    manuals, and the additional system elements here are

10:31  7    substantial.

10:31  8              So first, I want to dispose of the

10:31  9    misrepresentation of the record in K.Mizra's papers.

10:31  10             K.Mizra argues that Dr. Clark admitted

10:31  11   that the specific information in the NAC code was

10:31  12   described in Cisco's printed publications.  It cites to

10:32  13   Page 86, Lines 11 to 17, of Dr. Clark's testimony.

10:32  14             That is simply not there.  There is no

10:32  15   admission by Dr. Clark at that spot that the NAC code

10:32  16   doesn't add anything to the printed publications.

10:32  17             And if the Court is interested, I'm happy

10:32  18   to read that testimony or I can refer the Court to that

10:32  19   page.  But it's Page 86, Lines 11 to 17, of Dr. Clark's

10:32  20   testimony.

10:32  21             Here, Dr. Clark, turning to the main

10:32  22   question, relies on two things that go beyond a printed

10:32  23   publication, source code and the physical system using

10:32  24   NAC software that Dr. Clark will demonstrate for the

10:32  25   jury at trial.

| | | |
|---|---|---|
| 10:32 | 1 | K.Mizra argues that the use of the code |
| 10:32 | 2 | is de minimis because Dr. Clark did not provide enough |
| 10:32 | 3 | detail, but they admit that the code is cited for two |
| 10:32 | 4 | limitations.  There are only ten limitations.  And the |
| 10:32 | 5 | limitations relate to the creation of the posture |
| 10:33 | 6 | check, which is the core of the invention.  I think |
| 10:33 | 7 | that's not disputed. |
| 10:33 | 8 | Slide 2. |
| 10:33 | 9 | (Off-the-record discussion.) |
| 10:33 | 10 | MR. HALPERN:  Apologies, Your Honor. |
| 10:33 | 11 | So Dr. Clark's report explains that the |
| 10:33 | 12 | source code determines the status, that is the posture, |
| 10:33 | 13 | of the client computer and then returns the individual |
| 10:33 | 14 | status to the network, citing the lines of code that |
| 10:33 | 15 | perform these steps. |
| 10:33 | 16 | Next slide. |
| 10:33 | 17 | And Dr. Clark explains that the code uses |
| 10:33 | 18 | the plug-ins to gather status for the client system and |
| 10:34 | 19 | how the code assembles the data to create the posture |
| 10:34 | 20 | report, again, with cites to the specific lines of |
| 10:34 | 21 | code. |
| 10:34 | 22 | Now, again K.Mizra is saying this is not |
| 10:34 | 23 | a sufficiently detailed discussion.  It would like to |
| 10:34 | 24 | contrast it to the discussion of the code provided by |
| 10:34 | 25 | K.Mizra's infringement expert, Dr. Cole, to show |

10:34  1    infringement.

10:34  2                  Next slide, please.

10:34  3                  As you can see, Dr. Cole's report simply

10:34  4    recites the limitation at the top and then says, here

10:34  5    are the six files of code that satisfy this limitation.

10:34  6    And I note that the cites here are to pages, not lines.

10:34  7                  So there's like 30 pages or so cited

10:34  8    here, nothing more specific than that.  And I would say

10:34  9    if the Court is going to hold that citations to source

10:34  10   code are inadequate as an expert disclosure, then the

10:34  11   same rule should be applied to infringement and to

10:34  12   validity.

10:34  13                 Dr. Clark, at least in the slides I

10:34  14   pointed to, explains what the code is actually doing

10:34  15   with cites to lines.

10:34  16                 In addition, as noted in our opposition

10:35  17   brief and unrebutted, Dr. Clark has constructed a

10:35  18   physical embodiment of the NAC system on a network that

10:35  19   contains server switches and laptops and, importantly,

10:35  20   a trusted platform module.

10:35  21                 Dr. Clark discussed the demonstration in

10:35  22   his report, attached a video of it.  The TPM in that

10:35  23   system is in the same relationship as in K.Mizra's

10:35  24   infringement theory.  Running on a laptop, trying to

10:35  25   connect to a network using the prior art NAC product.

| | | |
|---|---|---|
| 10:35 | 1 | Obviously, a physical system with a |
| 10:35 | 2 | trusted platform module in it could not have been |
| 10:35 | 3 | presented in the IPR and was not presented in the IPR. |
| 10:35 | 4 | Finally, K.Mizra's assertion that |
| 10:35 | 5 | Gleichauf and NAC are identical is untrue. |
| 10:35 | 6 | And here's an example relating to |
| 10:35 | 7 | actually the key limitation in the IPR that was missing |
| 10:35 | 8 | from Gleichauf, which is the quarantine notification |
| 10:35 | 9 | page. |
| 10:35 | 10 | Next slide. |
| 10:35 | 11 | Okay.  So here is the NAC disclosure for |
| 10:36 | 12 | serving a quarantine notification page with highlights. |
| 10:36 | 13 | And it says:  During the admission control process, |
| 10:36 | 14 | clients are placed into a particular category. |
| 10:36 | 15 | That's referring to clients who are going |
| 10:36 | 16 | to be quarantined in this context. |
| 10:36 | 17 | And then it says:  Category assignment |
| 10:36 | 18 | can also cause pop-up messages to appear on the client |
| 10:36 | 19 | screen and redirect a web browser to a specific URL. |
| 10:36 | 20 | So this is talking about -- this is NAC, |
| 10:36 | 21 | the manual, talking about a pop-up message as the |
| 10:36 | 22 | quarantine notification page, okay? |
| 10:36 | 23 | Now, contrasting that to Gleichauf. |
| 10:36 | 24 | Next slide, please. |
| 10:36 | 25 | Gleichauf says:  The notification message |

65

10:36  1    may contain a text message for displaying to a user.

10:36  2           And then, again:  The message may be

10:36  3    displayed or written to a log file indicating

10:36  4    quarantine.

10:36  5           So the difference between a pop-up and a

10:36  6    text message as to whether or not one or the other

10:36  7    qualifies as a page, a notification page, is a very

10:36  8    important difference because that is precisely the

10:37  9    thing in the IPR for which a combination was needed

10:37  10   with Lewis, because the text message of Gleichauf was

10:37  11   not enough to constitute a quarantine notification

10:37  12   page.

10:37  13          A pop-up --

10:37  14          Go back to the previous slide.

10:37  15          -- which is what NAC discloses, that is

10:37  16   exactly the same thing that is in the accused product

10:37  17   that K.Mizra is alleging constitutes a quarantine

10:37  18   notification page.

10:37  19          So they're saying, if you have a pop-up,

10:37  20   that's a quarantine notification page.  That's why

10:37  21   Cisco infringes.  There's no pop-up in Gleichauf.

10:37  22          So these two references are materially

10:37  23   different, and K.Mizra's contention that they are

10:37  24   materially the same is incorrect.

