**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| K.MIZRA LLC,<br><br>      Plaintiff,<br><br>v.<br><br>CISCO SYSTEMS, INC.,<br><br>      Defendant. | Civil Action No. 6:20-CV-01031-ADA<br><br>**JURY TRIAL DEMANDED** |

**<u>DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO STRIKE AND EXCLUDE THE
OPERATIVE OPINIONS AND TESTIMONY OF K.MIZRA LLC'S DAMAGES EXPERT
MICHAEL PELLEGRINO</u>**

# <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION.................................................................................................1

II.     BACKGROUND ...................................................................................................2

     A.      The accused technology and relevant products...................................2

     B.      Mr. Pellegrino's reports and procedural history................................4

III.    LEGAL STANDARD............................................................................................9

IV.     ARGUMENT .......................................................................................................9

     A.      At minimum, the Court should exclude the portions of Mr. Pellegrino's opinions that calculate damages based upon Cisco's sales of hardware...........9

     B.      Each of Mr. Pellegrino's damages opinions is unreliable and inadmissible for additional reasons. ....................................................12

          1.      He includes speculative projected future sales for five years after trial. ...............................................................................12

          2.      He improperly manipulates the payment date, placing it years after the hypothetical negotiation. ...........................................16

     C.      Mr. Pellegrino's software damages opinions are too unreliable to reach a jury. ..............................................................................................17

          1.      As before, his 36% apportionment factor for a feature that only of customers report using is indefensible. ......................................17

          2.      He has the wrong base. ..........................................................19

V.      CONCLUSION ..................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan Sales, LLC v. UCB, Inc.*,
  No. 2:15-CV-01001-JRG-RSP, 2016 WL 8222619 (E.D. Tex. Nov. 7, 2016) .......................14

*Am. Seating Co. v. USSC Group, Inc.*,
  514 F.3d 1262 (Fed. Cir. 2008)..........................................................................................10

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015)..........................................................................................10

*Daedalus Blue LLC v. SZ DJI Tech. Co., Ltd.*,
  No. W-20-CV-00073-ADA, 2022 WL 831619 (W.D. Tex. Feb. 24, 2022).......................9, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)............................................................................................................9

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
  No. 6:11-CV-00201-JRG, 2017 WL 1322555 (E.D. Tex. Apr. 6, 2017) ..............................18

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
  No. 2:15-cv-00011-RSP, 2018 WL 3089701 (E.D. Tex. Mar. 7, 2018)...........................14, 15

*Exafer Ltd. v. Microsoft Corp.*,
  No. 1:20-cv-131-RP, 2024 WL 1087374 (W.D. Tex. Mar. 7, 2024) ....................................20

*Exmark Mfg. Co. v. Briggs & Stratton Power Prod. Grp.*,
  879 F.3d 1332 (Fed. Cir. 2018)..........................................................................................10

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)..............................................................................................19

*Linear Tech. Corp. v. Micrel, Inc.*,
  No. C-94-1633 MHP, 2006 WL 2130736 (N.D. Cal. July 27, 2006)....................................15

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)......................................................................................14, 17

*Magna Mirrors of Am., Inc. v. SMR Auto. Mirrors UK Ltd.*,
  No. 1:17-CV-77, 2020 WL 12432327 (W.D. Mich. Sept. 30, 2020) ....................................12

*MLC Intellectual Property, LLC v. Micron Tech., Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021) ..........................................................................................18

*Realtime Data, LLC v. Oracle Am., Inc.*,
    No. 6:16-CV-00088, 2017 WL 11574028 (E.D. Tex. Mar. 30, 2017) ...................................18

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)................................................................................................10

*Rite–Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995)................................................................................................10

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015)................................................................................................9

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013)..............................................................................................18

*VLSI Tech., LLC v. Intel Corp.*,
    87 F.4f 1332 (Fed. Cir. 2023) ................................................................................................10

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
    778 F.3d 1365 (Fed. Cir. 2015), *vacated on other grounds*, 136 S. Ct. 893
    (2016), *reinstated in relevant part*, 824 F.3d 1344 (Fed. Cir. 2016)......................................11

*Weisgram v. Marly Co.*,
    528 U.S. 440 (2000)..................................................................................................................9

*Westinghouse Co. v. Wagner Mfg. Co*,
    225 U.S. 604 (1912)................................................................................................................10

*Zimmer Surgical, Inc. v. Stryker Corp.*,
    365 F. Supp. 3d 466 (D. Del. Mar. 7, 2019) ..................................................................10, 12

## Statutes

35 U.S.C. § 284.......................................................................................................................19

## Other Authorities

Fed. R. Evid. 702 ....................................................................................................................9

## I.     INTRODUCTION

When Defendant Cisco Systems, Inc. ("Cisco") moved to exclude the original opinions of Plaintiff K.Mizra LLC's ("K.Mizra") damages expert, Michael Pellegrino, ECF No. 128, the Court recognized merit in Cisco's argument that damages for sales of hardware are not recoverable, Ex. 2 at 91:14–92:18. That conclusion is correct: K.Mizra says the invention's economic footprint lies in software. K.Mizra criticized Cisco's financial data (ECF No. 146), and the Court—observing that Mr. Pellegrino must have included hardware because he lacked information from Cisco, *id.*—ordered supplemental discovery and a do-over of damages expert reports, *id.* at 92:4–94:11.