10:37  25          Oh, and, finally, regarding K.Mizra's

| | | |
|---|---|---|
| 10:37 | 1 | motion for summary judgment of validity based on the |
| 10:38 | 2 | IPR, that is -- there's a long paragraph in their |
| 10:38 | 3 | motion where they ask for summary judgment and say the |
| 10:38 | 4 | clear-and-convincing standard cannot be met by Cisco's |
| 10:38 | 5 | evidence.  That argument is based entirely on the |
| 10:38 | 6 | premise that Gleichauf and NAC are identical; and, |
| 10:38 | 7 | therefore, this Court should simply follow the result |
| 10:38 | 8 | in the IPR.  As I've just shown, they are not |
| 10:38 | 9 | identical.  That was one example, there are others. |
| 10:38 | 10 | And of course, as already discussed, the |
| 10:38 | 11 | source code and the physical demonstration further |
| 10:38 | 12 | differentiate the record here from the IPR.  So the IPR |
| 10:38 | 13 | result would be on a totally different record from the |
| 10:38 | 14 | one that Cisco is presenting. |
| 10:38 | 15 | And I would just note, in case I didn't |
| 10:38 | 16 | make this clear already, the whole discussion of the |
| 10:38 | 17 | physical demonstration system with NAC loaded on it |
| 10:38 | 18 | that Dr. Clark created, there was no answer to that in |
| 10:39 | 19 | K.Mizra's reply brief.  They didn't say, for X, Y, or Z |
| 10:39 | 20 | reason, the physical demonstration is insufficient in |
| 10:39 | 21 | some way.  They simply ignored it. |
| 10:39 | 22 | THE COURT:  Thank you. |
| 10:39 | 23 | MR. HALPERN:  Thank you, Your Honor. |
| 10:39 | 24 | THE COURT:  The Court is going to deny -- |
| 10:39 | 25 | I'm sorry.  The Court is going to grant the motion and |

| | |
|---|---|
| 10:39 | 1 |
| 10:39 | 2 |
| 10:39 | 3 |
| 10:39 | 4 |
| 10:39 | 5 |

10:39    1    exclude that reference.

10:39    2                    Next up I have the 101 ineligibility.

10:39    3    Who's going to be arguing that?

10:39    4                    I'm not sure why you're getting up on a

10:39    5    101 motion.  Is it -- who --

10:39    6                    MR. HOLOHAN:  I believe -- I apologize,

10:39    7    Your Honor.  Was it our motion for summary judgment,

10:39    8    the denying the 101 motion?

10:39    9                    THE COURT:  Oh, so you've -- I just

10:39    10   expected them to be arguing on 101.  It doesn't make

10:39    11   much sense -- but you -- I'm not sure why it makes

10:40    12   sense for you -- it would make more sense for me to --

10:40    13   for them to tell me why they think it's ineligible

10:40    14   under 101 and have you respond to it.  But maybe I'm

10:40    15   just not used to doing this.

10:40    16                   MR. HOLOHAN:  Your Honor, I'm certainly

10:40    17   happy to defer to you in terms of order, but I --

10:40    18   the -- I believe the motion before the Court is that

10:40    19   there's a failure of proof on their 101 defense.

10:40    20                   THE COURT:  Well, I'll cut to the chase.

10:40    21   I agree with that.

10:40    22                   MR. HOLOHAN:  Okay.  Thank you, Your

10:40    23   Honor.

10:40    24                   MR. HALPERN:  May I argue, Your Honor?

10:40    25                   THE COURT:  No.

| | | |
|--|--|--|
| 10:40 | 1 | MR. HALPERN:  Okay. |
| 10:40 | 2 | THE COURT:  We've read the briefs and I'm |
| 10:40 | 3 | good.  Thank you.  And I will put down we've read the |
| 10:40 | 4 | briefs and they were unhelpful, but I'm going to -- |
| 10:40 | 5 | so... |
| 10:40 | 6 | Next up I have plaintiff's motion to |
| 10:40 | 7 | exclude the opinions of Cisco's expert Dr. Clark.  Are |
| 10:41 | 8 | these now -- with regard to enablement, is that now |
| 10:41 | 9 | moot? |
| 10:41 | 10 | MR. STARR:  I believe it is, Your Honor. |
| 10:41 | 11 | I think both parties have agreed that there was no |
| 10:41 | 12 | enablement opinion expressed at this time.  I'll defer |
| 10:41 | 13 | to counsel for Cisco. |
| 10:41 | 14 | THE COURT:  Is it moot or not moot? |
| 10:41 | 15 | MR. BRANNEN:  Oh, Your Honor, yes, I |
| 10:41 | 16 | believe it's -- we're in agreement. |
| 10:41 | 17 | THE COURT:  Then I have opinions |
| 10:41 | 18 | regarding anticipation.  I'll hear from -- I'll hear |
| 10:41 | 19 | the motion on that. |
| 10:41 | 20 | MR. STARR:  Thank you. |
| 10:41 | 21 | Thank you, Your Honor.  Again for the |
| 10:41 | 22 | record, my name is Bart Starr on behalf of K.Mizra. |
| 10:41 | 23 | We fully briefed this so I'll try to cut |
| 10:41 | 24 | to the chase.  Dr. Clark, who is Cole's technical |
| 10:42 | 25 | expert on the issue of invalidity, his opinion by his |

10:42   1   own admission is based upon what he refers to as an

10:42   2   improper claim interpretation.  Dr. Clark, in his

10:42   3   report, opines that the asserted claims of the '705

10:42   4   patent are invalid, quote, to the extent that claims

10:42   5   are improperly interpreted to cover the accused Cisco

10:42   6   products, end quote.

10:42   7              So he's admitting that his invalidity

10:42   8   position is premised on an improper claim construction.

10:42   9   K.Mizra is aware of no authority that permits Cisco to

10:42  10   premise an invalidity defense on an improper claim

10:42  11   interpretation and --

10:42  12              THE COURT:  Well, I have that Dr. Clark

10:42  13   says he is applying the same claim construction that

10:43  14   you all are, "you" being the plaintiff are, to find

10:43  15   infringement.  Is that not true?  I mean, it either is

10:43  16   correct or not.

10:43  17              MR. STARR:  Well, he does not set forth

10:43  18   what a claim construction -- the problem is --

10:43  19              THE COURT:  No.  He says, I'm -- for my

10:43  20   analysis, I'm doing it the same way the plaintiffs are.

10:43  21              Is that right or not?  Is he doing it the

10:43  22   same way or not?

10:43  23              MR. STARR:  It is difficult to determine

10:43  24   because he doesn't set forth what claim construction

10:43  25   he's using.

| | |
|---|---|
| 10:43 | 1 |

THE COURT:  Okay.  Well, if he -- if what
he says at trial is that -- well, a couple of things.
Assuming that -- what the defense told me is that
Dr. Clark is using the same claim construction.  What
he's going to tell the jury is, I'm using the same
claim construction for invalidity that you all are for
infringement.

MR. STARR:  Yes, Your Honor.

THE COURT:  Okay.  Now, if he's doing
that, then I'm denying the motion.

MR. STARR:  Okay.

THE COURT:  And with regard to the
lacking two claim limitations, motivation to combine,
I'm denying that as well.

Now, if what you're telling me -- if
you're telling me that Dr. Clark does not explain in
his report, for example, that he is applying the same
claim construction, when he goes to say that at trial,
you'll object and say, That's not in his report, and
then we will take up a different issue at that time.

MR. STARR:  Yes, Your Honor.

THE COURT:  So -- and while I'm talking
about that, let me explain to you how I handle this in
my court.

When they are putting on Dr. Clark on

| | |
|---|---|
| 10:44 | 1 |
| 10:44 | 2 |
| 10:44 | 3 |
| 10:45 | 4 |
| 10:45 | 5 |
| 10:45 | 6 |
| 10:45 | 7 |
| 10:45 | 8 |
| 10:45 | 9 |
| 10:45 | 10 |

direct, if they ask him a question, they should know the answer that's coming.  And if you stand up and say, Your Honor, that's not in his report, I expect counsel for Cisco to say, Of course it is, and be able to tell me the page and line, or page and paragraph.  Because every question they have on direct, they should know where it is in the report.  Doesn't have to be a quote, but they will have to --

This is bilateral.  I'm just picking on them for this example.  They will have to convince me that they put you all on notice that the jury was going to get to hear that evidence.  That's what's in the report.  And they will be -- if you say it's not in the report and I turn to them and they can't say where it's at, you're going to win.  I'm not going to wait for them to find it.  They will have to have it.