Since that time: (1) Cisco confirmed the data K.Mizra was seeking and produced it; (2) Mr. Pellegrino re-did his report and confirmed that he had no more complaints about Cisco's data; (3) the new report (incredibly) still included hardware damages, which Cisco asked K.Mizra to remove; (4) through the rebuttal report of Cisco's expert and deposing Mr. Pellegrino, Cisco identified multiple other errors in his revamped analysis and asked K.Mizra to fix them; and (5) the parties conferred, and K.Mizra agreed to have Mr. Pellegrino address certain errors but declined to fix others. At the end of the day, after serving three additional reports since the Court ordered the parties to try again, Mr. Pellegrino's opinions still fail *Daubert*.

Cisco now moves under Federal Rule of Evidence 702 to exclude Mr. Pellegrino's operative opinions and testimony, or to sever his inadmissible analyses from any portion the Court allows the jury to hear.[1] At minimum, he cannot include damages for hardware.

---

[1] Cisco also moves to strike certain opinions that Mr. Pellegrino could have, but did not offer in his January 15, 2024 report. Ex. 3 at 2 (increasing hardware and software damages), 128–29 (additional material purporting to support new "Lump Sum Calculations – Adjusted for Product Overlap" analysis); Ex. 4 at 46 ("Overlap Calculation Data Source Selection" analysis); 129 ("Calendar Year Versus Fiscal Year"). These opinions flout the parties' agreement concerning scope, and K.Mizra never sought leave to allow Mr. Pellegrino to offer them.

Mr. Pellegrino's current analysis is also riddled with additional flaws that make it too unsound to reach the jury. This motion addresses four. *First*, Mr. Pellegrino more than doubles his numbers by including damages for *projected* accused sales that he assumes will occur over five years after trial. These are sales that Cisco has not made and may never make, and there is no defensible basis for including them. *Second*, he inflates his numbers by millions of dollars through an unsupported (and unsupportable) assumption that although the hypothetical negotiation would have happened in 2016, Cisco would not have made the payment until four or five years later. *Third*, as before, his software apportionment is indefensible. And, *fourth*, he makes no attempt to offer a software damages opinion that corresponds to the correct universe of customers K. Mizra has identified. There is thus a fatal mismatch between Mr. Pellegrino's damages opinions and K.Mizra's liability case.

## II.  BACKGROUND

### A.  The accused technology and relevant products

K.Mizra's sole remaining asserted patent, the '705 Patent, claims a specific way to quarantine computers requesting access to computer networks. Ex. 1 at 9–10. K.Mizra asserts system claims 12 and 16, which require software and conventional hardware components such as a "processor." But throughout this case and currently, K.Mizra and Mr. Pellegrino have consistently stated that the economic footprint of the invention is in "software only." *Id.* at 25 ("Thus, the footprint of the inventions' use necessarily limits to the software only."); *see also* Ex. 3 at 26 (same); Ex. 5 at 25 (same); Ex. 6 at 23 (same); Ex. 7 at 39:19–40:10; Ex. 8 at 161:18–22.

The Cisco offering that K.Mizra and Mr. Pellegrino identify as embodying the invention is a feature called "posture check." Ex. 1 at 18 (referring to "posture assessment"). To use this feature, Cisco customers must have licenses to the highest level (the "Premier," or "Apex" level) of two different Cisco software products: the Identity Services Engine ("ISE") and the AnyConnect

Secure Mobility Client ("AnyConnect"). *Id*. at 19. Even at that level, posture check is just one of multiple functionalities that ISE and AnyConnect respectively provide, and one among a vast set of functionalities within ISE as a whole (that is, considering functionality offered at lower licensing levels). Ex. 9 at 119:13–120:3; Ex. 10 ¶¶ 99–103; Ex. 11 ¶¶ 136, 140.

Cisco also sells hardware that can run ISE software (Cisco's Secure Network Server or "SNS" hardware, which Mr. Pellegrino calls the "ISE Hardware"). Ex. 1 at 16–17. This hardware can run both the accused Premier/Apex version, as well as lower-tier, non-accused versions. Ex. 8 at 108:23–109:9. Nor is the Cisco hardware required: customers can run ISE software on other, non-Cisco hardware instead. Ex. 1 at 17 n.68; Ex. 12 at 30:17–31:19. In addition, customers running the accused version of ISE on Cisco's SNS hardware are not necessarily using posture check; they may use only other, non-accused features. Ex. 8 at 77:7–14. Cisco's telemetry data shows that only about ___ of ISE users enable posture check. Ex. 11 ¶ 140.

Since last July, K.Mizra's infringement and damages theories have become moving targets. For the bulk of this case—including in its final infringement contentions—K.Mizra accused ISE and AnyConnect software of infringing together.[2] *See, e.g.*, ECF No. 212 at 1–2. In addition, to satisfy the "processor" limitation of the asserted system claims, K.Mizra and its technical expert have always (and only) pointed to the Cisco SNS hardware. Ex. 13 at 127 (Claim 12[a]), 132 (Claim 12[h]), 136 (Claim 16). To avoid summary judgment, K.Mizra had to shift gears. Now, it appears to accuse only ISE, taking the position that AnyConnect merely supplies aspects of the claimed environment. ECF No. 212 at 3–6.[3] It remains undisputed, however, that to use the accused

---

[2] To meet the limitations of the accused claims, the AnyConnect software must also run on a laptop or other device that includes Windows 10 or 11 operating systems, and the ISE and AnyConnect software must be configured (by the customer) in specific ways. Ex. 10 ¶¶ 22–23, 84.