Now, as recently as yesterday, I went and -- because I thought maybe I'm crazy, but there's another trial going on here, and I went and watched a little bit of the trial.  I don't know why, but -- and this happened and it drives me crazy.  The one party puts on a witness, expert witness.  The other party cross-examines them and asks them something.  And then when the party's on redirect and they say, Can you explain your answer, the party over here gets up and

10:46  1   says, That's not in his report.

10:46  2                   Well, you don't get to ask a question on

10:46  3   cross and then say it's not in his report.  And that

10:46  4   happens every trial.

10:46  5                   MR. STARR:  Right.

10:46  6                   THE COURT:  So if -- you're very limited

10:46  7   to what's in the report, but if the other side asks a

10:46  8   question that asks for information, the expert gets to

10:46  9   explain the answer whether it's in his report or not.

10:46  10  If it's -- if the other side raised the issue and

10:46  11  opened the door.

10:46  12                  So I'm going to move on next to the

10:46  13  motion to exclude, I believe, the plaintiff's damages

10:46  14  expert.

10:46  15                  MR. STARR:  Thank you, Your Honor.

10:46  16                  MS. RAHIMI:  Good morning, Your Honor.

10:47  17                  THE COURT:  Let me -- I'm sorry.  Tell

10:47  18  me, first, who you are.

10:47  19                  MS. RAHIMI:  My name is Sarah Rahimi.

10:47  20  I'm from Stris & Maher.

10:47  21                  THE COURT:  Okay.  If you'll hold on one

10:47  22  second.  So as I'm going through what this is about, my

10:47  23  understanding is that it - on the first issue of

10:47  24  whether or not the plaintiff's expert used the correct

10:47  25  U.S. sales, it seems to me that this is an issue --

—73—

10:47　　1　they have a discovery issue over what was produced.  Is

10:47　　2　that right or not right?

10:47　　3　　　　　　　　MS. RAHIMI:  Not entirely, Your Honor.

10:47　　4　　　　　　　　THE COURT:  Well, what I have is that

10:48　　5　there's conflicting evidence of what Cisco produced and

10:48　　6　that that -- that that's part of the issue.  Is that

10:48　　7　what I'm going to hear from plaintiff?

10:48　　8　　　　　　　　MS. RAHIMI:  I'm sorry.  What was the

10:48　　9　question again?

10:48　10　　　　　　　　THE COURT:  Am I going to hear from the

10:48　11　plaintiff that the reason they used the U.S. sales

10:48　12　number that they're using is because that's what they

10:48　13　got from you all?  "You all" meaning Cisco.

10:48　14　　　　　　　　MS. RAHIMI:  You might hear from the

10:48　15　plaintiff for the reasons we explained in the reply

10:48　16　that is -- that is not substantiated.  They had the

10:48　17　information they needed in order to be able to use U.S.

10:48　18　sales for the accused combination of products --

10:48　19　　　　　　　　THE COURT:  So this is a discovery fight?

10:48　20　　　　　　　　MS. RAHIMI:  I'm sorry.  What was that?

10:48　21　　　　　　　　THE COURT:  This is a discovery fight?

10:48　22　　　　　　　　MS. RAHIMI:  It is not a discovery fight,

10:48　23　Your Honor.  It is about the methodology that

10:48　24　Mr. Pellegrino used in order to arrive at his opinions.

10:48　25　　　　　　　　THE COURT:  Okay.  Go ahead, please.

—74—

| | | |
|---|---|---|
| 10:49 | 1 | MS. RAHIMI:  Thank you. |
| 10:49 | 2 | Your Honor, we have identified the number |
| 10:49 | 3 | of major problems with Mr. Pellegrino's analysis in our |
| 10:49 | 4 | briefs, but rather than going to all of them, we'll |
| 10:49 | 5 | focus on three of the most egregious problems and I'll |
| 10:49 | 6 | be happy to answer any questions. |
| 10:49 | 7 | Next slide, please. |
| 10:49 | 8 | Your Honor -- |
| 10:49 | 9 | THE COURT:  Well, did you or did y'all |
| 10:49 | 10 | not -- if the plaintiff's going to say that there were |
| 10:49 | 11 | belated productions of financial documents, and these |
| 10:49 | 12 | other problems.  Did we have a -- what happened here? |
| 10:49 | 13 | I mean, we can't take up, in front of the jury, the |
| 10:49 | 14 | issues of -- if there was a problem with the production |
| 10:49 | 15 | during discovery, or if there was a problem, then it |
| 10:49 | 16 | wasn't up to the expert of either side to deal with |
| 10:49 | 17 | that.  It was up to me. |
| 10:49 | 18 | (Off-the-record bench conference.) |
| 10:50 | 19 | THE COURT:  Okay.  So tell me what |
| 10:50 | 20 | happened -- from your perspective, what happened with |
| 10:50 | 21 | regard to the production by Cisco, because I believe |
| 10:50 | 22 | I'm going to hear from the plaintiff.  Actually, let me |
| 10:50 | 23 | hear from the plaintiff first.  Let me hear from the |
| 10:50 | 24 | plaintiff as to why you came up with your number.  And |
| 10:50 | 25 | then I'll hear from Cisco as to why what you're saying |

| | | |
|---|---|---|
| 10:50 | 1 | isn't correct. |
| 10:50 | 2 | And then I'll get to the -- I realize |
| 10:51 | 3 | there's separate issue on the Premier-level ISE in |
| 10:51 | 4 | AnyConnect software, but for right now I'd like to hear |
| 10:51 | 5 | the plaintiff's side of what happened during discovery |
| 10:51 | 6 | and why they had their expert do what they did.  And |
| 10:51 | 7 | then I'll hear a response from Cisco's lawyers as to |
| 10:51 | 8 | why they disagree. |
| 10:51 | 9 | MS. RAHIMI:  Thank you, Your Honor. |
| 10:51 | 10 | THE COURT:  Because let me make clear, we |
| 10:51 | 11 | will not -- the lawyers will not bring up in front of |
| 10:51 | 12 | the jury issues about discovery.  It's not relevant |
| 10:51 | 13 | what happened during discovery. |
| 10:51 | 14 | If something a witness is testifying to |
| 10:51 | 15 | causes you concern because of what happened during |
| 10:51 | 16 | discovery, you come up and you come to the bench.  But |
| 10:51 | 17 | the jury isn't going to hear fights over what was and |
| 10:51 | 18 | was not produced. |
| 10:51 | 19 | Yes, ma'am. |
| 10:51 | 20 | MS. HO:  Good morning, Your Honor. |
| 10:51 | 21 | Patricia Ho for K.Mizra. |
| 10:52 | 22 | The reason we went through the document |
| 10:52 | 23 | production history was Cisco essentially -- one of |
| 10:52 | 24 | their arguments was that Mr. Pellegrino had ignored the |
| 10:52 | 25 | 928 and 929 workbooks and other more relevant evidence. |

What I attempted to lay out in the briefing was that Cisco had produced a series of purported financial spreadsheets relating to the accused products' revenue, but Mr. Pellegrino really -- under his analysis, which starts on Page 37 of his expert report, it's actually titled "Cisco's Data Production," he attempted to review all of these financial spreadsheets to essentially make sense of them and come up with a revenue number.