[3] As explained in Cisco's motion *in limine* (ECF No. 212), this sea change is improper and wholly absent from K.Mizra's technical expert's report. *Id.* at 6–7.

"posture check" feature, customers must have purchased both the ISE and AnyConnect software products, Ex. 7 at 78:2–16, and to allegedly infringe the system claims in accordance with K.Mizra's final contentions and technical expert report, customers must have all three products: (1) Premier/Apex-level ISE software (2) *running on* the Cisco SNS hardware and (3) Premier/Apex-level AnyConnect software, Ex. 14 at 1.

As explained next, K.Mizra previously sought damages for all three products. Now, Mr. Pellegrino has dropped AnyConnect, but improperly inflated what it seeks for the remaining two.

### B.     Mr. Pellegrino's reports and procedural history

**1.**     Mr. Pellegrino issued his first report on April 21, 2023. He offered multiple damages scenarios for all three products, two types of asserted patent claims (system and method), and two different payment dates. At the time, his top number for system claim damages beginning in November 2020 was           Ex. 6 at 2.[4] Each scenario was based on both actual and projected sales, including projections through patent expiration in 2029.

**2.**     Cisco moved to exclude. ECF No. 128. In addition to other errors, Cisco argued that Mr. Pellegrino incorrectly presented ISE Hardware damages, including because such sales do not and cannot qualify as convoyed sales. ECF No. 128 at 12–13.

**3.**     The Court heard Cisco's *Daubert* motion on July 13, 2023, and recognized merit in Cisco's argument that hardware sales are not recoverable here. Ex. 2 at 91:14–92:3. K.Mizra and Mr. Pellegrino received an opportunity to fix this error: the Court explained that the only understandable reason for including hardware was that Mr. Pellegrino "didn't have sufficient information, or there was a problem with the way Cisco gave [K.Mizra] the information for

---

[4] Mr. Pellegrino's report used a July 30, 2012 hypothetical negotiation date. Ex. D at 30. In a supplement produced on June 13, 2023, Mr. Pellegrino attested that a change in the hypothetical negotiation date to 2015 would have "no impact" on his testimony. Ex. 15 at 2.

[K.Mizra] to be able to discern between the software and the hardware." *Id.* It therefore allowed K.Mizra to undertake supplemental discovery and directed the parties to re-do damages reports, depositions, and, if necessary, *Daubert* motions. *Id.* at 92:4–94:18.

4.      After the hearing, the parties undertook the ordered discovery. K.Mizra requested additional data, and Cisco asked K.Mizra to clarify what it was seeking. In a July 27, 2023 email, K.Mizra confirmed that for the asserted system claims customers must have purchased "all three" of the "ISE Premier Software, Cisco SNS hardware, and AnyConnect Premier software." Ex. 14 at 1. In other words, K.Mizra confirmed that for its system claims, sales of ISE software alone, without Premier-level AnyConnect and without the Cisco hardware (which Mr. Pellegrino refers to as "ISE Hardware"), are not part of the accused base. Cisco provided the data for that universe, and supplemented its interrogatory responses accordingly. Ex. 16 at 27–29.

5.      Mr. Pellegrino served his new report on January 15, 2024. Despite the *Daubert* history and even though K.Mizra had dropped the method claims six months earlier, Ex. 17, Mr. Pellegrino again offered damages opinions based upon actual and projected sales through 2029 for all three products, and for both system and method claims. Ex. 5 at 2, 31.

6.      Cisco deposed Mr. Pellegrino on March 8, 2024. That deposition resulted in three relevant developments. First, Mr. Pellegrino confirmed that he received every bit of additional data he asked for, that he had "no complaints" about the quality of Cisco's data. Ex. 8 at 178:25–180:10. His testimony was unequivocal: "You've addressed my concerns." *Id.*

Second, Mr. Pellegrino testified that he had included damages for AnyConnect even though he had been told, on a "team call" with K.Mizra's counsel, that K.Mizra's theory was now that "ISE software alone infringes." Ex. 8 at 120:3–123:8; *see also id.* at 136:1–12 (testifying that his understanding came only from counsel, and not from K.Mizra's final infringement contentions or

any other document). Mr. Pellegrino agreed that, as a result, AnyConnect damages would only be available if they qualify as a convoyed sale, *id.* at 124:2–11, 133:11–17—analysis he had not performed, *id.* at 133:18–134:9.

Finally, Mr. Pellegrino acknowledged an error in K.Mizra's favor that Cisco's expert had identified—he conceded that his calculation of revenue for joint customers of ISE Software and AnyConnect was overstated by $20 million. Ex. 8 at 51:25–52:13, 58:10–59:20, 60:22–61:25. He acknowledged that this error inflated his ultimate opinion, characterizing the impact as "de minimis," and "less than $1.3 million." *Id.* at 58:10–59:29:20.