Up until the 928 and 929 workbooks were produced, which were produced on the very last day of fact discovery, everything prior to that had no totals or no real way to review, reconcile or even come up with a revenue number.

As I've explained in the response, there were just multiple -- these were spreadsheets where we had negative and positive totals. He was unable to -- even when looking at customer-level data, he was looking at the AnyConnect spreadsheets and the ISE spreadsheets and there were sometimes positive numbers for, you know, ISE invoice revenue versus negative revenue for AnyConnect customers. And so he couldn't come up with a base revenue number from all the spreadsheets.

Now, then the 928 and the 929 workbooks

—77—

| | |
|---|---|
| 10:53 | 1 |
| 10:53 | 2 |
| 10:54 | 3 |

1  were produced on the last day of fact discovery.  Those

2  essentially were the same in format as the previous

3  spreadsheets, but --

4            THE COURT:  How long had you been asking

5  for them?  I mean, how long had you been raising this

6  issue with Cisco that you had problems with getting

7  this and then you get it the last day?  How long had

8  you been --

9            MS. HO:  So I believe Interrogatories 8

10  and 9 asked for accused products' revenues, costs,

11  profits and margins.  And those were served back, I

12  believe, in 2021 before the case was stayed for IPR.

13            So the 928 and the 929 workbooks had

14  essentially grand totals.  That's the main difference

15  between those two workbooks and the prior spreadsheets.

16            They had a separate tab that show the

17  grand totals.  But again, when looking at the

18  underlying data, there's really no way to match it to

19  or reconcile or make sense of it.

20            Subsequently, the 956 workbook was

21  produced about -- this was after fact discovery, like a

22  week after fact discovery ended, which led to the

23  second deposition of Cisco's 30(b)(6) representative.

24            Basically we're given three hours to --

25  three additional hours to depose the Cisco

10:55   1   representative on the 956 workbook.  That deposition

10:55   2   was granted to us because the 956 workbook was

10:55   3   belatedly produced.

10:55   4               I would also note that Cisco never

10:55   5   amended or supplemented its interrogatory responses to

10:55   6   at least 8 and 9 to explain what the -- if the 956

10:55   7   workbook was responsive to those two interrogatories

10:55   8   and produced it in an e-mail with no further

10:55   9   explanation.

10:55   10              Mr. Pellegrino then was given a couple of

10:55   11  days to -- basically less than two business days to

10:55   12  look at it before the second deposition of the Cisco

10:56   13  representative.  For the first time the 956 workbook

10:56   14  actually laid out in a readable format the costs, the

10:56   15  margins, revenue information for ISE hardware, ISE

10:56   16  software and AnyConnect.  And I believe that's in the

10:56   17  briefing where we tried to screenshot some of the

10:56   18  summary pages.

10:56   19              Here's the summary pages here which I've

10:56   20  annotated and highlighted, but this was the very first

10:56   21  page of the workbook, which clearly shows what the

10:56   22  product COGS are, the royalties, the percentages

10:56   23  attributable to U.S. sales, the apportionment

10:56   24  percentages for the Premier and Apex licenses.

10:56   25              I'd also note that the 956 workbook in

| | | |
|---|---|---|
| 10:56 | 1 | contrast to the 928 and the 929 workbook was actually |
| 10:56 | 2 | generated internally by Cisco and from information and |
| 10:57 | 3 | databases they maintain in the ordinary course of |
| 10:57 | 4 | business. |
| 10:57 | 5 | In contrast, the 928 and the 929 |
| 10:57 | 6 | workbooks were generated by the Cisco representative's |
| 10:57 | 7 | consulting group.  He -- Mr. Boyles, who was designated |
| 10:57 | 8 | as the 30(b)(6) financial witness, is a consultant for |
| 10:57 | 9 | Cisco, did not have access to the information that was |
| 10:57 | 10 | used to generate the 956 workbook.  His company |
| 10:57 | 11 | generated the 928 and 929 workbooks, which -- it isn't |
| 10:57 | 12 | disputed that the 928 and the 929 workbooks reflect |
| 10:57 | 13 | invoice revenue. |
| 10:57 | 14 | But as Mr. Pellegrino goes through, |
| 10:57 | 15 | starting on Page 37 of his report, he found this |
| 10:57 | 16 | ultimately unreliable as compared to the 956 workbook |
| 10:57 | 17 | for many reasons.  Because the format of the 928 and |
| 10:58 | 18 | the 929 workbooks was basically unintelligible, he |
| 10:58 | 19 | didn't -- he couldn't tell if it would actually reflect |
| 10:58 | 20 | accurate revenue for the accused products. |
| 10:58 | 21 | So we have an invoice date.  We have some |
| 10:58 | 22 | invoice revenue -- two columns on the right that |
| 10:58 | 23 | purportedly show invoice revenue.  But Mr. Boyles had |
| 10:58 | 24 | testified he doesn't know if the underlying invoices |
| 10:58 | 25 | amounts were ultimately paid, how these orders were |

10:58   1   fulfilled.

10:58   2                    It really contradicts Cisco's just mode

10:58   3   of business in terms of selling subscription-level

10:58   4   licenses where these might be multiyear-level licenses.

10:58   5                    And Mr. Pellegrino actually did look at

10:58   6   what kind -- how Cisco recognizes its revenue, and it

10:58   7   appears that it engages in a deferred revenue-type

10:58   8   model.  And this was at his report on Page 44, we've

10:58   9   cited at Page 16 of our response brief, that looking at

10:59   10  their annual report, their SEC filings, they do

10:59   11  recognize revenue over time.

10:59   12                    And so in terms of the accused products

10:59   13  and how they're sold, how Cisco keeps its records, it's

10:59   14  really at odds to use the 928 and the 929 workbooks.

10:59   15                    And so for at least those reasons, he

10:59   16  found that they are unreliable, not to mention the

10:59   17  ancillary issues of the 956 workbook actually being

10:59   18  generated by Cisco itself for the first time and the

10:59   19  issues that I've just discussed there.

10:59   20                    THE COURT:  Okay.  Could I hear a

10:59   21  response, please?

10:59   22                    MS. RAHIMI:  Thank you, Your Honor.

10:59   23                    We have addressed some of these issues

10:59   24  on, I believe, Page 9 of our reply.  One moment.

11:00   25                    So it's not the case that for the first

11:00    1    time Cisco provided this financial data on the last day

11:00    2    of discovery.

11:00    3                     As the screenshots in K.Mizra's own

11:00    4    opposition shows, as early as March 2021, Cisco

11:00    5    produced sales data that goes as far back as

11:00    6    November 2014 -- so that's on Pages 7 and 9 of their

11:00    7    opposition -- because for years K.Mizra was asking for

11:00    8    sales data going six years back although that's not the

11:00    9    damages period they ended up using.

11:00    10                    In addition, as Ms. Ho noted, we -- we

11:00    11   amended our rog responses to point to the 928 and 929

11:00    12   workbooks as the correct sources.

11:00    13                    THE COURT:  When did you do that in

11:00    14   relation to the end of discovery?

11:01    15                    MS. RAHIMI:  So the last -- the latest

11:01    16   update was on the last day of discovery, which --

11:01    17                    THE COURT:  And how does that work?  What

11:01    18   are they supposed to do with that?