**7.** After Mr. Pellegrino's testimony, Cisco offered K.Mizra the opportunity to revise his report to correct three specific issues (and again asked K.Mizra to remove hardware). Ex. 18 at 1–2. K.Mizra clung to its hardware damages, but agreed that Mr. Pellegrino would (1) "remove the 'method claim' columns since those claims have been dropped," (2) remove damages associated with AnyConnect, and (3) revise Mr. Pellegrino's report to correct the error he acknowledged, which would "result in a reduction" to claimed damages. *Id.* at 1.[5]

**8.** On April 30, 2024, Mr. Pellegrino served a revised report. As expected and agreed, he removed the AnyConnect damages. But in an apparent attempt to compensate for the loss of that line item, he *increased* his hardware and ISE software opinions:

---

[5] Cisco proposed memorializing these agreements in a joint submission. Ex. 19 at 6 (Cisco's proposal, amendment "limited to removing method claims; removing AnyConnect; addressing estimated data issue and reducing damages accordingly"). K.Mizra removed them to "streamline" the amended scheduling order. But K.Mizra assured Cisco that doing so did not "change the substance[]" of the parties' agreement. *Id*. at 1–2 (K.Mizra's counsel).

Ex. 3 at 2, 129 (formatting cleaned up; top table reflecting all ISE software sales; bottom table purporting to limit the ISE Software damages line item to joint customers of ISE software and AnyConnect, but not hardware). Mr. Pellegrino also included new substantive analyses. Ex. 3 at 26–31, 128–29. Cisco had not consented to increases in Mr. Pellegrino's hardware or ISE software opinions or to new analyses—he was supposed to limit his changes as the parties had agreed. In a subsequent deposition, Mr. Pellegrino testified that these updated hardware figures and his new analyses were work he could have done in preparing his January report, but didn't. Ex. 7 at 32:7–35:25, 70:12–71:15, 72:10–20. Cisco objected to the increased damages calculations and new analyses, Ex. 20 at 1–4. The parties conferred, and K.Mizra agreed to make changes to resolve a subset of Cisco's concerns. *Id.*

9.      On May 7, 2024, K.Mizra served Mr. Pellegrino's operative report. The report removed some of Mr. Pellegrino's objectional material, but added *even more new analysis* to which Cisco did not agree, *see* Ex. 4 at 46–49, 129; *see also id.* at 128–29 (maintaining analysis added in the April draft). The operative report gives the same ultimate numbers as his April 30 report:

Ex. 1 at 2. Mr. Pellegrino's top table reflects damages for all ISE software customers regardless of whether they purchased any other products. His bottom table reflects customers who also purchased AnyConnect, but not the ISE hardware. *Id.*; *see also* Ex. 7 at 24:1–9, 76:15–22.

On June 7, 2024, Mr. Pellegrino testified about his operative report. He confirmed that:

- It is still his opinion that "the economic footprint of the invention resides in the software and not in the Cisco SNS hardware," Ex. 7 at 39:19–40:11;

- ISE Hardware damages are proper in his opinion if, and only if, they qualify as a convoyed sale, *id.* at 40:16–20, (which, as shown below, they do not); and

- His "damages number changes based on the amount of [Cisco's] actual sales," both in pre-trial damages and in "how that impacts the forecast" of post-trial profits, *id.* at 47:25–48:7.

8

Cisco now brings this motion.

## III.   LEGAL STANDARD

"Since *Daubert* . . . parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet." *Weisgram v. Marly Co.*, 528 U.S. 440, 455–56 (2000). The proponent must establish that:[6] "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1298 (Fed. Cir. 2015) (Rule 702 requires district courts to ensure that all expert evidence is "based on reliable principles and . . . sufficiently tied to the facts of the case."). As gatekeeper, this Court "ensure[s] that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993).

## IV.   ARGUMENT

The Court should exclude Mr. Pellegrino's hardware and software damages analyses.

### A.   At minimum, the Court should exclude the portions of Mr. Pellegrino's opinions that calculate damages based upon Cisco's sales of hardware.

In every version of his report, Mr. Pellegrino has opined that "the footprint of the inventions' use necessarily limits to the software only and not the hardware required to run the software." Ex. 6 at 23; Ex. 1 at 25 (operative report, taking the same position). Thus, there is no basis to award damages for Cisco's sales of ISE hardware. To be admissible, the opinion of a

---

[6] *Daedalus Blue LLC v. SZ DJI Tech. Co., Ltd.*, No. W-20-CV-00073-ADA, 2022 WL 831619, at *3 (W.D. Tex. Feb. 24, 2022) ("The burden of establishing the admissibility and relevance of expert testimony is on the party offering the testimony.").

damages expert must "carefully tie proof of damages to the claimed invention's footprint in the market place." *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010); *VLSI Tech., LLC v. Intel Corp.*, 87 F.4f 1332, (Fed. Cir. 2023) ("Any reasonable royalty must seek to measure the value of the patented technology—it must be apportioned to that value. . . .") (cleaned up); *Exmark Mfg. Co. v. Briggs & Stratton Power Prod. Grp.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("[T]he patent owner must apportion or separate the damages between the patented improvement and the conventional components of the multi-component product."); *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015) (explaining that it is essential "to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone"). Mr. Pellegrino's opinions about damages for Cisco's hardware sales remain inadmissible. The Court previously recognized the merit in Cisco's argument that hardware damages are not recoverable in this case, Ex. 2 at 91:14–92:3, and nothing has changed, ECF No. 128 at 12–13; ECF No. 160 at 5–7.