11:01    19                    MS. RAHIMI:  They had versions of the

11:01    20   workbooks before then.  But because they requested

11:01    21   information that was going six years back, Cisco had to

11:01    22   go into some archives to get that data.  So we were

11:01    23   continuously producing updated versions of the

11:01    24   workbooks.

11:01    25                    But it wasn't the case that for the very

11:01  1    first time they saw workbooks like that on the last day

11:01  2    of discovery.  We had been producing them since March

11:01  3    of 2021.

11:01  4                In addition, my e-mail, which is an

11:01  5    exhibit to their opposition at ECF 28-10, explains the

11:01  6    contents of these workbooks and what they -- and that

11:01  7    they contain sales data from July 2015 onward.

11:01  8                And of course, we also -- in the same

11:01  9    breath in which we produced these workbooks, we agreed

11:02  10   to put up Mr. Boyles, the 30(b)(6) witness, on these

11:02  11   financial issues again.

11:02  12               So -- and the data, which they insist is

11:02  13   the correct one -- or the workbook, the 956 workbook

11:02  14   that they insist is the correct one, was produced -- I

11:02  15   mean, it's -- excuse me.  It contains worldwide data

11:02  16   for sales that are not accused.

11:02  17               It -- it is very high level as they

11:02  18   themselves argue in their opposition.  And it was just

11:02  19   not the right thing to use when sales data for the

11:02  20   accused sales of the two products in combination at the

11:02  21   license levels that are accused was available to them.

11:02  22               Your Honor, may I proceed with making my

11:03  23   other arguments for the motion?

11:03  24               THE COURT:  Yes.

11:03  25               MS. RAHIMI:  All right.  So, Your Honor,

11:03  1   it's beyond dispute that under Section 284 only acts

11:03  2   that constitute infringement can provide a basis for

11:03  3   the recovery of damages.

11:03  4                    The Federal Circuit has been clear --

11:03  5                    THE COURT:  This is my 500th Daubert on

11:03  6   damages.  I don't -- just get to it.

11:03  7                    MS. RAHIMI:  Okay.  One way in which

11:03  8   Mr. Pellegrino overstated his revenue base is by

11:03  9   including hardware sales although he concedes that the

11:03  10  footprint of the invention resides in software.

11:03  11                   K.Mizra doesn't appear to dispute that if

11:03  12  Mr. Pellegrino wanted to include hardware sales in his

11:03  13  royalty base, he needed to treat them as convoyed

11:03  14  sales.

11:04  15                   And in order to be able to do that,

11:04  16  Mr. Pellegrino needed to show that the accused posture

11:04  17  check feature is what drives the sales of the ISE

11:04  18  hardware, but he didn't do that nor did he or K.Mizra

11:04  19  provide any evidence that the accused feature drives

11:04  20  any sales, hardware or not.

11:04  21                   K.Mizra's entire argument in response

11:04  22  appears to be that it was okay for Mr. Pellegrino to

11:04  23  include hardware sales because he didn't include all

11:04  24  hardware sales, only those reflected in the ISE

11:04  25  hardware tab of the 956 file.

—84—

| | | |
|---|---|---|
| 11:04 | 1 | But, Your Honor, the sales reflected in |
| 11:04 | 2 | that tab are all hardware sales, including worldwide |
| 11:04 | 3 | sales and including sales of noninfringing uses, such |
| 11:04 | 4 | as when customers buy ISE hardware without |
| 11:04 | 5 | Premier-level licenses to ISE software or to |
| 11:04 | 6 | AnyConnect. |
| 11:04 | 7 | So this is a clear overstatement of the |
| 11:04 | 8 | revenue base, which the Federal Circuit has warned |
| 11:04 | 9 | against because it would bias the jury.  And it |
| 11:05 | 10 | demonstrates how unreliable Mr. Pellegrino's |
| 11:05 | 11 | methodology is. |
| 11:05 | 12 | Next slide, please. |
| 11:05 | 13 | Mr. Pellegrino and K.Mizra acknowledge |
| 11:05 | 14 | that the accused combination requires a Premier-level |
| 11:05 | 15 | license to ISE, Premier-level license to AnyConnect, |
| 11:05 | 16 | configuration by the user to enable the posture check |
| 11:05 | 17 | feature within those license levels and deployment of |
| 11:05 | 18 | the Cisco software products on end points using Windows |
| 11:05 | 19 | 10 and 11. |
| 11:05 | 20 | Acknowledging the resulting need to |
| 11:05 | 21 | apportion for the value of the invention within this |
| 11:05 | 22 | accused combination, Mr. Pellegrino applied technical |
| 11:05 | 23 | apportionment factors that K.Mizra's technical expert |
| 11:05 | 24 | Dr. Cole came up with. |
| 11:05 | 25 | The apportionment factors are |

11:05  1    51.25 percent for AnyConnect and 36 percent for ISE.

11:05  2    But Dr. Cole's opinions in this regard are unreliable

11:06  3    and completely lack a factual basis.

11:06  4                    First, Dr. Cole ignored evidence in the

11:06  5    record that shows that only 7 percent of Cisco

11:06  6    customers use any posture check capability with ISE,

11:06  7    yet he inexplicably concluded that the appropriate

11:06  8    apportionment factor for ISE is 36 percent.

11:06  9                    Next, Dr. Cole acknowledged that

11:06  10   customers purchased lower level AnyConnect licenses for

11:06  11   the VPN capability, which is entirely different than

11:06  12   the accused posture check capability.  But he failed to

11:06  13   deduct the price of those lower level licenses from the

11:06  14   revenue base.

11:06  15                    Dr. Cole also did not attempt to

11:06  16   apportion among the other features within each Premier

11:06  17   license even though the Premier license provides access

11:06  18   to many other features besides the accused feature.

11:06  19   And he didn't attempt to apportion between accused and

11:06  20   unaccused configurations of posture check capabilities.

11:06  21                    In spite of all of these fatal

11:07  22   methodological errors by Dr. Cole, Mr. Pellegrino just

11:07  23   accepted the apportionment percentages wholesale.  The

11:07  24   percentages Dr. Cole came up with are not based on

11:07  25   market studies, consumer surveys, or any economic

11:07  1   analysis to ascertain whether the demand for ISE in

11:07  2   AnyConnect is driven by the accused posture feature.

11:07  3   Dr. Cole, instead, bases apportionment on Cisco product

11:07  4   guides that describe different license levels and

11:07  5   features and on his own experience at Lockheed, McAfee,

11:07  6   and the security industry.

11:07  7            Nothing in the guides he cites says

11:07  8   anything about the relative value of the different

11:07  9   features nor does he identify what's relevant about

11:07  10   them.  He just cites them in their 68-page entirety.

11:07  11            This is precisely the kind of

11:07  12   apportionment that the Federal Circuit in LaserDynamics

11:07  13   has held inadmissible, because it was plucked out of

11:07  14   thin air.  And Mr. Pellegrino's reliance on it was

11:07  15   excludable error.

11:07  16            Next slide, please.

11:08  17            Finally, Mr. Pellegrino repeats a

11:08  18   methodological error that he has committed in this

11:08  19   Court before.  He improperly disguised running profit

11:08  20   apportionment as a lump sum again, just as he did in

11:08  21   Daedalus Blue versus SZ DJI Technology, where this

11:08  22   Court excluded his testimony.  In that case, the

11:08  23   defendant moved to exclude Mr. Pellegrino's opinions on

11:08  24   multiple grounds, and one of them was that he had

11:08  25   conflated a lump sum with a running royalty license.