Mr. Pellegrino's sole justification for his hardware damages opinion is that they are convoyed sales. But his report falls far short of meeting that demanding standard. To recover for convoyed sales, the patentee must show that (1) the patented and non-patented products "'together constituted a functional unit' and [(2)] the patent-related feature drives demand for the functional unit as a whole." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 491 (D. Del. Mar. 7, 2019) (quoting *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008)); *see also Am. Seating*, 514 F.3d at 1269 (requiring a convoyed product to have no "market value . . . independent of the patented product"); *see also Westinghouse Co. v. Wagner Mfg. Co*, 225 U.S. 604, 615 (1912) (for convoyed sales, patentee must prove patented feature is the basis for customer demand); *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (entire market

value rule, which requires "the patent-related feature is the basis for consumer demand," applies to assessment of convoyed sales (cleaned up)).

Here, both requirements are missing. Mr. Pellegrino did not and cannot identify the requisite functional relationship, because the accused Premier-level ISE software can run on other, non-Cisco hardware, and the Cisco SNS hardware is also used to run non-accused software (i.e., lower tiers of ISE software). *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, (Fed. Cir. 2015), *vacated on other grounds*, 136 S. Ct. 893 (2016), *reinstated in relevant part*, 824 F.3d 1344, 1377 (Fed. Cir. 2016) ("If the convoyed sale has a use independent of the patented device, that suggests a non-functional relationship."). This is independently fatal.

Mr. Pellegrino also has no evidence—none—that the patented posture check feature drives demand for the supposedly-convoyed hardware. He concedes as much:

> Q:  There is no testimony from Mr. Kochuk or any other witness in this case that people buy the Cisco ISE hardware because of posture check; is there?
>
> A:  Well, I don't know on that. But I'm aware that those – the testimony was that they serve no secondary purpose. And that's what I quote. . . . .
>
> Q:  You've seen no evidence about the reason they bought the hardware having anything to do with posture check; have you?
>
> A:  If you[r] question is have I seen something from Bank of America that they said we're going to buy the SNS hardware because of posture – is that the question? I haven't seen stuff like that, that's correct.

Ex. 8 at 167:2–168:8; *see also id.* at 166:1–21 (admitting that he has not "seen any evidence . . . that the reason customers are buying ISE hardware instead of running ISE [Premier] on different hardware, non-Cisco hardware . . . has anything to do with the posture-check feature"). Instead, he admits that other features "that are completely unrelated to the invention" could be driving

demand. *Id.* at 164:15–20. This defeats convoyed sales for hardware. *See, e.g.*, *Zimmer*, 365 F. Supp. 3d at 491 (D. Del. 2019) (excluding convoyed sales for "manifolds" where "the patented features [] do not drive demand for the functional unit as a whole"); *see also Magna Mirrors of Am., Inc. v. SMR Auto. Mirrors UK Ltd.*, No. 1:17-CV-77, 2020 WL 12432327, at *6 (W.D. Mich. Sept. 30, 2020) (excluding convoyed sales for "variant mirrors" where "the customer advantages of purchasing the variant mirrors with the patented mirrors are not associated with the patented features").

Any suggestion that Mr. Pellegrino identified the requisite demand through revenue— because Cisco made money selling hardware to some customers who purchased ISE software and may have used the posture check feature—is a non-starter. Ex. 1 at 79–80; Ex. 8 at 105:8–19; Ex. 7 at 50:15–51:1. Even at the Premier/Apex level, each ISE software product contains multiple non-patented features that K.Mizra has not accused of infringement. Ex. 9 at 119:13–120:3; Ex. 10 ¶¶ 99–101; Ex. 11 ¶ 140. To point to the revenue alone is not a basis to attribute any demand specifically to posture check. And the possibility that customers *used* the posture check feature is not evidence that they purchased the product *because* of that feature. Mr. Pellegrino's hardware damages opinion is inadmissible and should be excluded.

**B.    Each of Mr. Pellegrino's damages opinions is unreliable and inadmissible for additional reasons.**

Mr. Pellegrino has inflated his hardware and software numbers in at least two indefensible ways. These are not mere matters for cross-examination.

**1.    He includes speculative projected future sales for five years after trial.**

Sixty-three to sixty-nine percent of the total damages amounts Mr. Pellegrino seeks to offer represent damages for post-trial sales that he projects Cisco will continue to make through the patent's expiration in November 2029. His projections are pure conjecture. There is no evidence

that Cisco would continue to offer posture check or that the parties would have considered any of Mr. Pellegrino's projected future sales scenarios during the hypothetical negotiation.

a.    Mr. Pellegrino concedes that the damages he calculated "change[] based on the amount of actual sales," that "more sales equals a higher damages number," and that he relied only on Cisco's past sales to project forward and calculate damages. Ex. 7 at 47:25–48:7, 56:14–24. He presents different calculations based on November 2020 versus November 2021 payment start dates, Ex. 1 at 2, and admitted that these numbers differ "because there are more sales that are accused if you get to start in November 2020." Ex. 7 at 48:14–20.

Mr. Pellegrino's report makes clear that the only factors in his calculation are units sold and the royalty rate:

> The lump sum payment calculation for the Asserted Patent would be the product of the infringing units considered over the entirety of the damages period and the royalty rate for each accused product, discounted to the present value as of the date of the filing of the opening complaint.