11:08  1    This Court didn't reach that issue and instead excluded

11:08  2    him for another error.

11:08  3                Here, Mr. Pellegrino purports to do a

11:08  4    lump-sum calculation.  Normally such an analysis would

11:08  5    begin with actual licenses to the patented technology,

11:08  6    which the Federal Circuit in LaserDynamics has held are

11:08  7    generally, and I quote -- sorry -- are generally the

11:08  8    most highly probative as to what constitutes a

11:08  9    reasonable royalty.

11:09  10                K.Mizra produced such licenses to the

11:09  11    asserted patent in this litigation and those license --

11:09  12    licenses reflect amounts of four -- excuse me -- of

11:09  13    five to six figures.  But Mr. Pellegrino effectively

11:09  14    ignored those modest comparable licenses and instead

11:09  15    opines that the lump sum would range from 10 to 44

11:09  16    million.

11:09  17                K.Mizra concedes in its opposition that

11:09  18    Mr. Pellegrino considers all of these license

11:09  19    agreements irrelevant.  A methodology that ignores a

11:09  20    factor that the Federal Circuit has held to be the most

11:09  21    highly probative as to what is -- as to what

11:09  22    constitutes a reasonable royalty is unreliable.  And so

11:09  23    is a methodology that is this divorced from the factual

11:09  24    record.

11:09  25                This error alone is grounds for

11:09  1   exclusion.  So instead of doing a lump-sum analysis,

11:09  2   what Mr. Pellegrino actually did is a running royalty

11:09  3   based on profit apportionment.  He projected sales six

11:10  4   years past trial through the life of the patent.  A

11:10  5   genuine lump-sum analysis would ordinarily end at trial

11:10  6   instead of assuming that a licensee would agree to

11:10  7   hypothetical negotiation --

11:10  8                THE COURT:  Why is that?  Why would the

11:10  9   plaintiff accept a lump sum that ended at trial?

11:10  10  That's not a lump sum.

11:10  11               MS. RAHIMI:  Why would the plaintiff

11:10  12  accept a lump sum that ended at trial?  Is that what

11:10  13  your question is?

11:10  14               THE COURT:  Why -- if there's still life

11:10  15  left in the patent and your folks are going to continue

11:10  16  to infringe it, why would they accept a lump sum that

11:10  17  didn't include the sales post-trial?  That makes no

11:10  18  sense to me.  It would have to include the post-trial

11:10  19  sales if they want a lump sum.

11:10  20               MS. RAHIMI:  There wouldn't necessarily

11:11  21  be -- so the reason why, in our view, a potential

11:11  22  licensee at the hypothetical negotiation wouldn't --

11:11  23               THE COURT:  Licensor.

11:11  24               MS. RAHIMI:  Yes.  I was going to speak

11:11  25  about our licensee.

89

```
11:11   1              THE COURT:  But I'm talking about the
11:11   2   licensor.
11:11   3              MS. RAHIMI:  So a lump-sum payment
11:11   4   absolutely covers the life of the patent or it can
11:11   5   cover the life of the patent, but the value of the
11:11   6   lump-sum payment isn't or doesn't need to be based on
11:11   7   projected sales during that time period.  According to
11:11   8   Mr. Pellegrino, this negotiation would have happened in
11:11   9   2012 or 2015, but there's no evidence that the
11:11  10   potential licensor or the potential licensee would have
11:11  11   known about or even relied on projected sales through
11:12  12   2029.  So why the lump-sum license -- or why the
11:12  13   lump-sum payment may --
11:12  14              THE COURT:  I don't think you know what
11:12  15   you're talking about.
11:12  16              MS. RAHIMI:  Your Honor, I think I do,
11:12  17   but maybe I'm not being --
11:12  18              THE COURT:  Let's move on.
11:12  19              MS. RAHIMI:  -- maybe I'm not being
11:12  20   clear.
11:12  21              THE COURT:  Counsel, you may be seated.
11:12  22              MS. RAHIMI:  Thank you.
11:12  23              My next point was actually going to
11:12  24   address this.  The Federal Circuit in LaserDynamics has
11:12  25   explained that instead the -- that instead of looking
```

| | | |
|--|--|--|
| 11:12 | 1 | at projected sales this far in advance -- |
| 11:12 | 2 | THE COURT: I'm familiar with that case. |
| 11:12 | 3 | What else do you have to say? |
| 11:12 | 4 | MS. RAHIMI: While parties at the |
| 11:13 | 5 | hypothetical negotiation may consider expected sales |
| 11:13 | 6 | projections, that's only the case if the parties would |
| 11:13 | 7 | have had that expectation during the negotiation. But |
| 11:13 | 8 | neither Mr. Pellegrino nor K.Mizra have identified any |
| 11:13 | 9 | evidence that the parties to a hypothetical negotiation |
| 11:13 | 10 | in 2012 or 2015 would have had any expectation |
| 11:13 | 11 | regarding anticipated sales in 2029, or that they would |
| 11:13 | 12 | have considered that during the negotiation. |
| 11:13 | 13 | And for these reasons, Your Honor, we |
| 11:13 | 14 | respectfully move to exclude his opinions and |
| 11:13 | 15 | testimony. |
| 11:13 | 16 | THE COURT: Thank you. What I'd like to |
| 11:13 | 17 | hear from the plaintiff is the issues that you had with |
| 11:13 | 18 | respect to getting the information that you think that |
| 11:13 | 19 | you needed for your damages expert. |
| 11:13 | 20 | MS. RAHIMI: Thank you, Your Honor. |
| 11:13 | 21 | MS. HO: So, Your Honor, your question |
| 11:14 | 22 | was -- is to -- |
| 11:14 | 23 | THE COURT: Here's what I'm going to do. |
| 11:14 | 24 | MS. HO: Yeah. |
| 11:14 | 25 | THE COURT: I'm going to take this trial |

| | |
|---|---|
| 11:14 | 1 |
| 11:14 | 2 |
| 11:14 | 3 |
| 11:14 | 4 |
| 11:14 | 5 |
| 11:14 | 6 |
| 11:14 | 7 |
| 11:14 | 8 |
| 11:14 | 9 |
| 11:14 | 10 |
| 11:14 | 11 |
| 11:14 | 12 |
| 11:14 | 13 |
| 11:14 | 14 |
| 11:14 | 15 |
| 11:15 | 16 |
| 11:15 | 17 |
| 11:15 | 18 |
| 11:15 | 19 |
| 11:15 | 20 |
| 11:15 | 21 |
| 11:15 | 22 |
| 11:15 | 23 |
| 11:15 | 24 |
| 11:15 | 25 |

case off the trial docket.  You all are going to get together.  Your client is going to tell Cisco what you think you need in terms of discovery.  You all -- I'm sorry.  The plaintiff is going to make very clear to the defendant what information your damages expert needs to do -- to amend his -- supplement his report. I'm not going to allow your expert to say, I did this because I didn't have the right numbers.

MS. HO:  Okay.

THE COURT:  I'm not going to do that, but I'm not going to make you go to trial without the right numbers.

MS. HO:  Okay.

THE COURT:  So we're going to go back to the board.  You are going to -- the plaintiff is going to very specifically request from Cisco the information you believe that you need.  For example, as I understood counsel's argument with respect to hardware versus software and all that, I think there's merit in that.  This is software.