Ex. 1 at 109. To calculate damages for past sales, he multiples Cisco's actual sales by his royalty rate; for the future damages component, he projects from Cisco's actual sales, then applies his royalty rate to his self-created projections. Ex. 21 at Ex. D thereto. His future projections thus differ depending on when he starts. *Id.* (offering different projections for 2025–2029 in the "November 2020" (Rows A–F) and "November 2021" (Rows G–L) start date models).

There is no evidence that the parties to the hypothetical negotiation would have taken this approach. Nothing suggests they would have done any kind of running profit apportionment, let alone one based on sales projected more than a decade into the future. Even if his approach could fly in some other case, there is no proof whatsoever to support it here.

And the approach is not air-worthy: Where damages are based on actual sales of infringing devices, experts may not testify that they are available post-trial. "[A] jury can only award damages

for devices it finds to be infringing, which necessarily requires a tort that occurred in the past, not a tort that is projected to occur in the future." *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-cv-00011-RSP, 2018 WL 3089701, at *6 (E.D. Tex. Mar. 7, 2018) (quotation marks omitted). Thus, "[a]ny opinion on a future royalty that may accrue from infringement that has not yet occurred (as opposed to a lump-sum royalty) is properly excludable under Rule 702(a) as being contrary to law or as not helpful to the trier of fact to determine 'a fact in issue.' Or such an opinion is simply excludable under Rules 401 and 402 as irrelevant." *Allergan Sales, LLC v. UCB, Inc.*, No. 2:15-CV-01001-JRG-RSP, 2016 WL 8222619, at *3 (E.D. Tex. Nov. 7, 2016)).

**b.**      Mr. Pellegrino's inclusion of five years of projected future infringing sales cannot be justified by calling his opinions a "lump sum" analysis. While "[p]arties agreeing to a lump-sum royalty agreement may, during the license negotiation, consider the expected or estimated … production … of a given invention," that may be done only "assuming proof is presented to support the expectation." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009). Here, there is none. Mr. Pellegrino's opinion that Cisco will continue to infringe after trial lacks any support. Ex. 7 at 57:6–10 ("Q: Your damages analysis continues to assume that Cisco will make additional accused sales of the products after trial through 2029, right? A: Correct."). He did not look at any Cisco projections from the time of the hypothetical negotiation or otherwise. *Id.* at 49:5–50:14. His report does nothing to rule out the possibility that Cisco will stop infringing if it loses at trial. He does not address the possibility that technological changes and market shifts might mean that Cisco's past performance is not indicative of any of the future results he predicts. He just assumes that, whatever happens at trial, Cisco will keep infringing unabated. This assumption is unfounded, and his analysis is inadmissible.

14

What's more, although true lump sum royalties can, of course, cover the entire life of the patent, calling Mr. Pellegrino's analysis a lump sum does not make it one. His calculations turn on, and change with, Cisco's ongoing, real-world sales; an award based on actual sales is by definition a running royalty. *Ericsson*, 2018 WL 3089701 at *7; *Linear Tech. Corp. v. Micrel, Inc.*, No. C-94-1633 MHP, 2006 WL 2130736, at *2 (N.D. Cal. July 27, 2006) (noting that "a lump sum royalty award is not based upon actual revenues earned or the actual period of infringement").

Mr. Pellegrino's opinion is fundamentally the same as the expert's opinion in *Ericsson* – which Judge Payne found improper. There, in a suit over mobile-phone operating system technology, the plaintiff's expert (Robert Mills) calculated damages by assessing the amount of "at-risk profit per phone" sold during the infringement period and dividing into a per-phone royalty. 2018 WL 3089701, at *2. Mills then multiplied that royalty by the number of devices sold from the start of the damages period until trial (his "pre-trial" damages) and by projected device sales from trial through patent expiration (his "post-trial" damages). *Id.* Then, Mills discounted that amount to present value at the payment date and called his royalty estimate a lump sum. *Id.* at *2–3. The Court held that this supposed lump sum analysis was improper because "[t]here was no evidence to justify why [the defendant] would have agreed to pay a royalty based on a per device calculation in full" up front "when it appears [the defendant] would have paid the same royalty on a running-basis after accounting for actual sales." *Id.* at *7.

So too here: Mr. Pellegrino relies entirely on actual sales and future sales projected from those actual sales. He couches those royalty-bearing sales as a lump sum only by discounting to present value, just as the excluded expert in *Ericsson* did. For all the same reasons, Mr. Pellegrino's opinion fails and should be excluded.

### 2. He improperly manipulates the payment date, placing it years after the hypothetical negotiation.

This Court has excluded Mr. Pellegrino for botching a hypothetical negotiation analysis before. *See Daedalus Blue LLC v. SZ DJI Tech. Co., Ltd.*, No. W-20-CV-00073-ADA, 2022 WL 831619, at *7–8 (W.D. Tex. Feb. 24, 2022). Here, he pays lip service to an appropriate hypothetical negotiation date (July 27, 2016)[7], but places the payment date four (or, in his alternative analysis, five)[8] years later, asserting that "[p]ayment would not be due until Cisco had an actual payment requirement . . . which would be the date of the opening complaint in this matter" – November 6, 2020. Ex. 1 at 31–32, 108. In testimony, Mr. Pellegrino defended this four-year negotiation– payment gap as "a milestone payment." Ex. 9 at 264:24–265:5. This maneuver adds millions to K.Mizra's supposed damages, but there is no basis to divorce the payment from the hypothetical negotiation.