And so I don't know why your guy -- you guys used the ISE hardware sales, other than I think what you're going to tell me is that you didn't have sufficient information, or there was a problem with the way Cisco gave you the information for you to be able

| | | |
|---|---|---|
| 11:15 | 1 | to discern between the software and the hardware and |
| 11:15 | 2 | that was why your guy did what he -- that's why the |
| 11:15 | 3 | expert did what he did. |
| 11:15 | 4 | So that -- that -- you know, that can't |
| 11:15 | 5 | go to trial that way.  You know, we did the best we |
| 11:15 | 6 | could.  That's not -- that's not okay. |
| 11:15 | 7 | So plaintiff will go back to defendant |
| 11:15 | 8 | and get the information -- and ask for the information. |
| 11:16 | 9 | Cisco will provide it.  If Cisco believes that what |
| 11:16 | 10 | you're asking for is inappropriate, then Cisco can let |
| 11:16 | 11 | me know and I'll deal with it more directly, but you |
| 11:16 | 12 | all are going to get this case, the damages portion of |
| 11:16 | 13 | it, at least, in shape where -- |
| 11:16 | 14 | There's merit in what the defendant is |
| 11:16 | 15 | saying, that your expert has had to kind of cobble |
| 11:16 | 16 | together his expert report, and that's -- that |
| 11:16 | 17 | certainly raises Daubert concerns, but your response |
| 11:16 | 18 | is, well, it's their fault. |
| 11:16 | 19 | I don't know that it is, I think it's |
| 11:16 | 20 | everyone's fault.  I think very early on in this case |
| 11:16 | 21 | the parties should have come to me and said, we have |
| 11:16 | 22 | this issue, and I could have resolved it whenever you |
| 11:16 | 23 | brought it up. |
| 11:16 | 24 | I have an open-door policy.  We handle |
| 11:16 | 25 | discovery disputes within a day or two of them being |

| | | |
|--|--|--|
| 11:17 | 1 | raised with us.  And I don't -- maybe that happened.  I |
| 11:17 | 2 | don't recall what happened in this case, specifically. |
| 11:17 | 3 | But you all are going to get the issues |
| 11:17 | 4 | of the production from Cisco resolved in terms of the |
| 11:17 | 5 | financial information, and then your expert is going to |
| 11:17 | 6 | supplement it.  They get to depose him.  Their expert |
| 11:17 | 7 | gets to do whatever they want in terms of a rebuttal |
| 11:17 | 8 | report on that.  And I'll deal with that. |
| 11:17 | 9 | And if you have -- and then once -- once |
| 11:17 | 10 | the plaintiff is -- when the plaintiff is satisfied |
| 11:17 | 11 | that you have everything you need for your expert to do |
| 11:17 | 12 | the report, then do the report.  And get it to them. |
| 11:17 | 13 | When they get the report, they get a report back to |
| 11:17 | 14 | you.  You all will do the depositions. |
| 11:17 | 15 | And then there may still be Daubert |
| 11:17 | 16 | issues.  But they won't be - they won't be defended by |
| 11:18 | 17 | saying, We didn't have the right information.  If -- |
| 11:18 | 18 | I'm certainly not implying that if -- that Cisco has to |
| 11:18 | 19 | accept what your expert does.  If your expert takes |
| 11:18 | 20 | their information and they're unhappy with it, I'll |
| 11:18 | 21 | deal with that on -- I'll deal with whatever they raise |
| 11:18 | 22 | at that time about it.  And -- but it won't be -- I |
| 11:18 | 23 | won't have to hear you -- the plaintiff say, The reason |
| 11:18 | 24 | we did it was because we didn't have what we needed. |
| 11:18 | 25 | Now, I don't want to be unfair to Cisco. |

| | | |
|---|---|---|
| 11:18 | 1 | Is there anything that Cisco needs -- as I'm making |
| 11:18 | 2 | this happen, is there anything Cisco wants to say in |
| 11:18 | 3 | response?  Is there anything Cisco needs for me to make |
| 11:18 | 4 | sure this is fair to both sides? |
| 11:18 | 5 | MR. BRANNEN:  I think we understand Your |
| 11:18 | 6 | Honor.  As long as we work together with them to come |
| 11:18 | 7 | up with the right data, try to get both experts an |
| 11:18 | 8 | opportunity to be heard.  We may have -- we may ask for |
| 11:18 | 9 | more Daubert briefing after that, but -- |
| 11:19 | 10 | THE COURT:  You'll -- you know, that's |
| 11:19 | 11 | fine. |
| 11:19 | 12 | MR. BRANNEN:  Thank you, Your Honor. |
| 11:19 | 13 | THE COURT:  That's fine.  And so if you |
| 11:19 | 14 | have a problem resolving this issue with regard to what |
| 11:19 | 15 | the plaintiff thinks is necessary and Cisco doesn't, or |
| 11:19 | 16 | Cisco -- whatever it is, that's why we're here.  And |
| 11:19 | 17 | I'm happy to take up these issues.  I want the |
| 11:19 | 18 | plaintiff to be able to say we got everything we |
| 11:19 | 19 | needed, and if that includes another 30(b)(6) |
| 11:19 | 20 | deposition -- |
| 11:19 | 21 | Now, let me tell you my view of the |
| 11:19 | 22 | world.  This is my "big brother" view of the world. |
| 11:19 | 23 | I'm not -- I don't require it.  Is -- you all -- I got |
| 11:19 | 24 | to quit saying that.  The plaintiff ought to know what |
| 11:19 | 25 | they want to ask the 30(b)(6).  It's not a questioning |

| | | |
|---|---|---|
| 11:19 | 1 | the CEO and hoping you get a good sound bite. |
| 11:19 | 2 | In my opinion, 30(b)(6)s are you know -- |
| 11:20 | 3 | you, the person taking it, know exactly what you want. |
| 11:20 | 4 | So if I were you, in this unhappy situation, I would |
| 11:20 | 5 | send in advance, to Cisco, a list of questions that you |
| 11:20 | 6 | anticipate for their 30(b)(6) to be able to answer. |
| 11:20 | 7 | Now, you're not going to be restricted to those. They |
| 11:20 | 8 | don't get to say, Ha, you didn't ask -- you didn't say |
| 11:20 | 9 | this in advance. But the more questions you send to |
| 11:20 | 10 | them -- everything that you send to them they either |
| 11:20 | 11 | have to tell you in advance, We think this is |
| 11:20 | 12 | irrelevant and we're not going to prepare, but they |
| 11:20 | 13 | don't get to say we didn't know you wanted that. |
| 11:20 | 14 | So the better job plaintiff does in |
| 11:20 | 15 | forecasting for the defendant what it is you want their |
| 11:20 | 16 | person to be able to answer, then they can have that |
| 11:20 | 17 | person, whoever it is, ready to answer on behalf of |
| 11:20 | 18 | Cisco; and, again, we won't be back here. |
| 11:20 | 19 | Again, I'm not -- you don't have to do |
| 11:20 | 20 | it. You're not limited to those questions. I'm just |
| 11:20 | 21 | saying that I found it very helpful to let the other |
| 11:21 | 22 | side know what it was they were going to be asked and |
| 11:21 | 23 | so they didn't get to say, oh, when you said |
| 11:21 | 24 | accounting, we didn't know that meant, you know, profit |
| 11:21 | 25 | and loss statements. Well, of course you did. |

11:21  1                    But here, you will have told them

11:21  2     exactly -- tell them exactly -- you've done the report.

11:21  3     Have your expert tell you the questions he needs

11:21  4     answered so that he can do his report.