It is clear why Mr. Pellegrino adopted the "milestone" approach: by separating the payment date from the hypothetical negotiation, Mr. Pellegrino artificially inflates K.Mizra's damages. Mr. Pellegrino calculates his various "lump sum" scenarios by adding up K.Mizra's claimed royalties over the entire respective damages periods, then discounting them to present value at the different payment dates. Ex. 1 at 118–26. So, for example, by discounting back to 2020, rather than to the hypothetical negotiation in 2016, he inflates K.Mizra's damages by $10.4 million. Ex. 22 at 10.

There is no support for any delayed payment approach. To construct a hypothetical negotiation, an expert must consider what the parties to the negotiation actually would have done.

---

[7] This is the date he selected because of the "trusted platform module" limitation. Microsoft began requiring a TPM in computers running Windows 10 and 11 operating systems as of July 28, 2016. Ex. 1 at 31. K.Mizra relies on this Microsoft mandate to prove infringement. *Id.* at 32.

[8] Pellegrino's alternative November 2021 date accounts for an argument Cisco makes about the effect of the license agreement between K.Mizra and Microsoft. Ex. 1 at 22.

Mr. Pellegrino admitted that he has no basis to say that Cisco or the licensor (K.Mizra's predecessor Radix Holdings and its principal Aaron Emigh) would have wanted a delayed payment:

> Q:    What evidence have you seen that Mr. Emigh or Radix negotiate for milestone payments?
>
> A:    I don't have any.

Ex. 8 at 45:15–23. Nor does he have any evidence that Cisco would have agreed to a delayed and thus significantly increased payment. *Id.* The Court should not permit Mr. Pellegrino to testify about a payment structure that he has no factual or legal basis to believe either party would adopt.

This opinion also makes no sense. Mr. Pellegrino opines that, in 2016, Cisco and K.Mizra's predecessor (the parties to the hypothetical negotiation) would have keyed their payment date on the future filing of this lawsuit. Ex. 8 at 39:19–40:2 (in his hypothetical world, "there's no vector for the requirement of the patent until the complaint was filed"). But in a hypothetical world, where Cisco licensed the patent in 2016, this suit would never happen. His delayed payment assumption is inconsistent with the requirement of a willing licensee and successful negotiation, *Lucent*, 580 F.3d at 1324, and inadmissible. Ex. 8 at 39:11–46:9 (testifying that Cisco "would not sit down voluntarily" and "I'm just saying empirically it doesn't get there without a lawsuit.").

### C.    Mr. Pellegrino's software damages opinions are too unreliable to reach a jury.

Additional errors render his software damages opinions too unreliable to reach a jury. Cisco's motion focuses on two of the most egregious defects.

#### 1.    As before, his 36% apportionment factor for a feature that only        of customers report using is indefensible.

Mr. Pellegrino's software damages calculations rest on the assertion that the posture check feature, which is one feature in the posture module, which in turn is one of ten-plus other modules that make up the Premier-level ISE software, Ex. 10 ¶ 99, represents 36% of the market value of the entire accused ISE software product. K.Mizra does not accuse any of ISE's hundreds of other

features of infringement. This apportionment is untenable on its face and requires some factual

support and analysis to satisfy *Daubert*. Mr. Pellegrino provides none. Neither does Dr. Cole,

whose opinions about the relative technical importance of different features constitute Mr.

Pellegrino's entire apportionment "analysis." Ex. 1 at 115; *see also* Ex. 10 ¶¶ 98–109.[9] He simply

ignores the telemetry data reflecting that only approximately          of Cisco ISE customers use any

posture check capability. Ex. 11 ¶ 140. This is plainly inconsistent with the notion that the posture

feature represents more than a third of the value of the entire ISE product.

      Courts routinely strike damages experts who fail to apportion. *See, e.g.*, *MLC Intellectual

Property, LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021) (affirming district court's

exclusion of reasonable royalty damages opinion for failure to apportion the royalty base or rate

to account for the patented technology); *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-

CV-00201-JRG, 2017 WL 1322555, at *4–5 (E.D. Tex. Apr. 6, 2017) (excluding expert opinion

because there was "no evidence" that the patentee's expert "separate[d] the value of the patented

features from the unpatented features of" the agreed-upon SSPPU). And that should be the result

here. Mr. Pellegrino did not adequately tie the royalty base to the patented feature and did not

attempt to show that posture check "creates the basis for customer demand or substantially creates

the value of the component parts," and does not rely on an expert who did. *Versata Software, Inc.

v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013).

      Nothing supports the overstated apportionment percentages Mr. Pellegrino applied. To the

contrary, he and Dr. Cole replicated the very same errors the Federal Circuit has warned against.

---

[9] There is no admissible support for Mr. Pellegrino's apportionment. His sole source, the data-free, conclusory assertions of a technical expert, obviously do not qualify. *See, e.g.*, *Realtime Data, LLC v. Oracle Am., Inc.*, No. 6:16-CV-00088 RWS-JDL, 2017 WL 11574028, at *5 (E.D. Tex. Mar. 30, 2017) (technical expert's opinions "may be an input into the damages expert's opinion about the proper apportionment value, but may not be the final apportionment value itself").