11:21  5                    Is there anything else -- we will get

11:21  6     this -- I'll do my best to -- once you -- I don't care

11:21  7     who it is.  Any one of you can be -- someone needs to

11:21  8     let me know when you all have finished this round.  And

11:21  9     then --

11:21  10                   Beth, is this your case?

11:21  11                   You may be gone.

11:21  12                   So unfortunately, I lose my clerks in six

11:21  13    weeks, sadly.  So -- but whoever Beth's replacement is

11:21  14    will be handling this case.

11:21  15                   Once you all are in a situation where the

11:22  16    expert reports have been exchanged, the depositions

11:22  17    have been taken and you are then prepared to do

11:22  18    additional briefing, contact my office and Beth's

11:22  19    replacement will -- we'll try and reschedule -- we'll

11:22  20    definitely reschedule you for a pretrial hearing and

11:22  21    we'll do our best to figure out a time when we can have

11:22  22    the trial.

11:22  23                   Is there anything else that we need to

11:22  24    take up?

11:22  25                   Let me ask -- go ahead.

| 11:22 | 1 | MR. BRANNEN:  I had one clarification, |
| 11:22 | 2 | Your Honor. |
| 11:22 | 3 | Your Honor's ruling on -- denied the |
| 11:22 | 4 | motion on Dr. Clark's, where they said he was doing |
| 11:22 | 5 | conditional validity. |
| 11:22 | 6 | So as we understand it, he would be |
| 11:22 | 7 | allowed to say, you know, if you read the claim the way |
| 11:22 | 8 | the plaintiff reads it, then Cisco had all of that |
| 11:22 | 9 | first. |
| 11:22 | 10 | But the ruling -- what he bases that on |
| 11:22 | 11 | is his demonstration of the NAC prior art system, that |
| 11:22 | 12 | he does the setup with the TPM. |
| 11:23 | 13 | Are we understanding that the ruling that |
| 11:23 | 14 | we're prohibited from presenting that applies to |
| 11:23 | 15 | both -- in other words, we couldn't have said to the |
| 11:23 | 16 | PTAB, their -- under their reading, we had it? |
| 11:23 | 17 | May we still present that argument at |
| 11:23 | 18 | trial, or is the ruling that that is precluded? |
| 11:23 | 19 | THE COURT:  I think I understand what |
| 11:23 | 20 | you're asking, but let me hear a response. |
| 11:23 | 21 | MR. BRUNELLI:  My understanding is that |
| 11:23 | 22 | ruling is precluded based on estoppel.  The piece of |
| 11:23 | 23 | prior art upon which Mr. Clark is relying is the NAC. |
| 11:23 | 24 | And the NAC is -- as this Court has found, has been |
| 11:23 | 25 | estopped from being able to be used in this case.  So I |

11:23   1   think that's the answer.

11:23   2                   THE COURT:  Yes, ma'am.  I know -- is

11:23   3   there anything you want to say in response?

11:23   4                   MR. BRANNEN:  We wouldn't have been able

11:23   5   to make that argument to the PTAB based on their

11:23   6   reading of the claim.  And in fairness, if what they're

11:23   7   saying the claims cover is something that Cisco had in

11:23   8   this system that --

11:23   9                   THE COURT:  I don't know how -- I didn't

11:24   10  do IPRs, but I don't know how what the plaintiff

11:24   11  claims -- what that -- I don't know why there would be

11:24   12  any impact in the IPR proceeding when their -- with

11:24   13  their determination of whether there's validity based

11:24   14  on the NAC or not.

11:24   15                  That's -- am I missing something?

11:24   16                  MR. BRUNELLI:  The NAC product is the --

11:24   17  what was used in the IPR was the manuals about the NAC

11:24   18  product.

11:24   19                  THE COURT:  So I'm saying --

11:24   20                  MR. BRUNELLI:  That's why I thought the

11:24   21  Court had --

11:24   22                  THE COURT:  And so my -- my understanding

11:24   23  the way the IPR would work is it would be irrelevant --

11:24   24  the IPR would determine whether or not they were going

11:24   25  to invalidate the patent based on the evidence of what

11:24  1    the NAC is.  And that -- so I'm not sure I understand

11:24  2    your question about whatever position the plaintiff is

11:24  3    taking.

11:24  4              It seems to me the IPR would be agnostic

11:24  5    to -- because they don't have -- it didn't have to be

11:24  6    in this case, right?

11:24  7              I mean, it could be, I'll make up a name,

11:25  8    Dell could have filed the IPR.  They're not a

11:25  9    defendant.  They still could have filed the IPR on this

11:25  10   patent, right, and used the NAC and they have rejected

11:25  11   it.  So Dell would not be able to use it, so I'm

11:25  12   excluding the NAC.

11:25  13             MR. BRUNELLI:  Yeah.  That was my

11:25  14   understanding.

11:25  15             THE COURT:  Regardless of whatever the

11:25  16   position the plaintiff is taking with regard to the

11:25  17   infringement contentions.

11:25  18             MR. BRUNELLI:  Yeah.  That was my

11:25  19   understanding, Your Honor.

11:25  20             The one question I did have was:  We

11:25  21   have -- with the trial being postponed, anything that

11:25  22   we were doing in preparation for the trial is also

11:25  23   postponed.  So we're not filing motions in limine on

11:25  24   Friday?

11:25  25             THE COURT:  You are correct.

| | | |
|---|---|---|
| 11:25 | 1 | MR. BRUNELLI:  Thank you, Your Honor. |
| 11:25 | 2 | THE COURT:  We don't need them.  We're |
| 11:25 | 3 | good. |
| 11:25 | 4 | MR. BRUNELLI:  That's what I figured.  I |
| 11:25 | 5 | just wanted to confirm. |
| 11:25 | 6 | THE COURT:  No.  We're good.  We got -- |
| 11:25 | 7 | we'll be in trial the next two weeks, and so -- which |
| 11:25 | 8 | is broadcast.  You can listen to it if you have |
| 11:25 | 9 | literally nothing else to do. |
| 11:25 | 10 | And so please just let us know when you |
| 11:25 | 11 | all need to restart the briefing schedule with Beth's |
| 11:26 | 12 | successor, and then we will -- and we will -- I do want |
| 11:26 | 13 | to make sure we get back to -- while I still have a |
| 11:26 | 14 | memory of what we did, I'd like to get back to the |
| 11:26 | 15 | pretrial conference as quickly as we can.  And then |
| 11:26 | 16 | we'll get you all set as quickly as we can as well. |
| 11:26 | 17 | Is there anything else? |
| 11:26 | 18 | Anything else? |
| 11:26 | 19 | MR. BRUNELLI:  No, Your Honor. |
| 11:26 | 20 | MS. HO:  No, Your Honor.  Thank you. |
| 11:26 | 21 | THE BAILIFF:  All rise. |
| 11:26 | 22 | (Hearing adjourned.) |
| | 23 | |
| | 24 | |
| | 25 | |

—101—

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS     )

3

4

5           I, Kristie M. Davis, Official Court

6   Reporter for the United States District Court, Western

7   District of Texas, do certify that the foregoing is a

8   correct transcript from the record of proceedings in

9   the above-entitled matter.

10          I certify that the transcript fees and

11  format comply with those prescribed by the Court and

12  Judicial Conference of the United States.

13          Certified to by me this 14th day of July

14  2023.

15

16                    /s/ Kristie M. Davis
                      KRISTIE M. DAVIS
17                    Official Court Reporter
                      800 Franklin Avenue
18                    Waco, Texas 76701
                      (254) 340-6114
19                    kmdaviscsr@yahoo.com

20

21

22

23

24

25

11:26