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012). To wit: neither conducted any market studies, consumer surveys, or economic analysis to ascertain whether the posture check feature drives demand for ISE or AnyConnect. *Id.*; *see also* Ex. 23 at 164:16–165:15; Ex. 9 at 111:13–114:7. All told, his apportionment amounts to exactly the sort of "vague qualitative notion[] of . . . relative importance" that the Federal Circuit held inadmissible as "plucked out of thin air." *LaserDynamics*, 694 F.3d at 69.

### 2. He has the wrong base.

Mr. Pellegrino's software damages opinions are also inadmissible because he has not offered any opinion limited to the correct base of Cisco sales—not as K.Mizra has identified it. His damages opinions thus exceed the reasonable royalty "for the use made of the invention by the infringer" allowed by 35 U.S.C. § 284. The mismatch between his opinions and K.Mizra's case renders them not merely irrelevant, but also unduly prejudicial under Rule 403.

After the Court ordered the parties to re-do damages discovery, Cisco asked, and K.Mizra confirmed, that for the system claims—the only claims addressed in Mr. Pellegrino's report—customers would have "to have purchased all three things—ISE Premier software, Cisco SNS hardware, AnyConnect Premier software." Ex. 14 at 1. Accordingly, Mr. Pellegrino's damages base must include *only* customers that purchased this combination and nothing more.

Both of Mr. Pellegrino's damages scenarios fail because, in both, he omits the hardware limitation.[10] Ex. 1 at 2. Mr. Pellegrino repeatedly confirmed, in his testimony, that his damages analyses do not address the hardware requirement. Ex. 8 at 155:25–156:10 ("[T]he SNS hardware

---

[10] In other words: although he has remained steadfast about including hardware sales when they would increase the damages award (i.e., as convoyed sales), he fails to limit the royalty base to only those customers who purchased the combination K.Mizra identified in its infringement contentions, technical expert report, and correspondence. *See* Ex. 13 at 127 (Claim 12[a]), 132 (Claim 12[h]), 136 (Claim 16); Ex. 24 at 104 (Claim 12[a]), 108 (Claim 12[h]), 110 (Claim 16).

doesn't really matter. That – that's an unnecessarily limiting filter."); Ex. 7 at 78:17–84:16 (Q: I am asking: In your current report, Exhibit 1, do you present any damages opinion that is intended to be the damages for people who purchased ISE software preloaded on Cisco SNS hardware? A: No.), 86:22–87:5 (agreeing that he would "need to do a different report" to present a number "on what the damages would be if the ISE Premier[] software has to be preinstalled on the ISE hardware"). Mr. Pellegrino's analyses therefore do not match K.Mizra's theory of the case, and are inadmissible. *Exafer Ltd. v. Microsoft Corp.*, No. 1:20-cv-131-RP, 2024 WL 1087374, at *2–3 (W.D. Tex. Mar. 7, 2024) (excluding expert opinion that used "unaccused technology to form the royalty base").

Mr. Pellegrino's top table also fails because that set of scenarios addresses only Cisco customers who purchased ISE software, regardless of whether they also purchased Cisco AnyConnect (or hardware). Ex. 1 at 2 (top table); Ex. 7 at 85:15–21 ("The ISE software in the top table considers no overlap" with AnyConnect). But that base is grossly over-stated because it includes customers who cannot have made any use of the patented posture check feature. Plus, K.Mizra's theory of the case requires AnyConnect—whether AnyConnect is accused (as K.Mizra originally contended) or just an "environment" for infringement (as it appears to now claim), K.Mizra cannot dispute that an infringing user must have AnyConnect. ECF No. 212 at 1–7. Pellegrino's opinion is thus at odds with K.Mizra's theory of the case, and is inadmissible. *Exafer*, 2024 WL 1087374, at *2–3.

## V.   CONCLUSION

None of these issues is a surprise to K.Mizra. Cisco has bent over backwards to afford K.Mizra and its expert a chance to present an admissible damages opinion. They have not done so. The Court's exclusion of Mr. Pellegrino's opinions and testimony is warranted.

Dated: August 9, 2024                    By: */s/ Melissa R. Smith*
                                                 Elizabeth R. Brannen
        Kenneth J. Halpern
        Peter J. Brody
        Sarah Rahimi
        STRIS & MAHER LLP
        777 S. Figueroa St, Ste 3850
        Los Angeles, CA 90017
        (213) 995-6800

        Melissa Smith (State Bar No. 24001351)
        melissa@gillamsmithlaw.com
        GILLAM & SMITH LLP
        303 South Washington Avenue
        Marshall, TX 75670
        Telephone: 903.934.8450
        Facsimile: 903.934.9257

        *Attorneys for Defendant*
        *Cisco Systems, Inc.*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that counsel for Defendant met and conferred with counsel for Plaintiff on August 8, 2024. Counsel for Plaintiff opposes the motion.

                          */s/ Melissa R. Smith*

## CERTIFICATE OF SERVICE

I certify that on August 9, 2024, the documents filed with the Clerk of Court via the Court's CM/ECF system under seal in the above-captioned case were subsequently served on all counsel of record by electronic mail.

                          */s/ Melissa R. Smith*